# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JIMMY DALE MILLER, an individual,    ) | |
|                                   ) | |

JIMMY DALE MILLER, an individual,                )
                                                 )
                    Plaintiff,                   )
                                                 )
          v.                                     )
                                                 )
COOK COUNTY, ILLINOIS, an Illinois               )   No.: 1:08-CV-00711
municipal corporation; SHERIFF'S                 )
CORRECTIONAL OFFICER JOHNNY                      )   Honorable Judge Robert W. Gettleman
JONES, in his individual and official            )
capacities; SHERIFF'S CORRECTIONAL              )
OFFICER ELTON JOHNSON, in his                    )
individual and official capacities; SHERIFF'S    )
CORRECTIONAL OFFICER                             )
CODDINGTON, in his individual and official       )
capacities; UNKNOWN PHYSICIAN in his             )
individual and official capacities; and DR.      )
STEIN, in her individual and official            )
capacities,                                      )
                                                 )
                    Defendants.                  )

### SECOND AMENDED COMPLAINT

Plaintiff, Jimmy Dale Miller ("Mr. Miller"), by and through his court-appointed

attorneys, files this Second Amended Complaint against Defendants, Sheriff Tom Dart ("Sheriff

Dart"), Sheriff's Correctional Officer Johnny Jones ("Jones"), Sheriff's Correctional Officer

Elton Johnson ("Johnson"), Sheriff's Correctional Officer John Coddington ("Coddington"),

Cook County, Illinois, and its division, Cook County Bureau of Health Services ("Cook

County"), Cermak Health Services of Cook County ("Cermak Health Services"), Dr. Andrew

DeFuniak ("Dr. DeFuniak"), and Dr. Leslie Stein ("Dr. Stein"), and alleges as follows.

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983 against Defendants acting under color of law, and seeks to recover monetary damages and injunctive relief for the deprivation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.   Accordingly, jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).  Plaintiff's claim for injunctive relief also is authorized by Rule 65 of the Federal Rules of Civil Procedure.

2.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the actions giving rise to the claims contained herein occurred within this judicial district.

## PARTIES

3.     Plaintiff Jimmy Dale Miller is a pretrial detainee at the Cook County Jail located in Chicago, Illinois.  He has been detained at this jail since July 3, 2007.

4.     Sheriff Dart operates the Cook County Department of Corrections ("CCDOC") as a division of the Cook County Sheriff's Office.  Sheriff Dart is being sued only in his official capacity.

5.     Johnny Jones, badge number 3702, is a correctional officer at the Cook County Jail and is an employee of Sheriff Dart and the CCDOC.  Jones is being sued in both his individual and official capacities.

6.     Elton Johnson, badge number 4361, is a correctional officer at the Cook County Jail and is an employee of Sheriff Dart and the CCDOC.  Johnson is being sued in both his individual and official capacities.

7.    John Coddington is a correctional officer at the CCDOC and is an employee of Sheriff Dart and the CCDOC.  Coddington is being sued in both his individual and official capacities.

8.    At all times relevant to this action, Jones, Johnson, and Coddington were duly appointed officers of the CCDOC and acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the State of Illinois, the Cook County Sheriff's office and the CCDOC.

9.    Cook County, Illinois is a municipal corporation.  The Cook County Bureau of Health Services is one of its divisions.  These entities are collectively referred to as "Cook County."

10.    On information and belief, Cermak Health Services is part of the Cook County Bureau of Health.  The doctors and other staff at Cermak Health Services of Cook County are Cook County employees.

11.    Dr. Andrew DeFuniak is a physician that provides health care services to inmates at CCDOC through Cermak Health Services.  Dr. DeFuniak is being sued in both his official and individual capacities.

12.    Dr. Leslie Stein is a physician that provides mental health services to detainees at the CCDOC through Cermak Health Services.  Dr. Stein is being sued in both her official and individual capacities.

13.    At all times relevant to this action, Dr. DeFuniak and Dr. Stein were health care personnel providing services to detainees of the CCDOC, and acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the State of Illinois, the Cook County Bureau of Health and Cermak Health Services.

- 3 -

## COUNT I
### (Against Officers Jones, Johnson and Coddington in their individual capacities)

14.    Plaintiff realleges and incorporates paragraphs 1-8 above as stated fully herein.

15.    On October 18, 2007, Mr. Miller attempted suicide by consuming over fifty pills while in his cell at CCDOC.

16.    Mr. Miller was taken to Cermak Health Services for treatment.

17.    Officers Jones, Johnson and Coddington were on duty, in uniform, and acting within the scope of their authority as correctional officers on October 18, 2007.

18.    Both Officers Jones and Johnson were with Mr. Miller at Cermak Health Services on October 18, 2007, and did there and then intentionally, maliciously, and sadistically beat Mr. Miller by committing acts including, but not limited to, the following:

      (a)    choking Mr. Miller;

      (b)    punching Mr. Miller about the face and body;

      (c)    hog-tying Mr. Miller and dragging him across the floor on his stomach; and

      (d)    hitting and kicking Mr. Miller until he bled.

19.    Officer Coddington watched portions of the October 18, 2007 beating and did nothing to stop the beating in violation of his duty to protect Mr. Miller from Officers Jones and Johnson's use of excessive force.

20.    As a result of the October 18, 2007 beatings, Mr. Miller suffered physical injury and severe pain that continues as of the date of this Complaint, including, but not limited to, bleeding from the mouth and severe neck pain that radiated down his left arm and numbness of his left thumb, index finger, and forearm.

21.     Officers Jones, Johnson and Coddington's actions violated Mr. Miller's rights as defined under the Fourteenth Amendment of the U.S. Constitution to refrain from using excessive force constituting cruel and unusual punishment.

WHEREFORE, Plaintiff prays for an order granting the following relief against Officers Jones, Johnson and Coddington, in their individual capacities:

(a)     compensatory damages in an amount to be determined at trial;

(b)     punitive damages in an amount to be determined at trial; and

(c)     costs, attorneys' fees, and any other relief this Court deems appropriate.

### COUNT II
### (Against Dr. Stein in her individual capacity)

22.     Plaintiff realleges and incorporates paragraphs 1-3, 9-11 and 12-13 above as stated fully herein.

23.     On or about July 3, 2007, Mr. Miller first arrived at CCDOC and informed Dr. Stein that he had been prescribed and had been taking psychiatric medications for years, and that he had been hospitalized following a previous suicide attempt.  Mr. Miller requested that psychiatric medications be provided to him during his time at CCDOC.

24.     Upon information and belief, at all relevant times, Dr. Stein was on duty as a mental health professional, and was acting within the scope of her authority to provide mental health services on behalf of Cook County.

25.     Dr. Stein refused to provide Mr. Miller with the requested psychiatric medications despite having performed no independent medical or psychiatric evaluation of Mr. Miller and despite her having actual knowledge that Mr. Miller had been prescribed psychiatric medications in the past and despite Mr. Miller's obvious and objectively serious need for psychiatric medications.

26.    Dr. Stein's refusal to provide Mr. Miller with the previously prescribed medications or even to evaluate Mr. Miller's mental health was done with deliberate indifference.

27.    Mr. Miller repeated his requests to Dr. Stein for psychiatric medications throughout the fall of 2007, but each request was denied.

28.    On October 18, 2007, Mr. Miller was feeling depressed and attempted suicide by taking an overdose of pills that were in his cell. This overdose was caused, in part, by Dr. Stein's refusal to provide mental health treatment and/or psychiatric medication to Mr. Miller.

29.    Mr. Miller was taken to Cermak Health Services where he underwent a mental health evaluation and was subsequently placed on psychiatric medications.

30.    Dr. Stein acted with deliberate indifference in refusing to provide psychiatric medications to Mr. Miller for a period of over four months until after Mr. Miller attempted suicide, thereby violating his Fourteenth Amendment rights under the U.S. Constitution.

WHEREFORE, Plaintiff prays for an order granting the following relief:

(a)    compensatory damages against Dr. Stein in an amount to be determined at trial;

(b)    punitive damages against Dr. Stein in an amount to be determined at trial; and

(c)    costs, attorneys' fees, and any other relief this Court deems appropriate.

## COUNT III
### (Against Dr. DeFuniak in his individual capacity)

31.    Plaintiff realleges and incorporates paragraphs 1-3, 9-11, 13 and 27 above as stated fully herein.

32.    On October 18, 2007, while at Cermak Health Services awaiting treatment for his drug overdose, Mr. Miller was beaten by Officers Jones and Johnson.

33.    After the beating, the examining physician, Dr. DeFuniak, performed only a cursory evaluation of Mr. Miller's condition, and did nothing to treat Mr. Miller's recent drug overdose or the injuries from his recent beating.  On information and belief, Dr. DeFuniak refused to treat Mr. Miller despite having actual knowledge that Mr. Miler had ingested an overdose of prescription drugs and that Mr. Miller had just been beaten by CCDOC officers.  As a result of the beating, Mr. Miller was bleeding from the mouth and showed obvious and objectively serious signs of trauma that Dr. DeFuniak ignored with deliberate indifference.

34.    Upon information and belief, Dr. DeFuniak was on duty as a medical professional, and was acting within the scope of his authority to provide medical services on behalf of Cook County.

35.    Dr. DeFuniak's refusal to treat, or even physically examine, Mr. Miller was done with deliberate indifference, thereby violating Mr. Miller's Fourteenth Amendment rights under the U.S. Constitution.

WHEREFORE, Plaintiff prays for an order granting the following relief:

(a)    compensatory damages against Dr. DeFuniak in an amount to be determined at trial;

(b)    punitive damages against Dr. DeFuniak in an amount to be determined at trial; and

(d)    costs, attorneys' fees, and any other relief this Court deems appropriate.

## COUNT IV
### (Against Cook County And Sheriff Dart For Injunctive Relief Only)

36.    Plaintiff realleges and incorporates paragraphs 1-13 and 15-20 above as if stated fully herein.

37.    As a result of, and shortly after, the October 18, 2007 beating, Mr. Miller began experiencing severe neck pain that radiated down his left arm and numbness of his left thumb, index finger, and forearm that continues as of the date of this Complaint.

38.    Mr. Miller complained to numerous CCDOC and Cermak Health Services staff persons, both orally and in writing, about his pain and discomfort resulting from the October 18, 2007 beating by Officers Jones and Johnson, but has not received any effective treatment for this condition.

39.    Mr. Miller was informed by medical personnel at Cermak Health Services that his injuries could be nerve injuries and that he should be evaluated for treatment by a neurologist.

40.    Mr. Miller has made numerous requests for such an evaluation by a neurologist, yet has been informed that it is the custom, practice and/or usage of Cook County to deny such requests because there is no neurologist on site.

41.    Mr. Miller's injuries are substantial and objectively serious.  Any further delay in seeking a neurological evaluation could cause him severe or irreparable harm.

42.    Mr. Miller's remedies at law are inadequate as they will not provide him with the neurological evaluation that he needs.

43.    Cook County's refusal to provide Mr. Miller with a neurological examination, for painful and continuing injuries caused by his brutal beating at the hands of Officers Jones and Johnson, rises to the level of a constitutional violation under the Fourteenth Amendment.

WHEREFORE, Plaintiff prays for an order granting an injunction compelling Cook County and Sheriff Dart to have Mr. Miller examined and evaluated by a neurologist at their expense, and to award costs, attorneys' fees, and/or any other relief the Court deems necessary.

**COUNT V**
**(Against Cook County, Cermak Health Services, Sheriff Dart, Jones, Johnson, Coddington, Dr. Stein and Dr. DeFuniak in their official capacities)**

44.     Plaintiff realleges and incorporates all paragraphs above as if stated fully herein.

45.     On or about July 11, 2008 the United States Department of Justice concluded an exhaustive investigation of the CCDOC and Cermak Health Services, and issued a written report finding, *inter alia*, that:

a.     Inmates at the Cook County Jail are regularly subjected to inappropriate and excessive use of physical force by prison guards (as one top security administrator frankly put it, there was a "culture of abusing inmates");

b.     Cook County and Sheriff Dart fail to provide adequate oversight of officers' systematic use of excessive force against inmates;

c.     Cook County and Sheriff Dart fail to provide adequate medical care to inmates with serious medical needs;

d.     The policy governing mental health screening at the Cook County Jail is inadequate; inmates are not properly screened at intake for serious medical conditions, including mental illness and risk of suicide;

e.     Cook County's own Director of Psychiatric Services acknowledged that the mental health screening process at the Cook County Jail was flawed and that the medical records operation was grossly inadequate;

f.     Inmates who go untreated due to this deficient mental health screening process may suffer from a worsening of symptoms, including suicidal thoughts;

g.     Inmates routinely do not receive medications as prescribed or have lapses in medication administration; and

- 9 -

h.      Sheriff Dart's written policy on suicide prevention fails to ensure
        appropriate management of suicidal inmates and lacks major components
        of an adequate suicide prevention program.

46.     A true and correct copy of the Department of Justice's Report on the Cook
County Jail is attached hereto as Exhibit A and incorporated herein by reference.

47.     These Department of Justice's findings are consistent with Mr. Miller's
allegations.  He too was subjected to excessive force by prison guards, inadequately screened at
intake for mental illnesses, denied necessary psychiatric medications leading to his suicide
attempt, and subsequently denied adequate medical care for his suicide attempt and injuries.

48.     Based on the findings of the Department of Justice, each of the named Defendants
were executing Cook County's and/or Sheriff Dart's pattern, practice, custom and/or policies
concerning excessive force and denial of adequate medical care when they committed the actions
and inactions against Mr. Miller alleged herein.

49.     As a result of their pattern, practice, custom and/or policies that allow for use of
excessive force against inmates and allow for the denial of treatment for inmates' serious
medical conditions, Cook County and Sheriff Dart are liable to Plaintiff for his injuries.

WHEREFORE, Plaintiff prays for an order granting the following relief:

(a)     compensatory damages against all Defendants, in their official capacities, in an
        amount to be determined at trial;

(b)     costs and attorneys' fees, and

(c)     any other relief this Court deems appropriate.

## REQUEST FOR JURY TRIAL

Mr. Miller requests a jury trial pursuant to Federal Rule of Civil Procedure 38(a) on all
claims for which a jury trial is available.

- 10 -

Dated:  August 22, 2008                    Respectfully submitted,


                                           By:___/s Henry Pietrkowski_____
                                              Henry Pietrkowski (IL #6230048)
                                              Kendric M. Cobb (IL #6282673)
                                              REED SMITH LLP
                                              10 South Wacker Drive
                                              Chicago, IL  60606-7507
                                              Telephone:   +1 312 207 1000
                                              Facsimile:   +1 312 207 6400

                                              *Counsel for Plaintiff* Jimmy Dale Miller

# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JUL 1 1 2008

Todd H. Stroger
Cook County Board President
118 N. Clark Street
Room 537
Chicago, IL  60602

Thomas Dart
Cook County Sheriff
Richard J. Daley Center
50 W. Washington Street
Room 704
Chicago, IL  60602

                    Re:   Cook County Jail
                          Chicago, Illinois

Dear President Stroger and Sheriff Dart:

    We write to report the findings of the investigation of
Civil Rights Division and the United States Attorney's Office
into conditions at the Cook County Jail ("CCJ").  On February 16,
2007, we notified the Cook County Board of Commissioners
("County") of our intent to conduct an investigation of CCJ
pursuant to the Civil Rights of Institutionalized Persons Act
("CRIPA"), 42 U.S.C. § 1997.  As we noted, CRIPA gives the
Department of Justice authority to seek a remedy for a pattern or
practice of conduct that violates the constitutional rights of
inmates in adult detention and correctional facilities.

    On June 18-22, 2007, and July 23-27, 2007, we conducted
on-site inspections at CCJ with expert consultants in
corrections, use of force, custodial medical and mental health
care, fire safety, and sanitation.[1]  We interviewed

---

    [1]    Our fire safety and sanitation experts accompanied us
only on the July on-site visit.

- 2 -

administrative staff, security staff, medical and mental health
staff, facilities management staff, training staff, and inmates.
Before, during, and after our visits, we reviewed an extensive
number of documents, including policies and procedures, incident
reports, use of force reports, investigative reports, inmate
grievances, disciplinary reports, unit logs, orientation
materials, medical records, and staff training materials.  In
keeping with our pledge of transparency and to provide technical
assistance where appropriate, we conveyed our preliminary
findings to CCJ officials and legal counsel for the County and
Sheriff's Office at the close of our July 2007 site visit.

During our July 27, 2007 exit meeting, and by letter dated
August 3, 2007, we notified CCJ officials of life-threatening
deficiencies in sanitation and safety measures at CCJ.  In
particular, we indicated that inadequate emergency key
precautions and grossly unsanitary conditions in certain tiers
resulted in a serious and immediate risk of harm to inmates.  On
August 6, 2007, counsel for the Sheriff's Office promptly
responded by indicating that a number of corrective measures were
being implemented to address our concerns.[2]

We commend the staff at CCJ for their helpful and
professional conduct throughout the course of the investigation.
We received complete cooperation with our investigation, which is
particularly appreciated given that CCJ is the country's largest
single-site jail.  CCJ provided us with unfettered access to
records and personnel, and responded to our requests, both before
and during our on-site visits, in a transparent and forthcoming
manner.  We also appreciate the County's and the Sheriff's
Office's receptiveness to our consultants' on-site
recommendations.  Accordingly, we have every reason to believe
that the County and the Sheriff's Office are committed to
remedying all known deficiencies at CCJ.

Consistent with the statutory requirements of CRIPA, we now
write to advise you of the findings of our investigation, the
facts supporting them, and the minimum remedial steps that are
necessary to address the deficiencies we have identified.

---

[2]      Counsel for the Sheriff's Office provided additional
information regarding corrective measures in a letter and
attachments on October 5, 2007.  We commend the Sheriff's Office
on these reported advances and view them as progress toward
improved conditions at CCJ.  We look forward to the opportunity
to verify the improvements.

- 3 -

42 § U.S.C. 1997b.  As described more fully below, we conclude that certain conditions at CCJ violate the constitutional rights of inmates.  In particular, we find that inmates confined at CCJ are not adequately protected from harm, including physical harm from excessive use of force by staff and inmate-on-inmate violence due to inadequate supervision.  In addition, we find that inmates do not receive adequate medical and mental health care, including proper suicide prevention.  CCJ inmates also face serious risks posed by inadequate fire safety precautions. Finally, we find that environmental and sanitation deficiencies at CCJ result in unconstitutional living conditions for inmates.

As discussed in this letter, these conditions have resulted in serious harm to CCJ inmates.  Three inmates committed suicide at CCJ in the first four months of 2008.  During our investigation, we identified multiple preventable inmate deaths and a preventable amputation, due to inadequate medical care.  In 2006, separate incidents of unchecked inmate violence resulted in two inmate deaths.  In a one-week period during March 2007, CCJ documented 35 inmate fights, required 27 uses of force, and found 46 weapons within the facility.  The myriad of serious incidents summarized here, and others discussed herein, indicates that CCJ is not adequately providing for the safety and well-being of the inmates.

## I.  BACKGROUND

Located on approximately 96 acres in Chicago, Illinois, CCJ is the largest single-site county jail in the United States.[3] CCJ has a daily population of approximately 9,800 adult male and female inmates, most of whom are awaiting trial in the criminal court system.  In 2006, CCJ admitted 99,663 inmates.  CCJ is staffed by approximately 3,800 sworn law enforcement officers and civilian employees.

CCJ is separated into 11 semi-autonomous divisions,[4] each with its own superintendent and standard operating procedures. The majority of the male inmates are housed in three maximum-security divisions (Divisions I, IX, and X), three medium-security male divisions (Divisions V, VI, and XI), and one

---

[3]     http://www.cookcountysheriff.org/doc/html/facility.html

[4]     The divisions are designated by number, one through eleven.  There is no Division VII.  The Receiving Classification Diagnostic Center essentially functions as a separate division, with its own superintendent.

- 4 -

medium and minimum-security dormitory division (Division II). Female inmates of mixed security classifications are housed on Division III, which also contains male and female medical and mental health tiers, and Division IV.  Division VIII contains Cermak Health Services and the Residential Treatment Unit.  The Receiving, Classification, and Diagnostics Center ("RCDC") is located in the lower level of Division V and handles reception, classification, and discharge for all CCJ inmates.  Division I is the oldest building, dating from 1929, and Division XI is the newest, opened in 1995.  The divisions range in rated capacity[5] from 353 inmates in Division III to 1,536 in Division XI.

All corrections and security functions at CCJ are administered by the Cook County Department of Corrections ("CCDOC") under the Cook County Sheriff.  Health care services at CCJ are provided by Cermak Health Services of Cook County ("Cermak"), which is part of the Cook County Bureau of Health. While the health services staff are County employees who are responsible for the health care of all CCJ inmates, they are not employed by, or responsible to, the Cook County Sheriff or CCDOC. Although health care and security issues require a degree of separation in all correctional facilities, as discussed in more detail below, the complete division between corrections and health care operations at CCJ results in serious administrative problems, including increased frustration, communication breakdowns, and finger-pointing.  Regardless of the administrative division, Cook County and the Cook County Sheriff's Office are responsible for the well-being of CCJ inmates, including providing adequate care for inmates' serious medical and mental health care needs.

In 1982, the County entered into a consent decree in Duran v. Dart, No. 74-C-2949 (N.D. Ill. Apr. 9, 1982) ("Duran Consent Decree") to resolve a class action lawsuit filed by pre-trial detainees, pursuant to 42 U.S.C. § 1983, regarding overcrowding of CCJ.  The Duran Consent Decree, as amended, is still under the jurisdiction of the United States District Court for the Northern District of Illinois.  The decree focuses on overcrowding, but does contain some provisions governing staffing, food service, personal hygiene, the law library, visitation, physical exercise, classification, environmental health, and emergencies.  CCJ's compliance with the Duran Consent Decree is monitored by the John Howard Association.  CCJ is also governed by multiple other

---

[5]    Actual capacity is often much lower than the rated capacity due to cells that are inoperable as a result of maintenance problems.

- 5 -

agreements and orders, such as <u>Harrington v. DeVito</u>, No. 74-C-3290 (N.D. Ill. Oct. 19, 1978) (mental health care) and <u>Jackson v. Sheriff of Cook County</u>, No. 06-CV-493 (N.D. Ill. July 16, 2007) (STD testing). Despite the existence of these court orders, a myriad of unconstitutional practices remain at CCJ. The current court orders applicable to CCJ either do not include specific provisions governing the constitutional concerns raised below regarding protection from harm, inadequate medical and mental health care, fire safety, and sanitation, or have not resulted in lasting or effective corrective measures.

## II.  LEGAL STANDARDS

CRIPA authorizes the Attorney General to seek injunctive relief to enforce the constitutional rights of inmates subject to a pattern or practice of unconstitutional conditions in jails and prisons. 42 U.S.C. § 1997. In defining the scope of jail inmates' Eighth and Fourteenth Amendment rights, the Supreme Court has held that corrections officials must take reasonable steps to guarantee inmates' safety and provide "humane conditions" of confinement. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994); <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979) (holding pre-trial detainees protected by Fourteenth Amendment); <u>Cavalieri v. Shepard</u>, 321 F.3d 616, 620 (7th Cir. 2003). Providing "humane conditions" requires that a corrections system must "take reasonable measures to guarantee the safety of the inmates" and satisfy inmates' basic needs, such as their need for medical care, food, clothing, and shelter. <u>Farmer</u> at 832. The protection of pre-trial detainees' rights under the due process clause of the Fourteenth Amendment is "at least as great as the Eighth Amendment protections available to a convicted prisoner." <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983).

When a jurisdiction takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 851 (1998) (citing <u>DeShaney v. Winnebago County Dept. of Social Servs.</u>, 489 U.S. 189, 199-200 (1989)).

The duties imposed and rights conferred by the Eighth Amendment apply to the unreasonable risk of serious harm, even if such harm has not yet occurred:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to

- 6 -

> cause serious illness and needless suffering the next
> week or month or year . . . . That the Eighth Amendment
> protects against future harm to inmates is not a novel
> proposition.  The Amendment, as we have said, requires
> that inmates be furnished with the basic human needs,
> one of which is reasonable safety.

Helling v. McKinney, 509 U.S. 25, 33 (1993) (internal citations
and quotations omitted); Woodward v. Correctional Medical
Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004)
(citing Farmer, 511 U.S. at 842).

The "Eighth Amendment prohibition against cruel and unusual
punishment has been expanded under the Due Process Clause of the
Fourteenth Amendment to impose upon both federal and state
correctional officers and officials the obligation to take
reasonable steps to protect inmates from violence at the hands of
other inmates."  Goka v. Bobbitt, 862 F.2d 646, 649-50 (7th Cir.
1988); see also Hudson v. Palmer, 468 U.S. 517, 526-27 (1984);
Swofford v. Mandrell, 969 F.2d 547, 549 (7th Cir. 1992); Anderson
v. Gutschenritter, 836 F.2d 346, 349 (7th Cir. 1988); Archie v.
City of Racine, 847 F.2d 1211, 1222-23 (7th Cir. 1988) (en banc).

The Eighth Amendment forbids excessive physical force
against prisoners.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).
This is true even when the use of force does not result in
significant injury.  Id.  A jail or prison official who inflicts
force maliciously and sadistically to cause an inmate harm
violates the Eighth Amendment.  Id.

Inmates also have the right to be free from retaliation for
engaging in constitutionally protected conduct, such as
complaining about conditions of confinement.  Walker v. Thompson,
288 F.3d 1005 (7th Cir. 2002); DeWalt v. Carter, 224 F.3d 607,
618 (7th Cir. 2000) ("An act taken in retaliation for the
exercise of a constitutionally protected right violates the
Constitution").

While low staffing levels do not, by themselves, constitute
due process violations, they provide support for a conclusion
that the inmates are treated "recklessly or with deliberate
indifference" to their safety.  Swofford, 969 F.2d at 549.
Similarly, although overcrowding is not a per se constitutional
violation, overcrowding resulting in bunking multiple inmates in
a single cell without adequate safety, space, sanitation,
bedding, or opportunities for activities outside the cells can
amount to unconstitutional conditions of confinement.  French v.
Owens, 777 F.2d 1250, 1252-53 (7th Cir. 1985) (holding that

- 7 -

overcrowding was unconstitutional where it led to unsafe and unsanitary conditions); Wellman v. Faulkner, 715 F.2d 269 (7th Cir. 1983) (holding that prison was unconstitutionally overcrowded); see also Nami v. Fauver, 82 F.3d 63, 67 (3d Cir. 1996) (holding that double-bunking coupled with extended in-cell periods despite safety hazards could constitute a constitutional violation).

A jailer's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 102 (1976); Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997). "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." Farmer, 511 U.S. at 834. Prison officials may not refuse, unreasonably delay, or intentionally interfere with medical treatment for incarcerated individuals. Hudson v. McHugh, 148 F.3d 859 (7th Cir. 1998) ("[T]his is the prototypical case of deliberate indifference, an inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury."); Zentmyer v. Kendall County, 220 F.3d 805 (7th Cir. 2000). "Deliberate indifference can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' or it can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" Wellman, 715 F.2d at 271 (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981)). Jail officials also may not provide an easier but less efficacious course of treatment nor may they offer only cursory medical care when the need for more serious treatment is obvious. See Estelle, 429 U.S. at 104-05. Failure to provide medication can violate the duty to provide adequate medical care to address serious medical needs. See, e.g., Zentmyer, 200 F.3d at 811.

The County's obligation to provide adequate medical care includes a duty to provide adequate mental health care. Farmer, 511 U.S. at 832; Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001) (noting that a mentally ill inmate's condition was "objectively, sufficiently serious" such that incarcerating him under conditions that posed a substantial risk that he would commit suicide subjected him to cruel and unusual punishment). In addressing the constitutionally minimal standards for mental health care in a jail or prison, the Seventh Circuit notes: "When a claim is based upon the failure to prevent harm, in order to satisfy the first element the plaintiff must show that the inmate was 'incarcerated under conditions posing a substantial

- 8 -

risk of serious harm.'"  Id. (citing Farmer, 511 U.S. at 832);
see also Estate of Novack v. County of Wood, 226 F.3d 525, 529
(7th Cir. 2000); Estate of Cole v. Fromm, 94 F.3d 254, 261 (7th
Cir. 1996).  Where a jail's "actual practice" towards treatment
of mentally ill inmates in general is clearly inadequate, the
facility may be held to be "on notice" at the time of an inmate's
incarceration that there is a substantial risk of deprivation of
necessary care.  Woodward, 368 F.3d at 927 (practice of
inadequate employee training, incomplete intake screening, and
inadequate suicide watch constituted deliberate indifference).

The risk of suicide is an "objectively serious harm" from
which inmates have a right to protection, under the deliberate
indifference standard.  Matos v. O'Sullivan, 335 F.3d 553, 557
(7th Cir. 2003).  Inadequate suicide prevention may constitute
deliberate indifference.  Hall v. Ryan, 957 F.2d 402, 406 (7th
Cir. 1992) (noting that prisoners have a constitutional right "to
be protected from self-destructive tendencies," including
suicide); Woodward, 368 F.3d at 929 (fact that no previous
suicides occurred in jail did not negate possibility of a
practice of deliberate indifference toward suicidal detainees);
Cavalieri, 321 F.3d at 620 (holding that the right to be free
from deliberate indifference to suicide was clearly established).

Inmates are constitutionally entitled to environmental
conditions that do not pose serious risks to health and safety,
including deficient sanitation, inadequate fire safety,
inadequate ventilation, and pest infestation.  Vinning-El v.
Long, 482 F.3d 923, 924-25 (7th Cir. 2007) (holding that
deliberate indifference could be established by inference from
conditions, including floor covered with water, broken toilet,
blood and feces smeared along wall, no mattress to sleep on);
Gillis v. Litscher, 468 F.3d 488, 568 (7th Cir. 2006) ("[A] state
must provide . . . reasonably adequate ventilation, sanitation,
bedding, hygienic materials, and utilities (i.e., hot and cold
water, light, heat, plumbing).");  Board v. Farnham, 394 F.3d 469
(7th Cir. 2005) (requiring adequate ventilation); Isby v. Clark,
100 F.3d 502, 506 (7th Cir. 1996) ("Sanitation, we assume,
includes things like odors and general cleanliness around the
cell.") (emphasis in original); French, 777 F.2d at 1257 (holding
that fire safety is a "legitimate" concern under the Eighth
Amendment); Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir.
1995) (requiring adequate pest control).

In addition, detainees have a right to be free of bodily
restraints, such as shackles or a restraint chair, unless the
facility demonstrates a legitimate penological or medical reason
for the restraint.  Murphy v. Walker, 51 F.3d 714, 718 (7th Cir.

- 9 -

1995).  Where restraints are used, the inmate should be properly
monitored and the length of restraint-time should be limited to
ensure the inmate's safety.  <u>French</u>, 777 F.2d at 1253-54.
Restraints imposed by correctional officers that are medically
unjustifiable and have no adequate security rationale infringe on
an inmate's due process rights.  <u>Wells v. Franzen</u>, 777 F.2d 1258,
1263 (7th Cir. 1985) (restraint of a suicidal inmate).

### III.  FINDINGS

We find that CCJ fails to adequately protect inmates from
harm and serious risk of harm from staff and other inmates; fails
to provide inmates with adequate medical and mental health care;
fails to provide adequate suicide prevention; fails to provide
adequate fire safety precautions; and fails to provide safe and
sanitary environmental conditions.

### A.    INADEQUATE PROTECTION FROM HARM

Corrections officials must take reasonable steps to
guarantee inmates' safety and provide "humane conditions" of
confinement.  <u>Farmer</u>, 511 U.S. at 832.  Providing humane
conditions requires that a corrections system must satisfy
inmates' basic needs, such as their need for safety.
Additionally, jail officials have a duty to take reasonable steps
to protect inmates from physical abuse.

To ensure reasonably safe conditions, officials must take
measures to prevent the use of unnecessary and inappropriate
force by staff.  Officials must also take reasonable steps to
protect inmates from violence at the hands of other inmates.  In
addition, officials must provide adequate systems to investigate
incidents of harm, including staff misconduct and alleged
physical abuse of inmates.  Finally, a jail has an obligation to
protect vulnerable inmates from harm, such as those who are at
risk of suicide or at risk from other inmates.  For the reasons
set forth below, CCJ fails to meet constitutional standards in
all of these regards.

### 1.    Inappropriate and Excessive Use of Force

Although the violence present in a correctional setting
necessarily permits the appropriate use of force, the
Constitution forbids excessive physical force against inmates.  A
determination of whether force is used appropriately requires an
evaluation of the need for the use of force, the relationship
between that need and the amount of force used, the seriousness
of the threat reasonably believed to exist, and efforts made to
temper the severity of a forceful response.  <u>Hudson v. McMillian</u>,

- 10 -

503 U.S. 1, 7 (1992). Generally accepted correctional practices
provide that appropriate uses of force in a given circumstance
should include a continuum of interventions, and that the amount
of force used should not be disproportionate to the threat posed
by the inmate. Absent exigent circumstances, lesser forms of
intervention, such as issuing disciplinary infractions or passive
escorts, should be used or considered prior to more serious and
forceful interventions.

We found that inmates at CCJ are regularly subjected to
inappropriate and excessive uses of physical force. CCJ officers
too often respond to inmates' verbal insults or failure to follow
instructions by physically striking inmates, most often with the
active assistance of other officers, even when the inmate
presents no threat to anyone's safety or the security of the
facility. Moreover, even in cases in which the initial use of
force is reasonable, officers sometimes continue to engage in
physical force after the inmate has been brought under control or
is effectively restrained.

A top security administrator frankly acknowledged to us the
existence of "a culture of abusing inmates" when he came to CCJ
in October 2006. While senior management has taken steps to
reduce the use of force, such as requiring Use of Force Reports
and by subjecting these documents to greater scrutiny, the
excessive and inappropriate use of force has not been brought
under control. We believe that, despite management's efforts, a
culture still exists at CCJ in which the excessive and
inappropriate use of physical force is too often tolerated.

Our investigation included an intensive examination of
documents provided by CCJ concerning the incidents listed below
and a host of others occurring between January 2006 and July
2007. We also conducted a great many staff and inmate
interviews. In some cases, our findings of inappropriate or
excessive uses of force are in accord with CCJ's own conclusions.

        a.    Use of Force in Response to Verbal Altercations

The use of force, while sometimes necessary in a corrections
setting, must be appropriate to the given circumstances and
proportionate to the threat posed. A verbal taunt from an inmate
to an officer is a rule violation and may appropriately result in
disciplinary action, but it should not require a physical
response. As the examples below demonstrate, verbal altercations
with inmates too often provoke physical responses from CCJ
officers:

- 11 -

1. In July 2007, following his hour of exercise, Alberto P.[6] refused to return to his cell and a female officer locked the cell doors while Alberto remained outside. He called the officer a "b----." When Alberto came out with his property to be moved to disciplinary segregation for insulting the officer, he was beaten by a number of officers. One officer later told Alberto that he had tried to stop the beating, but he just "didn't have enough juice" (apparently explaining his inability to control the other officers). CCJ records confirm that Alberto was transferred to segregation and taken to Cermak for his injuries.

2. In June 2007, Dennis L. returned to his cellblock after a psychological evaluation. An officer refused to give Dennis a dinner tray. Dennis got into a verbal altercation with the officer and threw a cup of liquid at him. A number of officers attacked Dennis in his cell. Emergency Room records indicate that Dennis suffered blunt trauma to his head and body, three teeth knocked loose, and a laceration to his lower lip from this incident.

3. In April 2007, Billy D. wanted to exit his cell and was accused of pushing his way out. He had a "heated" verbal altercation with the officer. One officer struck Billy in the face and other officers joined in. Medical records show that Billy required internal and external stitches to close a one-inch laceration that punctured his lip.

4. In September 2006, an officer was handing out extra lunches to inmates. Malcolm W. asked for one, but was refused. Malcolm and the officer exchanged verbal insults. A mental health staff member and another inmate witnessed the officer slap Malcolm's face and drag him from the dorm. CCJ's Internal Affairs Division ("IAD") sustained allegations of abuse, and recommended that the officer be suspended for 29 days. The officer was "dedeputized" and prohibited from carrying a firearm or effecting arrests.

---

[6]    To protect privacy, we have used pseudonyms to identify inmates and officers listed in this letter. Upon request, we will provide the County with a schedule that cross-references the pseudonyms with the proper names, where appropriate.

- 12 -

5.    In March 2006, Danny P., who according to CCJ records
was a slight man of 5'1" and 110 pounds, was on his way
to the law library.  He got into a shouting match with
the female officer escorting him, which resulted in him
being taken back to his housing unit.  Near the secure
staff station, the officer lunged at Danny and began to
slap him.  Two other officers grabbed his arms and
pushed him into a dayroom.  As he was being handcuffed,
several other officers continued to punch and kick him.
He was hit in the mouth after being handcuffed.  CCJ
records show that a sergeant found Danny standing
outside the security office handcuffed and bleeding
about the face.  The female officer was disciplined for
failing to report the incident in a timely manner and
also for failing to obtain medical treatment for Danny.
Danny filed a lawsuit against CCJ regarding this
incident, and the parties agreed to settle the case in
March 2008.

    b.    Use of Force for Failure to Follow Instructions

It is inappropriate and excessive to use force for rule
violations which do not present a threat to safety or security.
At CCJ, inmates' failure to follow orders too often lead to
physical abuse, even where no security risk is present:

1.    In June 2007, there was a fight on Thomas K.'s unit, in
which he did not participate.  A group of officers came
to the unit, strip-searched the inmates, and sent them
back to their cells.  As Thomas started to go up the
stairs to his top tier cell, his hands were on his neck
holding his shirt, instead of on top of his head, as he
had been directed.  An officer grabbed Thomas by the
neck, which choked him, and Thomas reacted by grabbing
the officer's arm.  The officer immediately swung and
hit Thomas in the eye with a walkie-talkie, causing a
wound that required five stitches to close.  Cermak
medical records confirm Thomas's injuries and that he
was hit with an "unknown object."  The officer
continued hitting Thomas after the first blow, although
Thomas offered no resistance.  We observed Thomas's
injuries during our on-site visit.

2.    In February 2007, Matthew S. was ordered to leave the
barber shop for standing up before his turn.  When he
tried to explain why he stood up, an officer grabbed
him by the collar and told him to leave the barber
shop.  Matthew argued with the officer.  Outside the

- 13 -

barber shop, officers shoved his head into the concrete after he had been handcuffed. CCJ records confirmed that Matthew needed stitches to his face and a tetanus shot following this incident, but he refused treatment.

3.  In April 2006, Terrence M. was being processed in his division when an officer noticed that Terrence had an unauthorized shirt. The officer asked for the shirt, but Terrence refused to give it to him. After Terrence was restrained, the officers punched and kicked him. As a result of the beating, Terrence suffered a broken jaw that required surgery at an outside hospital. CCJ found abuse by one officer, and the officer was terminated.

4.  In April 2006, Darnell J. refused to go to recreation when he was told he could not first use the bathroom. Several officers shoved Darnell into the hallway where they beat and kicked him. A sergeant watched and then joined in the beating. Two other inmates in the hallway were also beaten. Darnell was hospitalized for neck injuries. CCJ found abuse by the sergeant and seven officers and also that the sergeant and several officers had filed false reports. IAD recommended termination for the sergeant and three officers.

5.  In March 2006, John S. was being strip-searched prior to going to recreation. He was tapping on the wall. An officer ordered him to stop and hit him on top of the head. John continued to tap. After John was searched, the officer said: "You're f----- guilty" and slammed him on top of a cart and against the wall. John was pulled into the hallway where other officers started to beat him. He was hit in the face, dragged by his hair, choked, and beaten. Photographs of John in the CCJ files show injuries to his face and body. IAD found that the officers used excessive force and recommended that two officers be terminated.

6.  In March 2006, Jacob D. objected to a tier change and insisted on speaking with an officer. Three officers extracted him from his cell. He was handcuffed behind his back and, while they were taking him to the segregation unit, the officers pushed his head into the wall. He was hit in the face, thrown down stairs, kicked, and punched repeatedly. Photographs of Jacob from the following day show that his face was badly bruised and his eye was swollen shut. IAD found that

- 14 -

three officers used excessive force and recommended
that they be suspended for 29 days.

7.    In January 2006, Byron S. was cleaning the dayroom with
      other inmate workers when a group of officers accused
      Byron and another inmate of planting contraband in the
      visiting area, and took both inmates into the hallway.
      Byron was beaten by multiple officers.  After he was
      handcuffed and lying on the floor, Byron received a
      blow that broke his jaw.  Medical records confirm that
      his jaw was fractured.  Byron's jaw was wired shut at
      an outside hospital, which required him to eat with a
      straw.  Three months later, Byron required additional
      surgery and his jaw was wired shut for a second time.
      Byron filed a lawsuit against CCJ regarding this
      incident, and the parties agreed to settle the case in
      September 2007.

8.    In January 2006, Michael A. was resisting going to
      disciplinary segregation because he believed he had
      already served his time for the infraction in question.
      He asked to talk to a sergeant, who said that nothing
      could be done.  When he continued to resist, stating
      that he wanted to talk to a captain, a correctional
      officer said:  "No," and struck him in the face.  Other
      officers were called and joined in beating him.  He was
      sent by ambulance to an outside hospital.  Medical
      records show he suffered a fractured nose and two black
      eyes.

### c.    Use of Force as Punishment or Retribution

We found that inappropriate and excessive use of force also
occurs when officers are angry and upset about inmate violence
against staff.  Physical force is also sometimes inappropriately
used at CCJ even after an active dispute between an inmate and
officer has ended, apparently to punish the inmate.  Retaliatory
force even occurs when officers are dealing with mentally ill
inmates with limited impulse control, although the inmates do not
present a threat to themselves or others.[7]  The use of force is

---

[7]    According to a division superintendent, a number of
officers assigned to the tiers for inmates with mental illness
have not received training on working with the mentally ill.  The
excessive use of force with mentally ill inmates is likely
attributable to lack of, or ineffective, officer training.

- 15 -

never appropriate as retribution for previous bad acts and is inappropriate when an inmate is not a present threat:

1.  In July 2007, Robert T., who suffers from mental illness, exposed himself to a female officer. In response, he was taken to a clothing room where a group of officers handcuffed him and then proceeded to hit and kick him after he was restrained. CCJ records confirm that Robert was sent to an outside hospital with severe head trauma.

2.  In June 2007, Russell G.'s cellmate opened the cell door and Russell got out of his cell. In response, an officer locked all the inmates in their cells. After Russell was back in his cell, officers sent his cellmate downstairs and entered Russell's cell. The officers handcuffed Russell, then stomped on his back and hit him. His eye became swollen and his teeth were chipped. Before taking him to the dispensary, the officers threatened to beat Russell again and charge him with battery unless he told medical staff that he had hurt himself falling off his bunk. Russell was sent from the dispensary to Cermak Hospital for medical treatment.

3.  In August 2006, an inmate stabbed an officer. Because Martin S. had argued with the officer earlier in the day, officers erroneously believed he had committed the stabbing.[8] As a result, officers responded to an "all available" call and began to beat Martin in the mistaken belief that he was the inmate who had assaulted the officer. Besides being punched and stomped, he was also hit with a radio and kicked in the groin.

4.  Inmate Andrew B. was also housed in the unit where the August 2006 attack on the officer occurred. Andrew had nothing to do with the attack. A large number of officers came onto the unit and proceeded to beat the inmates indiscriminately. Andrew was ordered to lie down and, while he promptly obeyed, he was stomped and kicked by the officers.

---

[8]   CCJ records confirm that another inmate was charged with the crime.

- 16 -

5.  In April 2006, Damien H. pushed out of his cell. An
    officer escorted him back to his cell. At the door of
    his cell, Damien turned and hit the officer, for which
    he was charged with aggravated battery. All available
    officers were called and, while restraining Damien,
    several officers punched, kicked, and stomped him. IAD
    found that three officers had used excessive force and
    recommended 29-day suspensions for all of them.

6.  In January 2006, an officer wanted Jerry M. to return
    to his cell, which Jerry resisted, and the officer
    rolled the door over Jerry's foot. Jerry called the
    officer a "b----." The officer then beat Jerry with
    handcuffs wrapped around his hand like brass knuckles.
    A CCJ internal investigation of this incident found
    that excessive force had been used and recommended that
    the officer be terminated. The Sheriff's Merit Board,
    which hears CCJ termination cases, ruled against CCJ
    and reinstated the officer to duty.

### d.   Use of Force at Intake

The pattern of inappropriate and excessive use of force is
distributed throughout the CCJ divisions, and not confined to the
areas where the use of force is most likely to occur in a
correctional setting: the maximum security units and intake
area. However, an especially high number of abuse of force
allegations do emerge from CCJ's RCDC intake unit.

There is unanimity of opinion among those familiar with CCJ,
including administrators and staff, the County, the Sheriff's
Office, and the court monitors, that conditions in RCDC are
unacceptable and must be changed. As discussed in more detail
below, the RCDC is chronically overcrowded, cramped, chaotic, and
insufficiently staffed. The impact of these conditions on the
use of force is considerable. In the RCDC, inmates who request
attention for various needs run the risk of becoming victims of
physical abuse. Inmates are especially vulnerable to abuse when
they are taken in large groups to be strip searched in an
isolated area out of the view of non-security intake staff. Many
inmates report that those who are old, mentally ill, or do not
understand English, are struck by officers for undressing or
dressing too slowly. Finally, inmates may also be targeted for
physical abuse because of the charges for which they were
arrested.

1.  In September 2006, Pedro S. was arrested on a sex
    charge brought by his niece. While in the intake area,

- 17 -

three officers who had read his charge began taunting
him, yelling threats in Spanish, and asking if he knew
what was about to happen to him.  The officers struck
him many times and called him a "f------ Mexican."  The
other inmates were ordered to turn and face the wall
"or else."  Because the officers threatened to kill
Pedro if he said anything about the incident, he did
not seek medical attention.  Pedro was released four
days later and immediately saw a doctor and reported
the incident to the Chicago Police Department.  The
Police Department contacted CCJ.  Medical records
confirm that Pedro's injuries included a broken rib and
damage to his jaw and knee.

2.   In July 2006, Lonnie L., 59-years-old, was leaving the
     medical area of intake and heading to the bullpen.
     When he turned around to get more medication, an
     officer told him not to return to the medical area.
     Lonnie did not obey the order.  The officer came into
     the medical area and hit Lonnie on the mouth.  When
     Lonnie fell to the ground, the officer kicked him and
     again struck him in the mouth, knocking out a tooth.
     The officer dragged Lonnie by the pants out of the
     medical area.  During Lonnie's intake strip search, the
     same officer hit him in the back with a cane.  Three
     inmates testified that they witnessed the incident.
     Medical records indicated injury to Lonnie's ribs and
     lung.  CCJ found abuse and recommended that the officer
     be terminated.

3.   While being processed into CCJ in May 2006, Antonio R.
     was wandering around the intake area asking for his
     methadone.  An officer told him to return to his
     holding pen.  Antonio apparently did not obey quickly
     enough, as the original officer and others proceeded to
     beat him, first in the main open area and then in an
     adjoining tunnel.  They hit Antonio with a radio,
     knocked out his dentures and smashed them under a boot.
     As a result of this incident, Antonio suffered multiple
     fractures and a collapsed lung.  After being returned
     from one outside hospital, he was sent to another in
     acute respiratory distress.  He was transferred to a
     Level 1 trauma center, where he needed to be placed on
     a ventilator.  Medical records confirm Antonio's severe
     injuries.

4.   In February 2006, while being processed into the CCJ
     for driving on a suspended license, James W. would not

- 18 -

(and could not) remove jewelry embedded in a piercing because it was permanently soldered.  The officer conducting the strip search attempted to strike James, who blocked the blow.  The officer then called over other officers, who hit James in the face multiple times.  One officer hit him repeatedly with a handcuff wrapped around his hand.  James later stated that the officers had used his head as a "bongo drum."  Medical records confirm that James was diagnosed with a perforated ear drum and blood in his right ear at Cermak Hospital the next day.  Additional records show that the incident resulted in diminished hearing in one of James's ears.  James filed a lawsuit against CCJ concerning this incident and the parties agreed to settle the case in March 2008.

### e.    Inadequate Oversight of Use of Force

Effective measures to prevent excessive and inappropriate uses of force start with the adequate reporting of information to permit the identification of potential problem cases and effective internal investigations.  We find that CCJ fails to elicit adequate information about use of force incidents, making management review ineffective.  We also find that, in most cases, internal affairs investigations of use of force are undertaken only when a lawsuit is filed, rather than when a serious incident occurs.

### i.    Management Review

In order for CCJ to provide adequate oversight of officers' use of force, management must have adequate information to review incidents and reach a conclusion as to the propriety of a use of force.  While all officers involved in a use of force incident fill out a Use of Force Report, in most cases these reports provide very little information because they are written in generalities.  For example, numerous Use of Force reports fail to describe, in factual terms, the type and amount of force that officers used.  Many Use of Force Reports merely describe the force used with phrases such as, "used the least amount of force necessary to gain control of the inmate" or "faced inmate to the floor."  Although most shift commanders review Use of Force and Incident Reports to ensure that reports are completed, some commanders reported that they do not review the reports for substantive content.  Although copies of Incident Reports are forwarded to CCJ's Executive Director, Assistant Executive Directors, Superintendents, and the official file, it is unclear

- 19 -

if the administration routinely conducts any additional review of these reports.

Moreover, while in most cases there are both Incident Reports and Use of Force Reports, the reports generally do not indicate the nature or extent of an inmate's injuries, arguably the most telling indication that there *may* have been an inappropriate use of force. The reports usually conclude with an inmate being taken for "medical attention," but with no indication of why medical attention was required. The reports also fail to capture the time the inmate received medical attention, which makes it difficult to assess whether medical attention was promptly provided. In the May 2006 case of Jacob D., there is no indication of any injury in the CCJ reports, but when Jacob was transferred the next day to the Illinois Department of Corrections ("IDOC"), his facial bruising and swelling was so severe that the IDOC contacted CCJ immediately to report the physical condition of the incoming prisoner. In the case of John S., there is also no indication of injury in the CCJ reports about a March 2006 incident. The reports simply state that John was taken for medical attention and released from the dispensary, with no mention of any injuries. In fact, as photos taken later show, John suffered two black eyes and a swollen lip, among other injuries. In both of these cases, CCJ eventually found excessive use of force by the officers, but the reports themselves were devoid of helpful information.[9]

Because the information contained in Use of Force and Incident Reports is insufficient for management to determine whether the incident raises suspicions concerning use of force, review by management, when it occurs, usually does not result in identifying cases for investigation. There can be no effective oversight if necessary information is not put forth when the incident happens. For example, a report indicating that an inmate sustained a black eye after an inmate-officer altercation should raise concern, but management will never know about the black eye under the current system.

In addition to the lack of information contained in CCJ reports, we discovered that the Incident Reports did not contain a tracking number or source of issuance until a July 2007 initiative by the Executive Director. This initiative is consistent with generally accepted correctional practice. Previously, it was extremely cumbersome to track any one incident

---

[9]     In both of these cases, investigations were initiated as a result of external complaints.

- 20 -

(for use of force and other serious incidents) and, in all likelihood, impossible to ascertain if all incidents were being reported and processed.  Incident tracking numbers are now to be issued by External Operations staff.  Serious incidents and uses of force should also be tracked by each division with a uniform logging system for recording serious incidents at all levels of CCJ.

Finally, CCJ has no tracking or early warning system to identify those officers who are the most frequent users of physical force and those whose actions have elicited the most complaints of excessive force, grievances, or injuries.  An appropriate early warning system is an accountability tool that allows for early intervention by alerting a facility to a need for retraining, problematic policies, supervision lapses, or possible bad actors.  In 2004, CCJ hired an external consulting firm to review its policies and procedures regarding the use of force after a special grand jury concluded that a 1999 incident, in which correctional officers beat and terrorized 49 inmates at CCJ, constituted "gross, if not criminal, misconduct."  The consulting report recommended that CCJ institute an early warning system "as soon as possible."  The 2004 recommendation was never implemented.

## ii.  Investigations

To ensure reasonably safe conditions for inmates, correctional facilities must develop and maintain adequate systems to investigate staff misconduct, including alleged physical abuse by staff.  Beyond management review, the avenue for oversight at CCJ is the Internal Affairs Division ("IAD"). Generally accepted correctional practices require clear and comprehensive policies and practices governing the investigation of staff use of force and misconduct.  Adequate policies and practices include, at a minimum, screening of all Use of Force and Incident Reports, specific criteria for initiating investigations based upon the report screening, specific criteria for initiating investigations based upon allegations from any source, timelines for the completion of internal investigations, and an organized structure and format for recording and maintaining information in the investigatory file.  The investigation must also be and appear to be unbiased.  CCJ's investigatory practice fails on multiple levels.

To be effective, investigations must be undertaken promptly. A jail, by its nature, has a tremendously high turnover of inmates.  An inmate whose incident is being investigated may well have left CCJ if the investigation does not occur soon after the

- 21 -

incident, and the same is true for inmate witnesses. Because CCJ
does not initiate many use of force investigations, most use of
force investigations are not opened until long after an incident
has taken place. Instead, investigations are undertaken because
the inmate has filed a lawsuit, which can be up to two years
after an incident occurs. For example, the investigation of
Michael A.'s January 2006 beating did not begin until 16 months
after the incident, despite the fact that Michael was treated at
an outside hospital, suffered a fractured nose, and had,
according to the medical records, "raccoon eyes." The
investigation of the incident in which Byron S. suffered a broken
jaw did not start until Byron filed suit seven months later, even
though Byron's visible injuries required him to eat through a
straw with his jaw wired shut. Because of the delay, inmate
witnesses to the occurrence will likely have left CCJ by the time
an investigation begins. IAD's only attempt to reach an inmate
witness who has left CCJ is a form letter to a last known
address, which rarely elicits any response. We found that many
investigations are simply undertaken far too late to be
effective.

Perhaps even more troubling is the fact that investigations
are reactive and suffer from the appearance of bias. The vast
majority of IAD files we reviewed stated that the investigation
of use of force was opened at the request of CCJ's attorney in
response to an inmate lawsuit CCJ is defending in court. It is
almost impossible for IAD to appear fair and unbiased when the
investigation is undertaken only because CCJ is defending an
inmate lawsuit. All uses of force should be appropriately
reviewed through the chain of command. Whenever Incident
Reports, Use of Force Reports or other information raise the
possibility that excessive force was used, such incidents should
be thoroughly investigated by IAD. In particular, incidents
involving suspicious inmate injuries, such as black eyes or blunt
head trauma, and incidents requiring medical care at an outside
hospital should be investigated by IAD. An appropriate
evaluation of incidents for investigation will require more
detailed Use of Force and Incident Reports and a more thorough
management review than CCJ's current practice.

IAD also reported a backlog in resolving use of force cases
and incidents involving inmate-on-inmate assaults because it is
difficult to obtain medical releases from Cermak, CCJ's on-site
health care provider, in a timely manner.[10] Obtaining medical

---

[10]   IAD is under the Sheriff's Office while Cermak is part
of the Cook County Bureau of Health.

- 22 -

records from Cermak can take anywhere from six to 12 months,
which prevents IAD from bringing prompt closure to an
investigation.  This type of delay is totally unacceptable, and
is devastating for any investigation.

We also found that there are attempts by officers or other
staff to conceal the inappropriate or excessive use of force.
CCJ officials found that the officer involved in the January 2006
beating of Jerry M. had attempted to persuade a sergeant on the
tier to change his story as to what had happened.  In another
case, Russell G. reported that the officer who caused his
injuries in June 2007 threatened him with worse treatment unless
he told the medical staff that he had hurt himself by falling out
of his bunk.  We found two accounts of senior division staff
attempting to dissuade inmates from complaining about the use of
force, in one case by the offer of a favor and in the other by
the threat of criminal charges.  CCJ's administration and IAD
must take action to ensure that inmates are not intimidated into
concealing excessive use of force and that information received
is accurate and credible.

Finally, we also found flawed investigatory techniques at
CCJ.  For example, investigators often do not give sufficient
attention to the inmate injuries that are known.  When
investigators question officers accused of using excessive force,
the officers are generally not even questioned as to how an
inmate's particular injury might have occurred.  For example, IAD
opened an investigation of the March 2006 case of Antonio R.
after a doctor at an outside hospital reported that Antonio was
in serious condition with "blunt trauma all over his body."
Although the investigator was aware of Antonio's injuries at the
time he questioned both of the officers involved, he never asked
the officers about the nature of Antonio's injuries or how they
occurred.  While there may sometimes be tactical reasons to avoid
discussing inmate injuries when an officer is first questioned,
the investigation is incomplete if the officers are never asked
to address the inmate's resulting injuries.

We found other examples of investigatory techniques that are
unlikely to result in complete or credible information.  For
example, on March 9, 2006, an investigator interviewed inmate
Gabriel M. about a use of force incident involving another inmate
in his tier.  The investigator then attempted to interview
Gabriel's cellmate about the same incident but, since the
cellmate could not speak English, the investigator utilized
Gabriel as the Spanish interpreter to provide his cellmate's
statement.  Relying on one inmate to translate for another inmate
in an investigation involving both of them is a poor

- 23 -

investigatory technique that calls into question the credibility of the information gathered by CCJ investigators.[11]

### iii. Videocameras and Overhead Cameras

When properly utilized, cameras in a correctional setting can augment inmate safety and security and provide essential information for investigations.  Certainly video surveillance should never be used to substitute for direct officer supervision of inmates, but it often is helpful to supplement supervision and for incident reconstruction.  CCJ has limited and antiquated live feed overhead cameras in some divisions, but the cameras do not have the critical capability to record and replay, and most do not capture activities outside of the housing unit dayrooms. Moreover, while there are two small monitors in the RCDC intake area, we discovered that the officers in the Security Office were unaware that the monitors could view various parts of the intake area.   The cameras, installed to monitor activity in a part of CCJ that had experienced among the highest number of allegations of excessive and inappropriate uses of force, were not being used.

Procedures at CCJ require that a handheld videocamera be brought to the scene of any use of force and that the use of force be recorded.  While this policy is helpful for review of cell extractions and other planned uses of force, it is not surprising that the use of handheld videocameras has not been an effective means of oversight for unplanned uses of force.  None of the numerous videotapes we reviewed captured an unplanned use of force in progress.  Improvements and additions to CCJ's video surveillance system, including the ability to record for retrieval following an incident, would be a much more effective oversight mechanism.

### 2.   Deficient Inmate Safety and Supervision

CCJ does not provide adequate inmate supervision, which exposes inmates and staff to unsafe conditions.  Lack of adequate

---

[11]   Title VI of the Civil Rights Acts requires that recipients of federal funds take reasonable steps to provide meaningful access to limited English proficient communities. Given Cook County's growing Hispanic population, CCJ should ensure that some investigators and correctional officers are familiar with rudimentary Spanish.  In addition, CCJ staff would benefit from receiving diversity training.  See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

- 24 -

security staff, insufficient direct supervision in the majority
of the housing units, a dilapidated physical plant, inadequate
policies and procedures, and an overcrowded environment combine
to result in an unsecure facility that is dangerous for everyone
on the premises.  On April 9, 2007, the John Howard Association
found that the rates of injuries to CCJ inmates and staff have
increased significantly in the past decade, despite a substantial
decrease in inmate population.[12]  In 2006, inmate injuries
occurred at the highest rate since the John Howard Association
began gathering data, and staff injuries reached the third
highest rate since 1991.[13]  Our review of CCJ documents revealed
that between January 1, 2007 and June 19, 2007, IAD opened
approximately 254 cases involving inmate assault and/or battery
and five cases of sexual assault.  In 2006, IAD opened
approximately 357 cases involving inmate assault, battery, or
sexual assault.

   Insufficient inmate supervision has been a serious problem
at CCJ for decades.  Inmate supervision is seriously compromised
by chronic overcrowding and under-staffing.  The federal district
court monitoring the Duran Consent Decree has repeatedly cited
CCJ for failing to provide adequate security staff to ensure safe
and secure conditions at the facility.[14]  In September 2006,
then-Sheriff Michael Sheahan admitted that the Jail is "severely
understaffed."[15]  The John Howard Association's April 9, 2007
report found that CCJ would require an additional 189 new
correctional officers and suitable replacements for the 130 to

---

   [12]   Court Monitoring Report, Duran v. Dart, No. 74-C-2949,
at 115-16 (N.D. Ill. Apr. 9, 2007) ("2007 Court Monitoring
Report").  Monthly averages for staff injuries have risen from
6.6 in 1996 to 28.3 staff injuries per month in 2006.

   [13]   Id. at 116.  Monthly averages for inmate injuries
increased from 14.7 injuries per 1000 inmates in 1996 to 27.8
injuries per 1000 inmates1 in 2006.

   [14]   Leonard N. Fleming, "Federal Judge Warns County to Fix
Overcrowding at the Jail," Chicago Sun Times, Dec. 1, 2007;
Jonathan Lipman, "Judge Blasts Staffing at Jail," Daily
Southtown, Dec. 29, 2005.

   [15]   Joint Status Report, Duran v. Dart, No. 74-C-2949, at 8
(N.D. Ill. Sept. 29, 2006).

- 25 -

152 correctional officers on inactive status[16] to comply with the Duran Consent Decree and "good correctional practices."[17]  CCJ's Post Analysis Reports and Divisional Staffing Reports for April through June 2007 revealed that at least 172 correctional officer positions at CCJ were vacant or inactive.  Although the External Operations Unit, which is responsible for the security of the CCJ perimeters, the Emergency Response Team, the Canine Unit, and the transportation of 800 to 1500 inmates to and from court daily, has an authorized security staffing complement of 420 positions, on May 1, 2007, the actual External Operations manpower availability comprised 352 positions.  Our expert consultant found that the level of correctional staff available to supervise housing units at CCJ is woefully inadequate.

     The lack of adequate staff is magnified by the fact that CCJ is chronically overcrowded.  In fact, every day from June 2006 through April 2007, numerous inmates were required to sleep on the floor of two-person cells that housed three inmates.[18] Divisional reports for the period of February 26, 2007 through June 17, 2007 reflect that an average of 485 inmates were forced to sleep on the floor each night.  During our site visit on July 23, 2007, Division VI held 1268 inmates in space with a rated capacity of 992 inmates.[19]  Dormitory Four in Division II is operating at twice its design capacity.[20]  However, we did not observe any increase in security staffing levels or enhanced supervision practices within the overcrowded divisions.

     Overcrowding has an impact on security at CCJ.  For example, the week of March 19, 2007, CCJ had more inmates sleeping on the floor (591) than any other week in the four-month period of March through June 2007.  During that week, CCJ also had the most fights (35), the most uses of force (27), and found the third most "shanks" (homemade knives) (34) and second most weapons

---

[16]    Correctional officers on "inactive status" include persons on disability, suspension, leave of absence, military leave, or leave for a duty injury.

[17]    2007 Court Monitoring Report at 84.

[18]    Id. at 12.

[19]    The actual capacity of Division VI was much lower than 992 on July 23, 2007, due to numerous cell closures because of maintenance problems, which further exacerbated the overcrowding.

[20]    2007 Court Monitoring Report at 15.

- 26 -

(12), of any other week during the same period.[21]  On November 30, 2007, Judge Virginia Kendall for the United States District Court for the Northern District of Illinois apparently chastised the County and Sheriff's Office for failing to ease overcrowding at CCJ, stating:  "This is no longer a budget problem.  It is a constitutional violation."[22]  Despite the fact that CCJ has been subject to the <u>Duran</u> Consent Decree for 25 years, the County and the Sheriff's Office have been unable to solve the problems of overcrowding and inadequate supervision at CCJ.

CCJ has taken some unusual steps to try to deal with the problems of overcrowding and inadequate staffing.  The practice of cross watching, discussed below, is an unacceptable and dangerous approach.  A recently instituted policy of extended lockdowns is similarly unacceptable.  In the spring of 2007, CCJ implemented extended lockdown periods for all general population inmates.  Under this system, only half of the inmates in each housing tier were allowed out of their cells during each shift.  Generally, this meant that half of the inmates were allowed out of their cells for a period in the morning, half of the inmates were allowed out of their cells for a period in the afternoon and evening, and all of the inmates were locked in their cells during the night.  Because the groups of inmates rotated on a shift by shift basis, the result was that every other day each group of inmates spent a continuous 26-hour period locked inside the cells.  This practice was applied indiscriminately to all general population inmates, except those housed on the medical units.  As discussed in further detail below, in addition to constituting an unjust restriction on pre-trial detainees, the extended lockdown practice interfered with medical and mental health care, programs, and the grievance system.  Moreover, deficient maintenance in many cells (no lighting, plumbing failures, etc.) resulted in inhumane conditions for an extended lockdown.  Therefore, as a result of CCJ's inadequate supervision, inmates are subjected to unjustified, prolonged periods of in-cell confinement.  Following our July 2007 visit, the Sheriff's Office informed us that CCJ had revised the lockdown policy to decrease the length of the in-cell periods.  This would be an improvement

---

[21]     Weekly averages for March through June 2007 were:  23.5 fights, 17 uses of force, 23.5 shanks, and 6.6 weapons.

[22]     Staff Writer, "Judge Orders Cook County to Fix Jail Overcrowding," <u>PR Newswire Europe</u>, Nov. 30. 2007; Leonard N. Fleming, "Federal Judge Warns County to Fix Overcrowding at the Jail," <u>Chicago Sun Times</u>, Dec. 1, 2007; Notification of Docket Entry, <u>Duran v. Dart</u>, No. 74-C-2949 (N.D. Ill. Nov. 30, 2007).

- 27 -

and a welcome change, and we look forward to assessing the new
lockdown system.[23]

    As discussed below, the result of CCJ's inadequate inmate
supervision is that inmates and staff are exposed to unsafe
conditions, an increased risk of violence and an abundance of
dangerous and illegal contraband.

        a.    Assaults on Inmates and Staff

    The severity and frequency of inmate-on-inmate assaults
demonstrate that CCJ is not providing for the safety and
well-being of the inmates.  In a period of less than two months
in the spring of 2006, inmates reportedly engaged in at least
seven separate knife fights that resulted in serious injuries to
at least 33 inmates and seven correctional officers, including
one inmate death.[24]

    Weekly Divisional Reports from February 26, 2007 through
June 17, 2007 show an average of 23.5 inmate fights and 3
incidents of "battery to staff with injury" per week at CCJ.
Many of these incidents occurred in CCJ's maximum security
divisions, where inmates should be supervised at the highest
level, and extra precautions should be taken to minimize access
to, and creation of, shanks and other weapons.  Clearly CCJ
cannot be expected to prevent all altercations between inmates.
Nevertheless, the Constitution requires correctional officers and
Cook County officials to take "reasonable steps to protect

_____

    [23]    CCJ's latest attempt to deal with overcrowding involves
a "hot bunking" pilot program whereby inmates volunteer to take
turns using the same bed in eight-hour shifts.  See Sheriff's
Supplemental Report, Duran v. Dart, No. 74-C-2949, at 2 (N.D.
Ill. Jan. 15, 2008).  Although each inmate is reportedly using
his or her own bedding, the hot bunking procedure could result in
serious sanitation and infection control problems, as well as
possible inmate-to-inmate intimidation regarding potential
volunteers.

    [24]    See e.g., William Lee, "Two Cook County Jail Inmates
Were Stabbed During a Fracas in a Maximum-security Division
Monday Night," Daily Southtown, May 2, 2006; Lori Rackl, "2
Inmates in Hospital After Jail Brawl," Chicago-Sun Times, Apr.
24, 2006; William Lee, "Seven Inmates at Division 11 are Injured
by Homemade Knives in a Gang-Related Fight," Daily Southtown,
Apr. 24, 2006; Staff Writer, "Knife Fights in Cook County Jail
Injure 17," Chicago Tribune, Mar. 13, 2006.

- 28 -

inmates from violence at the hands of other inmates." Goka v.
Bobbitt, 862 F.2d 646, 649-50 (7th Cir. 1988). The level of
inmate-on-inmate and inmate-on-staff violence that is occurring
within CCJ is so unacceptably high that it is clear that inmates
are not adequately supervised, in accordance with generally
accepted correctional standards. Notably, just as the Court and
CCJ staff have recognized the shortage of staff supervision,
inmates are also aware that they could engage in violence with
little to no supervision. Much of the violence at CCJ involves
group attacks, which reflect some degree of planning and
coordination by the inmates, without the staff's knowledge or
intervention.

As the following examples demonstrate, CCJ is not meeting
its constitutional obligations to provide for the safety and
well-being of its inmates:

1.   On December 29, 2007, multiple inmates suffered stab
     wounds during a fight in a Division IX dayroom. Six
     inmates required treatment from outside hospitals and
     two inmates were admitted to the hospital with multiple
     stab wounds and other serious injuries. Officers were
     required to use Oleoresin Capsicum spray ("OC spray")
     to break up the fight. CCJ recovered four shanks, some
     of which measured six inches in length, and another
     weapon in the tier. Despite the severity of this
     incident, IAD did not open an investigation file.

2.   On June 26, 2007, an officer delivering breakfast trays
     found inmate Louis J. unconscious on the floor of his
     cell in Division IX. Louis J. was admitted to the
     hospital for trauma and died on July 8, 2007, as a
     result of his injuries. Hospital records showed a
     hematoma with fractures and wounds to the face and
     head. Although the Incident Report related to this
     incident states that Louis J. may have suffered a
     seizure, Louis J.'s cellmate was promptly transferred
     to CCJ's highest level of disciplinary segregation, the
     Level IV Special Incarceration Unit in Division IX.
     However, CCJ could not produce a disciplinary citation,
     hearing record, or investigation documentation on the
     incident.[25] Louis J.'s cellmate was still in the

---

[25]   We requested all documentation related to this incident
on multiple occasions. We never received any disciplinary or
investigation records. CCJ did not complete a mortality review
for Louis J., allegedly because he was no longer in custody at
the time of his death.

- 29 -

Special Incarceration Unit a month after the incident, during our July 2007 site visit.

3.  On June 26, 2007, officers noticed that several inmates from Tier 4B were running as they returned from the Division X gymnasium. Officers found several inmates with stab wounds and other injuries in the corner of the gymnasium. One inmate was hospitalized with a stab wound to the neck and another inmate had a broken jaw. The fight was apparently the result of different gang affiliations mixed within the tier. Upon investigating, officers recovered three shanks. CCJ placed the entire 48-inmate tier on extended lockdown from June 26 through July 8, 2007, wherein each inmate was allowed out of his cell for only one hour per day, and only one inmate was allowed out at a time. No other obvious precautions were taken to address the gang problem on the tier. When the lockdown ended on July 8, another fight broke out involving some of the same inmates and the same gangs as the June 26 incident. One inmate was stabbed and officers recovered another shank.

4.  On June 20, 2007, inmates Auben J. and Sam D. suffered injuries to their heads and faces following a fight in the outdoor area of Tier A-H in Division IX. Because no officers witnessed or responded to stop the fight, it was eventually broken up by another inmate, Roger R. Officers only learned of the fight after observing Auben J. bleeding from the head when he returned from exercise. Because Roger R. admitted that he helped separate the fighting inmates and injured Auben J. in doing so, he was transferred to disciplinary segregation along with Auben J. and Sam D.

5.  On May 10, 2007, seven inmates were treated for stab wounds after a gang-related fight involving approximately 25 inmates in the Division IX, Tier 3C, dayroom. Inmates Mark V., Alex W., and Arthur A. had to be transferred to outside hospitals for medical treatment. CCJ staff found a shank in the dayroom.

6.  On December 5, 2006, 31-year-old Marcus K. was found dead in his cell. His cellmate was charged with first-degree murder for allegedly strangling Marcus K. after the two were heard arguing. The two men were locked in their cell at the time, and other inmates in

- 30 -

the common area alerted a correctional officer that an
inmate needed help during the altercation.

7.   On April 22, 2006, inmate Izzy J. suffered a fatal stab
     wound to the head during a gang-related fight involving
     approximately 20 inmates in Division XI.   Six other
     inmates were hospitalized after the brawl; five of the
     inmates were stabbed with shanks.

8.   On April 2, 2006, inmates Tyson D. and Freddy R. were
     seriously injured during a gang-related fight involving
     at least six other inmates in Division XI.   Both Tyson
     D. and Freddy R. were admitted to the hospital with
     multiple stab wounds to the back.

In addition to the inmate-on-inmate violence, CCJ's security
failings put staff in danger as well:

1.   On March 22, 2007, maximum security inmate Reed W.
     stabbed a correctional officer, a nurse, a hospital
     patient, and a bus driver during an unsuccessful escape
     attempt at Stroger Hospital, where he had been taken
     for a doctor's appointment.   CCJ officials reported
     that Reed W. may have smuggled a shank out of CCJ
     Division IX in his rectum.

2.   On August 16, 2006, correctional officer Ben W. was
     hospitalized for five days and required 30 stitches
     after being attacked by inmate Daniel M. in Division V.
     The inmate was able to run from the scene before any
     other officers could come to Officer W.'s aid.

3.   On April 15, 2006, six officers received medical
     treatment, and at least four inmates were hospitalized
     for stab wounds, after a multiple-inmate fight broke
     out in a Division XI dayroom.   Officers recovered
     several wooden sticks and at least one metal shank
     following the fight.

### b.   Inadequate Security Staffing

As a result of insufficient security staffing, CCJ is not
providing adequate supervision of the inmate housing areas.   As
discussed above, a major concern surrounding inmate supervision
is the practice of "cross watching."   Cross watching refers to
the practice of having one correctional officer simultaneously

supervise two tiers of cells as opposed to one.[26]  The
correctional officer monitors the second tier on camera while
stationed in the first tier's control center.  By policy, the
officer supervising a housing unit is supposed to conduct
security rounds inside the unit every 30 minutes, which allows
him to check on inmates in their cells and in the shower and
bathroom areas.  These areas are not visible on the security
monitors or from the officer's standard post inside unit's
control center.  However, if or when the officer conducts a
security check inside the first housing unit, the second housing
unit is unsupervised.  If the officer leaves the control center
of the first housing unit to conduct a check of the second
housing unit, the inmates in the first housing unit can see that
there is no officer supervising their actions.[27]  Although we
recognize that CCJ has made efforts to increase staffing levels
in housing units and decrease cross watching, we observed
numerous instances of cross watching during our June and July
2007 visits to CCJ.  The practice is highly utilized during lunch
periods, but we also observed cross watching throughout the day.

As noted earlier, because inmates are aware when there is
not an officer in the housing unit, there is a higher risk for
illicit inmate behavior, including inmate assaults, production of
weapons, and gang and drug activity.  For example:

1.    On May 15, 2007, an officer was cross watching two
      tiers in Division IX, a maximum security division.
      Inmate Carson T. was assaulted by five or six inmates
      in the tier dayroom.  He received multiple wounds to
      his shoulders, back, face, and was admitted to the
      hospital.  The cross watching officer did not notice
      anything amiss until he saw inmate Carson T. pacing by
      the tier door.  CCJ documents noted that Carson T. had
      "injuries resulting from being attacked with a homemade
      knife" and that a "small piece of metal was sticking
      out [his] back."  During the subsequent investigation,
      security staff found two shanks in the tier.  No
      officer observed the dayroom assault.

---

[26]    Cross watching is prohibited by the <u>Duran</u> Consent
Decree and the John Howard Association has cited CCJ for the
practice, but it continues to occur.  <u>See</u> 2007 Court Monitoring
Report at 86.

[27]    The number of inmates per housing unit varies across
divisions, but it is not unusual for one cross watching officer
to be responsible for more than 90 inmates in two units.

- 32 -

2.   On May 10, 2007, also in Division IX, an officer was
     cross watching two tiers when a disturbance involving
     25 inmates occurred.  Seven inmates received injuries
     including multiple lacerations and puncture wounds.

3.   On December 24, 2006, the assigned officer was cross
     watching two tiers in Division VI when inmate George W.
     assaulted inmate Otis F., causing a head injury.

4.   On July 25, 2006, inmate Andrew K. committed suicide in
     Division I while the assigned officer was cross
     watching two tiers.  The Medical Examiner reported that
     inmates discovered Andrew hanging by the cell bars,
     alerted officers, untied his noose, and initiated chest
     compressions before staff intervened.  Although staff
     reported that sight checks occurred in the tiers on a
     frequent basis, it is not clear if the officer actually
     saw Andrew in his cell at the times reported.
     Inexplicably, the CCJ investigation of the incident did
     not include the results of interviews of the other
     inmates who were present in the tier at the time of
     Andrew's death.

5.   On March 19, 2006, inmate John M. was attacked by two
     other inmates in Tier D-B of Division XI, which at the
     time was a maximum security division.  Because the
     officer assigned to Tier D-B was at lunch, and the two
     closest officers were cross watching Tiers D-B and D-C
     and Tiers D-A and D-D, the officers had to wait for
     back-up to arrive before anyone could enter Tier D-B to
     break up the fight.  John M. suffered two puncture
     wounds to his neck and one puncture wound under his
     arm.  After the fight, officers recovered two steel
     shanks, a broken cane, and three razors from the tier.

     **c.   Contraband and Vandalism**

     Another indicator of inadequate supervision is the amount of
dangerous contraband that is being recovered from the housing
units and the ease by which inmates can fabricate homemade
weapons.  Due to the dilapidated condition of scores of cells,
shower areas, and various dayroom features, inmates have ample
material for fabricating weapons, including floor tiles, metal
from light fixtures, metal from the ventilation system, glass
from cell light bulbs, electrical wiring, and plumbing fixtures.
It is virtually impossible for any correctional facility to
completely deter inmates from obtaining materials for weapons due
to the condition of the physical plant, but the problem at CCJ is

- 33 -

further exacerbated by the lack of direct supervision in most of the divisions.

Even though the CCJ administration has recently made efforts to curtail the creation of shanks and other weapons through the establishment of a "Weapons Committee," a severe contraband problem still exists. For example, IAD's Contraband Log reveals that, between January 1, 2007 and June 19, 2007, security staff found approximately 484 weapons and shanks. Many of these weapons and shanks were found in inmate cells and dayrooms after a stabbing incident. The Weekly Divisional Reports from February 26, 2007 through June 17, 2007 show an average of 23.5 shanks and 6.6 weapons found each week at CCJ. In just one week, April 2-8, 2007, CCJ staff recovered 55 shanks and 12 weapons. In 2006, IAD opened approximately 590 cases involving shanks, 77 involving weapons, and 115 cases involving other contraband. The number of weapons and shanks is extremely high, even considering CCJ's large inmate population.

During our site visits, we noticed scores of opportunities for inmates to fabricate shanks and other weapons. We found broken and jagged floor tiles laying exposed in dayrooms without raising the notice of staff. In some instances, inmates are using the absence of ventilation grates in their cells to rig a "dumbwaiter" system that allows them to transmit drinking water between the housing unit's upper and lower tiers from within their locked cells. However, the inmates can also use these passageways to pass contraband. Shower and bathroom walls in the Residential Treatment Unit ("RTU") that had been damaged by inmate vandalism provided ample opportunity for weapons production and concealment of contraband. We observed numerous vandalized cell lighting fixtures and missing and vandalized cell vents, which are commonly used to create shanks. Inmates' access to the lighting fixtures can lead to additional dangers. For example, on June 14, 2007, an inmate attempted suicide by cutting himself with a broken light bulb.

In addition to the troubling, unchecked proliferation of weapons at CCJ, it is clear that there is a serious narcotics problem. Between January 1, 2007 and June 19, 2007, IAD opened approximately 110 cases related to narcotics/drugs. In 2006, IAD opened approximately 160 cases involving narcotics/drugs.

The lack of adequate supervision at CCJ is further highlighted by the frequent and flagrant rule violations that are evident in almost every tier throughout the facility, including special management units that should have a higher degree of supervision. For example:

- 34 -

1.    Scores of cells have been vandalized and are rife with
      gang and general graffiti.

2.    Scores of cells contain homemade clothes lines.  The
      hanging linens prevent adequate visibility into the
      cell.  Also, the clothes lines can be used by inmates
      as potential weapons or suicide implements.

3.    Small in-cell fires are common.  Many inmates use the
      cell lighting fixtures as an ignition source for
      warming food and starting fires.  Numerous inmates
      covered the cell light bulb with a milk carton that
      serves as a lamp shade and an ignition source.  In
      scores of cells, the bottom bunk has evidence of having
      been heated.  Inmates and staff reported that inmates
      use the bottom bunks as hot plates for warming food by
      setting a fire underneath them.

4.    Scores of cells contain dozens of empty milk cartons
      and other stored debris that can be used by inmates for
      improper purposes and provide a potential fuel load in
      case of a fire.

5.    Numerous shower areas have been vandalized, resulting
      in exposed ceilings and materials that can and are used
      to fabricate weapons.

6.    Numerous inmates use extra blankets as carpets or room
      dividers for their cell, while other inmates claim a
      shortage of blankets.

7.    Scores of cells, shower areas, bathrooms, and dayrooms
      have exposed electrical wiring.

8.    Scores of vents, window sills, stairwells, and screens
      throughout the tiers are plugged and covered with
      debris.

9.    As discussed below, many in-use cells are so unsanitary
      or have such severe maintenance problems that it is
      clear that adequate security checks are not occurring.

It is common for inmates to try to engage in vandalism or
rule infractions, and CCJ could not be expected to prevent all
such inmate activities.  However, it is not generally accepted
correctional practice to allow these violations to occur so
flagrantly and with such prevalence throughout the facility.

- 35 -

The sheer frequency of these issues demonstrates that inadequate supervision is common at CCJ.

### d. Inadequate Visibility

Inmate supervision is further hampered by CCJ's physical layout, which does not allow for direct supervision in most divisions. With the exception of the Division II and RTU dormitory units, correctional officers are not stationed inside the housing units. In most divisions, the housing units are supervised by an officer from a tier control center or security entrance post that only allows for observation of the dayroom and some common areas of the housing unit. This is the case even in the special management units, such as disciplinary segregation and protective custody, which is a grossly atypical corrections practice. The officer cannot see into the individual cells while in the control center and is therefore required to conduct frequent physical checks of inmates in their cells. However, security check documentation at CCJ is spotty. For example, during our on-site visits we discovered pre-recorded security checks on housing unit logs and also security checks that were suspiciously logged at precise intervals throughout a shift without any deviation. In addition, numerous inmates throughout the facility reported that officers commonly only enter the housing unit during shift change or meal times, but not on regular rounds throughout the day. This is not surprising, as a single officer may be cross watching two housing units simultaneously from one control center.

Even if security rounds within the housing units are occurring as scheduled, lack of visibility into cells is a major safety concern. Scores of cells are dark due to inoperable lighting fixtures, missing light bulbs, or inmate vandalism of lighting fixtures. We also observed the results of rampant vandalism of the lighting system in the RTU dormitory units, despite the fact that an officer is purportedly posted inside each RTU dormitory at all times. In fact, one RTU dormitory had no working lights and another had only two or three working lights, out of 24 light fixtures. Lack of operable lights makes the entire unit dangerous both for inmates and officers. This problem is compounded by the fact that correctional officers cannot replace broken or burned out light bulbs, but must issue a work order and wait for Facilities Management to handle the request. In addition, we observed many cells and shower areas with "privacy curtains" and with the celldoor windows obscured by cardboard, paper, towels, and other materials. It is very difficult, if not impossible, for officers to provide adequate safety and security checks of inmates when they cannot see into

- 36 -

the cells and shower areas.  Compounding the lack of adequate
inmate supervision within the housing units is the fact that
cells are not equipped with intercoms or emergency call buttons,
which are useful safety and security features designed to allow
for a locked inmate to alert an officer in an emergency
situation.  Intercoms or emergency call buttons are especially
important for special management units, where the inmates spend
approximately 23 hours of the day locked inside their cells,
often alone.

Of particular concern for inmate and officer safety is the
lack of visibility in the Special Incarceration Unit of Division
IX.  As these cells house CCJ's highest risk offenders and
inmates with demonstrated behavior problems, the celldoor windows
have been modified to prevent inmates from throwing liquids or
objects at officers.  However, instead of installing a protective
covering that would allow for observation, such as safety glass,
CCJ welded a metal plate with small holes in it on to the cell
windows in the Division IX Level 4 tier.  As a result, it is
virtually impossible to see into the cell, especially at night.

In addition to inadequate interior security visibility,
during a night time tour of CCJ, we observed approximately 22
external post and building lights that were not functioning in
the area between Division I and Division V.  This is unacceptable
and a significant security risk.

###     e.    Inadequate Security Policies and Procedures

At CCJ, each separate division has Standard Operating
Procedures ("SOPs") that cover all the necessary components for a
security program, such as key control, cell locking procedures,
incident reporting, and search procedures.  During our review, we
found that while some CCJ policies and procedures were up to
date, many were not.  Generally accepted correctional practices
require that post orders should be reviewed on a quarterly basis.
CCJ policy requires that post orders be reviewed annually.  We
reviewed the post orders available at various security posts
throughout CCJ and found many post orders that had not been
reviewed in multiple years.  For example, in Division XI, we
inspected a manned gun tower.  The post order for the tower was
dated January 1996 and was last revised on January 15, 2003.  In
addition to being outdated, the post order did not contain
essential information for an armed post, including instruction on
when and under what circumstances the weapon should be used.
CCJ is also lacking in proper policies regarding inventory of
security equipment, including the newly introduced OC spray,
which could allow for unaccounted misuse by correctional

- 37 -

officers.  When post orders are not updated regularly and do not
address vital information, facility practices will develop in an
ad hoc nature and will not account for current needs.  Outdated
policies, procedures, and post orders are inconsistent with
generally accepted correctional standards and contribute to a
failure of the overall security system.

Although CCJ policies must adapt to some extent to account
for the different security levels and different physical layouts
in the various divisions, there is widespread policy variation
from division to division on issues ranging from the handling of
grievances to incident reporting.  This can be confusing for
correctional officers, who rotate posts every 90 days and may be
transferred from one division to another without adequate
training on division-specific SOPs.  Policy discrepancies abound
division to division, which result in widely different security
practices.  There is no standardized format in use throughout CCJ
for division Roster Staffing Reports and Post Analysis Reports.
Even CCJ's top level administration is unclear how security
procedures are implemented throughout the facility.  For example,
a high level security official told us that each and every inmate
should be patted down when he or she returns from the recreation
yard.  However, Division I supervisors reported that inmates are
only subjected to pat downs at random upon their return from the
yard.

An additional area of policy concern is with regard to
special management units, which include the Special Incarceration
Units, disciplinary segregation, and protective custody units.
Generally accepted correctional practices require that officers
who are assigned to these types of units possess a higher level
of detention experience, receive focused training in special
management operations, and are regularly assigned to these units
for stability purposes.  Correctional officers in CCJ's special
management units rotate on a regular basis and do not receive
specialized training for working with high risk inmates.  This
practice should be changed at the policy level.

### f.   Disciplinary Process

CCJ operates the inmate discipline component with a policy
and procedure that appears to be adequate and provides sufficient
due process to inmates.  However, we did note some concerns with
regard to the disciplinary process.  First, hearings are not
consistently conducted in a private, confidential manner and
secure setting in accordance with generally accepted correctional
standards.  During our observation of the disciplinary hearings
in Division II, 12 inmates were brought into a large room and

- 38 -

seated together for their individual disciplinary hearings, including inmates whose disciplinary charges involved incidents of violence against each other. The proceedings were conducted within hearing of the other inmates. This process certainly presents safety and security issues because there may still be animosity between inmates who were involved in an altercation. For example, on July 26, 2007, two inmates began fighting during a disciplinary hearing in the Division VI library, and required medical care. Also, the victim may be reluctant to be truthful during the hearing for fear of retaliation by the aggressor. In addition, we noted that the statements made by the inmates during the hearing are written down by the disciplinary board in a very abbreviated fashion that may not adequately represent the inmates' statements.

### 3.   Deficient Classification Procedures

All inmates admitted or discharged from CCJ are processed in the RCDC. The RCDC is located in the basement of Division V, and was originally designed as a storage area. Instead of storage, it holds several hundred inmates as they are strip searched, processed through booking, fingerprinted, photographed, screened for medical and mental health problems, and assigned to a bullpen until they can be transferred to their appropriate divisions. Almost every evening, the RCDC bullpens hold hundreds of inmates, for several hours at a time, who are crowded shoulder-to-shoulder behind chain link fences so tightly that there is insufficient space for them to sit or lie down. There is one female bathroom and only one male bathroom, with two toilets, and no hand washing facilities, for hundreds of male inmates to share.[28] While the RCDC overflows with hundreds of inmates, a surprisingly small number of correctional officers attempt to perform a multitude of duties, including the supervision of inmates. In addition to the natural stress resulting from admission to jail, inmates upon booking, who may have been held for multiple days in various police departments before arriving at CCJ, can be medically and mentally unstable. Newly admitted inmates are very unpredictable. The overcrowded, disorganized, and understaffed RCDC is a major security and safety risk to staff and inmates.

---

[28]     On January 14, 2008, the Sheriff's Office sent us photographs of recent renovations to the RCDC bathroom, including six new sinks and five new urinals. This is a vast improvement, but the single bathroom and limited toilets is still problematic, given the immense number of inmates in the RCDC each evening.

- 39 -

     The John Howard Association found the RCDC "grossly
inadequate in size, design, and virtually every other respect."[29]
We concur.  The Sheriff's Office and the County concede that the
RCDC physical plant is inadequate and we understand that funds
have been allocated for construction of a new RCDC and RTU, but
the new facility will not be completed until late 2009, at the
earliest.[30]

     Classification problems do not end with the physical plant
of the RCDC.  The Sheriff's Office admits that the present
classification system is "extremely obsolete."[31]  The system was
purchased in 1991 and last updated in 1993.  It is an antiquated
inmate tracking system that is incapable of tracking basic
information, such as the number of empty beds in each CCJ
division at any time.  The RCDC Superintendent is required to
make telephone calls on a constant basis to the other divisions
in order to ascertain the bed availability.  Although the RCDC
Superintendent has access to e-mail, the superintendents of the
other divisions do not.

     The classification system contains provisions for initial
custody assessment and for custody re-assessments.  However,
although CCJ uses a Special Incarceration Unit "level system" to
manage high risk inmates and security threat groups, that
information is not contained within the classification policies
and procedures manual.

     Perhaps more troubling than the obsolete nature of the CCJ
classification system is the fact that many supervisors do not
understand how to properly utilize the system.  Midway through
our second site visit to CCJ, we learned that information on each
inmate's classification status and history is readily available
from terminals in every division.  However, many CCJ supervisors
and even division superintendents had previously reported to us
that they could not access such information on the system.  The
superintendent who revealed the broader tracking capabilities to
us acknowledged that many CCJ supervisors are not proficient with
the CCJ system.

_____

[29]    2007 Court Monitoring Report at 67.

[30]    President Todd H. Stroger and the Cook County Board of
Commissioners' Status Report, <u>Duran v. Dart</u>, No. 74-C-2949, at 8
(N.D. Ill. June 11, 2007).

[31]    Sheriff's 2007 Status Report and Response to John
Howard Association Court Monitoring Report, <u>Duran v. Dart</u>, No.
74-C-2949, at 22 (N.D. Ill. June 11, 2007).