- 40 -

Given the high level of inmate assaults and gang-related violence at CCJ, it is clear that inadequacies of the classification system are contributing to CCJ's security deficiencies.

### 4.    Inmate Grievance Procedure

An inmate grievance system is a fundamental element of a functional jail system, intended to provide a mechanism for allowing inmates to raise conditions of confinement related concerns and issues to the administration.  If viewed as credible by inmates, it can also serve as a source of intelligence to staff regarding potential security breaches as well as staff excessive force or other misconduct.  The grievance system should be readily accessible to all inmates.  Inmates should be able to file their grievances in a secure and confidential manner and without the threat of reprisals.  Staff responsible for answering inmate grievances should do it in a responsive and prompt manner.  Unfortunately, we noted a number of serious concerns with the inmate grievance process at CCJ.

The primary responsibility for coordinating and responding to inmate grievances lies with the Correctional Rehabilitation Workers ("CRWs").  Each of the approximately 40 CRWs, if evenly distributed throughout CCJ, has a caseload of well in excess of 200 inmates, which is extremely ambitious.  Although management staff expect that the CRWs conduct at least two visits to each of their assigned units per week to collect grievances and to perform other duties, this is not occurring on a consistent basis.  Moreover, numerous inmates complained that they do not have access to the CRWs (and consequently, the grievance process) if they are locked in their cells when the CRWs conduct rounds, which is a common occurrence.

At the divisional level and by divisional policy and procedure, there are supposed to be locked grievance boxes in the housing units for inmates to place their grievances in.  The CRWs are supposed to collect the grievances from the locked boxes each weekday.  However, the grievance system functions differently in practice, and varies from division to division and even from tier to tier.  Although it is not reflected in the written policies, the prevailing current practice is for the inmate to give the completed grievance to the CRWs when they conduct rounds.  Staff reported that inmate grievances are to be inserted in confidential envelopes and sealed by the inmate, which is also not written in the divisional policies.  In some divisions, an inmate can also give the completed grievance to a security supervisor, who will record it in a log and give it to a CRW.  In

- 41 -

other divisions, security staff refuse to handle any grievance, to avoid conflicts and the appearance of impropriety.  In yet another version, inmate grievance forms are kept and passed out only by the CRWs and completed forms are collected by the block sergeant and brought to the CRWs' office.  Although most of the divisions are not using the grievance boxes, many staff members, including the Program Services Administrator, were under the impression that inmates were using the boxes.  There is an extremely high level of confusion regarding the grievance policy and practice at all levels of CCJ.

In addition, access to grievance forms by inmates is a universal problem.  Although many management staff believe that the grievance forms are available on the tiers, this is simply not the case.  The vast majority of the units that we visited during our June and July 2007 site visits did not have inmate grievance forms or confidential envelopes available on the housing units.  Grievances forms are not available in Spanish language, despite the fact that many CCJ inmates can only speak, read, and understand the Spanish language.[32]

We also found that inmates believe the grievance process is unreliable and repeatedly complained about its effectiveness, with reason.  For example, inmates stated that grievances related to the use of force generally result in one of two inadequate responses.  Sometimes an investigator will speak to inmates after they file use of force grievances, but the inmates stated that they never heard back about their grievances.  Most inmates complained that they heard nothing at all in response to a use of force grievance or received a summary denial.  Inmate Byron S. filed a grievance approximately one month after an officer broke his jaw in January 2006.  Thirteen days later he received a one sentence response to his grievance stating that there would be no IAD investigation because Byron had been found to have "assaulted and battered staff . . . as detainee was combative."  In fact, although the officer initially reported that he was attacked by inmates, the officer admitted he had fabricated the story weeks before Byron filed the grievance.  IAD filed a complaint against the officer for falsification of a report, yet the response to Byron's grievance, over a month later, was factually inaccurate according to CCJ's own records.  Moreover, the grievance did not trigger an investigation.  CCJ opened the investigation seven months later, after Byron filed a lawsuit.

---

[32]     See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

- 42 -

### 5.  Access to Information

Generally accepted correctional practice requires that newly admitted inmates are given an opportunity to learn about the facility rules and regulations, services that are available, policies and procedures that affect the inmate, and facility schedules.  Each inmate should receive a facility handbook, containing all the relevant information, and should have an opportunity to have the information explained to him or her if the inmate cannot read.  Most facilities have a formal orientation procedure as a part of the intake processing.  At CCJ, officers reported that they offer inmates a copy of the inmate handbook in the RCDC.  There is no documentation as to whether a handbook is offered or accepted.  Although there was a small stack of inmate handbooks behind a counter in the RCDC strip search area, we did not observe a single inmate of the hundreds present in the RCDC area with a CCJ handbook during either of our site visits.

### B.  INADEQUATE MEDICAL CARE

Jail officials are responsible for providing adequate medical care to inmates.  Moreover, a jail may not deny or intentionally interfere with medical treatment.  A delay in providing medical treatment may be so significant that it amounts to a denial of treatment.  Our investigation revealed that medical care provided at CCJ falls below the constitutionally required standards of care.  We found the following deficiencies: (1) inadequate medical staffing; (2) inadequate intake screening; (3) inadequate health assessments; (4) inadequate acute care; (5) inadequate chronic care; (6) inadequate emergency care; (7) inadequate record keeping; (8) inadequate medication administration; (9) inadequate management of communicable diseases; (10) inadequate access to medical care; (11) inadequate medical facilities; (12) inadequate dental care; and (13) inadequate quality assurance.

### 1.  Inadequate Medical Staffing

CCJ lacks the medical staff necessary to provide adequate medical services.  Generally accepted correctional standards of care require that facilities maintain adequate staffing to provide inmates with necessary medical care.  Many of the problems identified below are exacerbated by the inadequate medical staffing.  In early 2007, there were significant health care cutbacks at CCJ, including 23 clinical positions (four physicians and three dentists), nine management positions, and 16 other health care positions.  These cutbacks have severely

impacted the quality and timeliness of medical care at CCJ.  Most
notably, the nursing staff shortages, which have left many
divisions understaffed during periods of the day, and the dental
staff shortages have caused or aggravated inadequate medical
services.

## 2.    Inadequate Intake Screening

CCJ fails to adequately identify inmates' urgent and/or
ongoing health needs through appropriate intake screening.
Adequate intake screening is essential for ensuring that inmates
are receiving proper care for acute or chronic needs.  Generally
accepted correctional medical standards require that incoming
inmates be screened by staff trained to identify and triage
serious medical needs, including drug and alcohol withdrawal,
communicable diseases, acute or chronic needs, mental illness,
and potential suicide risks.  CCJ's intake screening fails to
identify such needs and increases the risk of serious harm.

At CCJ, correctional medical technicians are responsible for
conducting intake screenings.  If an inmate's intake screening is
positive for a possible acute or chronic condition, the inmate
should be referred to a physician assistant for an evaluation.
Nationwide, more than 30 percent of inmates have acute or chronic
conditions that would require a medical or mental health
evaluation on the first day at a correctional facility.[33]  In
contrast, only 15 percent of the 100 intake screening records we
reviewed during our June 2007 on-site visit resulted in a
referral for evaluation.  During our July 2007 on-site visit, we
reviewed 120 intake screening records and found that only six of
the inmates were referred to the physician assistant.  These
numbers depart significantly from what would be expected in CCJ's
inmate population, which strongly suggests that the CCJ intake
screening process is incomplete and inadequate.

Screenings take place in an area of the RCDC that is
chaotic, noisy, and crowded.  The screening interviews often
occur while inmates are handcuffed together, resulting in a total
lack of privacy, which compromises the quality of information
received.  Further, CCJ's screening form is deficient because it
lacks sufficiently specific questions regarding acute and chronic
illnesses, including drug and alcohol withdrawal.  We found
several instances where acute and chronic medical needs were not

---

[33]    National Commission on Correctional Health Care, The
Health Status of Soon-to-be-Released Inmates:  a Report to
Congress (May 2002).  http://www.ncchc.org/pubs/pubs_stbr.html.

- 44 -

recorded on intake.  These practices contravene generally
accepted correctional medical standards, and place inmates at
significant risk of harm.

For example, we identified the following cases of intake
screening deficiencies:

a.  Nadia H. died in late 2006, one day after being booked
    into CCJ, likely of withdrawal syndrome.[34]  During
    intake, she reported a history of heroin addiction, yet
    staff failed to document her drug use and history of
    addiction.  Despite knowledge that Nadia had a history
    of addiction, staff disregarded her emergent condition
    and placed her in general population.  The next day she
    was found dead in her cell.

b.  Julia G. was booked into CCJ in 2007 with a history of
    alcoholism and a dangerously high blood pressure.  The
    screening process failed to identify that she was at
    risk of developing delirium tremens, a potentially
    life-threatening, but preventable, complication of
    alcohol withdrawal.  Instead of evaluating and treating
    her medical condition, she was transferred to general
    population, where she developed delirium tremens and
    had to be admitted to the hospital.  She also had co-
    morbid hyperthyroidism, which should have been detected
    during the intake screening.  Because of CCJ's
    inadequate screening, Julia was at a very high risk of
    death.

c.  In June 2007, David M. was booked into CCJ with a
    history of heart disease, deep vein thrombosis,
    depression, and recent trauma.  Despite his serious
    medical history, he was neither examined by a physician
    assistant nor did he receive any medical care.  Even
    after informing CCJ personnel on several occasions that
    he was currently taking a prescription for Coumadin (a
    blood-thinner prescribed for those at high risk for a
    blood clot and for some heart conditions), it took
    staff over three weeks before David finally received
    his first dose of Coumadin.

---

[34]    We reviewed the medical records of 20 inmates seen by
the physician assistants in the intake area on June 18, 2007, and
found that none of the inmates were asked about a history of
alcohol withdrawal syndrome, a life-threatening condition that is
common among inmates.

- 45 -

d.   In June 2007, Lyle P. was booked into CCJ. At intake,
     Lyle reported his HIV infection and his strong
     adherence to his medication regimen, but he did not
     receive his medication prescription. Nearly two weeks
     passed before he was finally seen by an infectious
     disease specialist. Because of the two week lapse in
     medication, the specialist chose to delay treatment,
     which further enhanced the risks for Lyle to develop
     potentially-fatal drug resistance.

e.   During our July 2007 on-site visit, we encountered an
     inmate who suffered from a recent facial trauma,
     including redness, swelling, and abrasions on the left
     side of his face. He complained of visual disturbances
     and discomfort over the entire left side of his face
     during intake, yet he was not examined by medical
     staff. It was only after we brought his condition to
     CCJ personnel that he was re-evaluated by medical
     staff.

## 3.   Inadequate Health Assessments

CCJ does not give its inmates an adequate health assessment
within a reasonable period after admission. The generally
accepted standard of care is to conduct a health assessment
within fourteen days of admission, or sooner when medically
indicated. This assessment typically includes a review of intake
information, a complete medical history, a physical examination,
and screening for tuberculosis ("TB") and sexually transmitted
diseases ("STDs"). Appropriate and timely health assessments are
particularly critical should screening procedures fail to
identify an inmate's serious health needs and improves the
facility's ability to provide efficient and adequate care.

The great majority of inmates admitted to CCJ do not receive
a health assessment within a reasonable period after admission.
Many inmates never receive a physical examination at all. Even
inmates who were appropriately referred to the physician
assistants upon intake did not consistently receive appropriate
referrals for follow-up or assessment.[35] The necessity for a full
health assessment is underscored by the grossly inadequate intake
screening process. In addition to the risk to individual inmates
with untreated conditions, CCJ's failure to conduct health

---

[35]   The physician assistants in intake spend approximately
five minutes per patient and conduct very cursory examinations
without privacy or an appropriate facility.

- 46 -

assessments puts all inmates and staff at risk from the spread of disease.

### 4.    Inadequate Acute Care

CCJ fails to provide adequate and timely acute care to inmates with serious or potentially serious acute medical conditions. CCJ's acute care services substantially depart from generally accepted correctional medical care standards. We identified grossly inadequate acute care that led to prolonged suffering and premature deaths of inmates at CCJ. Acute care was so deficient that inmates suffered needlessly because medical staff failed to ensure that inmates met scheduled appointments, failed to monitor acute conditions, and failed to timely treat inmates' conditions. We found numerous instances where CCJ's failure to adequately assess and treat inmates likely contributed to preventable deaths, amputation, hospitalizations, and unnecessary harm.[36]

The following examples highlight CCJ's deficiencies in providing acute care:

a.    In early 2006, Gloria D. died after not receiving adequate care for an emergent and life threatening condition. Gloria, who suffered from human immunodeficiency virus ("HIV"), was admitted to CCJ in early 2006. After one month in the facility, staff ordered an x-ray after Gloria complained of persistent cough and shortness of breath. Although her x-ray was abnormal, Gloria did not receive any follow up care. Less than three weeks after her abnormal x-ray, Gloria developed a fever, tachycardia,[37] and low oxygen saturation. Gloria was hospitalized and died of untreated Pneumocystis carinii.[38]

----

[36]    Our medical chart review was hampered by CCJ's highly disorganized and incomplete medical records. For example, 72 percent of the records we requested for inmates sent to hospital emergency rooms were unavailable. While the medical records deficiencies hindered our review, we were still able to document serious lapses in medical care.

[37]    Tachycardia is a rapid heart rate, over 100 beats a minute, which can be caused by cardiac arrhythmia.

[38]    Pneumocystis carinii is an opportunistic but preventable infection that occurs in immunosuppressed populations, primarily HIV patients with advanced infection.

- 47 -

b.    In July 2006, Manuel M. was admitted to CCJ with a
      life-threatening blood pressure reading, an elevated
      pulse, and a history of alcohol use.  Although he was
      medicated and monitored daily for hypertension, he was
      not treated for alcohol withdrawal and, on his third
      day at CCJ, exhibited tremors and an altered thought
      process, signs of delirium tremens.  He should have
      been hospitalized at this point, but was not.  On his
      sixth day at CCJ, when his blood pressure decreased
      some from its previously high levels, he was put in
      general population.  He was never treated for delirium
      tremens and committed suicide while delirious.

c.    In August 2006, inmate Aaron B.'s leg was amputated as
      a result of a bone infection resulting from CCJ's
      failure to provide adequate acute care.  On August 8,
      2006, Aaron was admitted to CCJ.  He arrived at CCJ
      with a soft cast on his leg.  Medical staff removed the
      soft cast and replaced it with a hard cast.  Aaron
      complained of constant pain for nearly a week before he
      was finally seen by a physician on August 14.  The
      physician scheduled an immediate orthopedist
      appointment for August 16.  Unfortunately, Aaron never
      saw the orthopedist because the orthopedist refused to
      treat Aaron without his medical chart, which CCJ staff
      did not provide.  After complaining of discomfort and a
      malodorous discharge dripping from his hard cast, on
      August 31, he was admitted to Cermak infirmary with
      osteomyelitis (an acute or chronic inflammatory process
      of the bone).  His leg was later amputated because the
      severe infection had destroyed substantial soft tissue.

d.    In late 2006, Aidan A. died after suffering from
      sepsis.[39]  He was admitted to CCJ after suffering from a
      gunshot wound in his arm.  His wound was surgically
      repaired and he had metal inserted in his arm to set
      the bone.  The orthopedist scheduled an appointment so
      that the metal insert could be removed, but CCJ failed
      to take him to the hospital for his scheduled
      appointment.  After seven weeks at CCJ, Aidan developed
      a deep tissue infection which elevated his respiratory
      rate and his pulse rate became dangerously high.  By
      the time he was finally taken to the hospital, it was
      too late to contain the infection and Aidan died at the

---

[39]    Sepsis is the presence of bacteria or other infectious
organisms or their toxins in the blood or in other tissue.

hospital of sepsis two months after his admission to CCJ. This was a preventable death.

e.    Five days after his 2007 intake to CCJ, Henry H. had a new, on-set seizure and suffered a fractured jaw during the incident. It took six days for him to be seen by an oral surgeon and he was never evaluated for the cause of his seizure, as he should have been.

## 5.    Inadequate Chronic Care

CCJ fails to provide adequate care to inmates with serious medical needs that require monitoring and follow-up medical care. Inmates who suffer from chronic medical illnesses must be regularly monitored by medical professionals to prevent the progression of their illnesses. Monitoring should occur on a regular basis to ensure that symptoms are under control and that medications are appropriate based on generally accepted correctional medical standards. However, we found that CCJ was deficient in ensuring that patients are seen on a regular basis, that medications are timely distributed, and that inmates are monitored and treated to prevent the progression of illnesses.

Specifically, in examining a sampling of medical records of inmates with chronic conditions, we found the following instances of deficient chronic care:

a.    In reviewing the records of ten CCJ inmates with diabetes, we looked for seven nationally accepted interventions.[40] Inadequately monitored diabetes can lead to stroke, vision loss, diseases that effect the feet and muscles, kidney damage, coma, and death. In a gross departure from generally accepted correctional standards, none had a documented urinary microalbumin within the last 12 months; only two had a measurement of A1c hemoglobin within the past three months; four had a cholesterol measurement within past year; two were on aspirin prophylaxis; and two had a dilated retina exam. Our review of these files revealed that CCJ was not adequately monitoring these inmates through

---

[40]    These interventions are: measurement of sugar levels upon intake, measurement of urinary microalbumin, dilated examination of the retina, cholesterol measurement, measurement of A1c hemoglobin, chronic care visit with physician, and aspirin therapy.

- 49 -

chronic care visits or consistently screening them from the conditions that they are at risk of developing.

b.   We reviewed the treatment of 14 inmates suffering from moderate or severe asthma.  Chronic follow-up care and regular monitoring of peak expiratory flow (a test that measures how well the airways are working) are critical in the proper care for persons with asthma.  We found five of the 14 inmates had not been seen for chronic care within the last three months and only seven of the 14 had any measurement of their peak expiratory flow. We also requested records of 13 inmates seen in the Cermak emergency room for acute asthma between March 5 and May 2, 2007.  None of these patients had follow-up to see if they were improving.[41]

c.   Similarly, we requested the records of 15 inmates at the facility who are on the blood thinner Coumadin. This medication has very narrow therapeutic range; if an inmate is given too little, the medication will be ineffective, but if the medication is given too much, he or she will experience substantial detrimental effects.  Accordingly, frequent measurement of the blood-clotting ability of patients taking Coumadin is critical.  Of the records we requested, two were lost, one inmate was not scheduled for follow up for eight weeks, instead of the typical one to two weeks, and another inmate did not have necessary laboratory tests at intake.  Inmates who are taking Coumadin but who are not monitored appropriately are placed at risk for a potentially life-threatening blood clot or a hemorrhage.

d.   We also reviewed the records of five paraplegic inmates who suffered skin breakdowns, skin ulcers (bed sores), or wound infections.  Our expert consultant found patterns of egregious failures of care regarding wound care in each of these cases.  In one startling example, we reviewed the chart of inmate Wallace G., who suffered a skin breakdown.  An x-ray revealed that his initial skin breakdown caused a soft tissue infection which likely caused a bone infection.  Despite the abnormal x-ray, we were unable to find any follow-up care, treatment for the condition, or assessment by the

---

[41]   Only 23 percent of the records requested were available and only one of those charts contained the emergency room record.

- 50 -

physician.  These failures are gross deviations from
generally accepted correctional medical standards.[42]

## 6.    Inadequate Emergency Care

CCJ fails to provide adequate emergency care.  We observed
an emergent incident during July 2007 on-site visit, when we
encountered a male inmate who was known by CCJ staff to have a
history of heart disease.  While we were on his housing unit,
inmate Mitchell H. experienced severe heart complications and
lost consciousness.  Although the dispensary nurse responded to
the emergency call, it took 15 minutes for the ambulance and EMT
to arrive.  While the dispensary nurse was struggling to revive
Mitchell, the EMTs were chatting and inattentive to Mitchell's
needs.  After nearly 45 minutes of suffering severe chest pains,
Mitchell was finally placed in the ambulance.  CCJ's slow
response does not comport with generally accepted correctional
medical standards and placed this inmate at risk of serious harm.

We found additional instances of deficient emergency care
that put inmates' health and lives at risk.  As part of our
review, we randomly selected five inmates who were seen in the
Cermak emergency room for alcohol withdrawal symptoms in the
spring of 2007 and concluded that CCJ's treatment and assessment
was deficient in four out of five cases.  Two of the inmates were
sent to the emergency room because of their significant
elevations of blood pressure.  In both cases, CCJ staff neither
treated their high blood pressure nor adequately monitored their
condition.  Rather, CCJ sent both inmates back to general
population without a thorough examination.  Two other inmates
were seen in the emergency room, but we were unable to find
emergency room notes that documented any treatment.[43]  The last
inmate received no treatment because he suffered from asthma and
did not require treatment for alcohol withdrawal.

## 7.    Inadequate Medication Administration

We found numerous systemic problems with medication
administration and management.  CCJ frequently fails to:

---

[42]    Our expert consultant advised CCJ of this patient's
inadequate care during our July 27, 2007 exit conference.

[43]    CCJ has a responsibility to obtain discharge summaries
or notes from the hospital when inmates are treated at outside
facilities in order to adequately assess and treat inmates upon
their return to CCJ.

(1) verify identification of inmates receiving and ingesting medication; 2) provide critical medications to inmates without delay or lapses; and (3) maintain inmate medication administration records ("MARs") concurrently with distribution.

Generally accepted correctional medical standards require that facilities administer medication and maintain adequate medication records to meet the medical needs of the inmates and to prevent medication errors and other risks of harm. Regular and systematic reviews of medication usage is also required to ensure that each inmate's prescribed medication regimen continues to be appropriate and effective for his or her condition.

During our on-site visits, we observed the distribution of medication in each of the CCJ divisions. In every instance, we found nurses throughout the facility who failed to verify inmates' identification before administering medication. This deficient practice increases the chances of dispensing medications to the wrong inmate or dispensing medication to an inmate who may have an adverse reaction to medication. Also problematic was the failure of nursing staff to observe inmates swallowing prescribed medication. This failure prevents nursing staff from accurately recording administered medications and creates an unsafe and potentially dangerous environment where medication could be hoarded, sold, or result in overdoses. The nurses' failure to verify identification and observe inmates swallowing medications is inconsistent with generally accepted professional standards of correctional medical care and greatly increases the risks for error and harm.

Our investigation also revealed significant delays, errors, and lapses in medication administration, all of which have contributed to needless suffering and inmate hospitalizations. The following examples illustrated the medication administration deficiencies:

a.    As discussed above, David M. was booked into CCJ in June 2007 with a prescription for the blood thinner Coumadin, but there was a 22-day delay before he finally received his first dose of Coumadin.

b.    In May 2007, Roy H. was booked into CCJ. He was admitted after a kidney transplant. He was prescribed medication to prevent his body's rejection of his kidney transplant. After 16 days without his prescribed medication, he had to be hospitalized because his body began to reject his kidney and he

- 52 -

developed metabolic acidosis, a potentially
life-threatening condition.[44]

c.  In 2007, Gregory T. was booked into CCJ after a
hospitalization for deep vein thrombosis.  Although he
had a prescription for Coumadin, CCJ staff failed to
order his prescription.  For nearly 20 days, he
needlessly suffered.  He developed a blood clot in his
leg and had to be hospitalized because of CCJ's failure
to order his prescribed medication.

d.  In 2007, Stella R. had a prescription for Coumadin and
a prescription for hypertension medication, yet CCJ
staff failed to order her prescriptions.  Stella went
nearly 20 days without her prescriptions.  It was only
after we brought this medication error to CCJ's
attention that Stella had her prescriptions ordered.

e.  In 2007, Rebecca N., an HIV-positive inmate, had a
prescription for antiretroviral medication, but CCJ
staff failed to administer her medication daily as
prescribed.  There was a five-day lapse in her
medication, which is especially dangerous for inmates
with HIV.

f.  In 2007, Grant P. suffered head trauma during seizure,
which was likely caused by his not receiving 11 of his
31 prescribed doses of his anticonvulsant medication.

We also found deficiencies in CCJ's MARs.  Contrary to
generally accepted correctional standards, numerous MARs were not
contemporaneously completed or signed as medication was
distributed.  CCJ medical staff often left records blank or
failed to log critical clinical information upon distribution of
medication to inmates.  We spoke with a medication technician who
told us that because of staffing problems in several divisions it
was virtually impossible to distribute medications and document
MARs at the same time.  This practice is inconsistent with
generally accepted professional standards of correctional medical
care and greatly increase the risk of error.

We also reviewed a sampling of MARs during our on-site
visits and found that approximately 15 percent of the MARs were
blank which made it difficult to determine if inmates were
receiving medications as prescribed.  In Division IV, we found

---

[44]    Metabolic acidosis is a clinical disturbance
characterized by a relative increase in total body acid.

- 53 -

particularly high level of blank MARs. When we spoke to the
nursing staff on the division, we learned that Division IV was
severely understaffed. Further, we learned that staffing
shortages had resulted in the division and nurses being unable to
dispense medications in the afternoon or evening. Inmates were
forced wait until the morning before they were able to get their
medications. Similarly in Division III, we learned that
medications were not delivered because of staffing shortages and
inmates were not receiving medications as prescribed. Blank MARs
are indicative of inadequate training, supervision, and staffing.

8.   **Inadequate Infectious Disease Control**

CCJ fails to adequately treat, contain, and manage
infectious disease. This failure is dangerous and places
inmates, staff, and the community at unnecessary risk of serious
health problems. CCJ's management of TB, Methicillin-resistant
Staphylococcus aureus ("MRSA"),[45] and other infectious diseases
deviates from generally accepted correctional medical standards.
Inmates with infectious diseases are not appropriately contained,
treated, or managed. The overcrowding, poor ventilation, and
constant exposure of inmates to each other and CCJ staff are
conditions conducive to the spread of disease. CCJ's containment
and management of infectious disease substantially departs from
generally accepted correctional medical standards.

CCJ fails to ensure adequate containment of TB. Once TB has
been identified, treatment must be initiated and monitored.
Inmates believed to have infectious TB should be placed in
specialized respiratory isolation ("negative pressure") rooms to
reduce the risk of transmission through airborne particles.
Isolation rooms are essential to the prevention of contagion.
These isolation rooms should be tested to ensure proper
ventilation. In addition, staff who are potentially exposed to
the risk should wear masks and be trained in the use of
specialized respirators. We found that CCJ does not comply with
these generally accepted correctional standards.

The most egregious example of CCJ's failure to provide
adequate containment of TB is inmate Wallace G. Wallace was
housed in a respiratory isolation room because of his abnormal
chest x-ray and a history of TB. The room purportedly had
negative pressure to contain any TB organisms. However, we

---

[45]   MRSA is a potentially dangerous drug-resistant bacteria
that can cause serious systemic illness, permanent disfigurement,
and death.

- 54 -

inspected the respiratory isolation room and discovered that the room did not contain negative pressure. A correctional officer was stationed outside the hallway to the negative pressure rooms, in order to ensure that people entering the area wore proper masks, but the doors to the area were propped open. Immediately following our discovery of the possible inadequate containment, we informed CCJ personnel of our finding and the potential health risks. CCJ staff later moved Wallace to another respiratory isolation room that contained negative pressure.

Thereafter, we inquired into whether CCJ was following the Centers for Disease Control and Prevention's recommendations for containment of TB. The recommendations require facilities to check respiratory isolation rooms monthly, and daily when rooms are occupied.[46] We found that neither CCJ, Cermak, nor Facilities Management Department inspect the isolation rooms. This oversight exposes staff and other inmates to a high risk of TB infection.

Similarly, CCJ fails to provide adequate management of skin infections. Consistent with generally accepted correctional practices, jails should adopt a skin infection control plan to guide the prevention of transmission of skin infections, including drug-resistant infections such as MRSA. MRSA transmission can be prevented by early identification, effective treatment, wound care, follow-up, environmental controls, and efficient laundry practices. We found serious deficiencies in these critical areas at CCJ.

CCJ lacks an adequate tracking system to ensure that skin infections are properly treated. We learned that CCJ had a nurse practitioner responsible for wound care and tracking patients with skin infections, but she did not record any of her findings in inmates' medical records. Without an adequate tracking system, inmates with infections are not properly treated and the risk of transmission increases significantly. Similarly, we found that the CCJ laboratory did not report diagnostic cultures of skin infections to the nurse practitioner. A culture, which is an examination of a sampling of cells taken from the affected area, may be done to identify the microorganism causing the skin infection and to determine the antibiotic or other treatment that will effectively treat it. Without wound cultures, it is impossible to recommend appropriate antibiotics and increases the risks of harm.

---

[46]    http://www.cdc.gov/mmwr/PDF/rr/rr5509.pdf

- 55 -

Laundry is also an important component to prevent the
transmission of infection.  Inmates should have access to clean
underwear and regular changes of uniform.  CCJ launders inmates'
clothing once per week, thereby increasing the risk of infection
transmission.  Inmates informed us that the only way to maintain
clean underwear is to wash it themselves in sinks and toilets in
the cell area.  We observed uniforms, underwear, and linen
hanging to dry throughout the cell area and on railings and
dayroom window ledges on every division.  These deficient
practices greatly increase the risk of intramural transmission of
skin infections.

### 9.   Inadequate Record Keeping

CCJ fails to maintain complete, accurate, readily
accessible, and systematically organized medical records.  CCJ
lacks an adequate medical records system to ensure that inmates'
records are correct and accessible so that physicians can provide
appropriate care.

CCJ's medical records system is strained and overflowing
with unfiled and inaccurate medical records.  For example, there
is a three month backlog of unfiled medical records in the
central medical records room; a two month backlog of unfiled
emergency room records; and a three to 14 month filing back log
of medical records in various CCJ divisions.  The backlog of
unfiled records seriously interferes with the continuity and
coordination of care at CCJ.  This inefficient filing system
greatly increases the risk of error in treatment, assessment, and
care.  Further, the current system does not facilitate a system
for coordinated treatment by multiple providers because inmates'
records are not accurate, organized or timely filed.

We found records throughout the facility with critical
medical information missing.  For example, as discussed above,
although inmate Aaron B. was scheduled to see the orthopedist for
his serious knee injury, the physician refused to treat Aaron
because CCJ could not find his medical chart.  Aaron's leg was
subsequently amputated because of a serious infection that
developed due to inadequate care resulting from a chart that was
missing in the medical record.

The inadequate record system is further impeded by
clinicians who created "shadow charts."  Physicians kept lists,
logs, or filed copies of progress notes and diagnostic reports in
their desks so that they could properly monitor their patients'
progress.  While the concept of creating shadow charts might seem
to enhance continuity of care, they actually create another

barrier for maintaining accurate, complete, and accessible
medical records.  In most instances, physicians maintained notes,
lists, and logs that were not updated in central records, which
further created a gap in maintaining complete records.

Our investigation also revealed that medical records were
not readily accessible.  For example, we found that clinicians
did not have access to inmates' records maintained in the
divisions after 3:00 p.m. because the medical records rooms were
locked at that time due to staffing problems.  This lack of
medical continuity and coordination of care seriously interferes
with the clinician's ability to manage medical emergencies
outside of the Cermak units.

### 10. Inadequate Access to Medical Care

The CCJ sick call process fails to provide adequate access
to medical care.  CCJ inmates access medical care by completing
sick call requests.  Although CCJ correctional staff are
responsible for collecting sick call requests, inmates reportedly
make multiple requests before receiving medical care.  Our review
of medical records confirmed that many inmates made several
requests for care before receiving treatment.  For example, on
July 25, 2007, inmate Jackson E. requested medical treatment for
staples that had been left in his scalp and sutures that had been
left in his arm.  Although he made several requests to have the
staples and sutures removed, he did not receive treatment, even
after our consultant alerted CCJ staff to his condition.  He
reportedly was placed in lock down for ten days for making
repeated requests for medical care.  It is inappropriate to
punish inmates for requesting medical care.  Similarly, inmate
Donald C. made repeated unanswered requests for medical care for
eye hemorrhages and lacerations he sustained in an altercation
with custody staff.

Also of concern, inmates reported that they were limited in
their ability to access medical care by the practice of extended
half-tier lockdowns, discussed above.  When inmates are confined
to their cells for extended periods, they have limited access to
custody staff and can be denied access to medical and mental
health care.  For example, inmate Chester H. reported that he had
a seizure during the 26-hour lock down period and he was unable
to receive medical care and was unable to attract the attention
of CCJ personnel.  He needlessly suffered while he waited for
medical care.  Because the nurses do not go onto the units to
deliver medications to inmates who are locked in their cells,
inmates who are on lockdown status during medication
administration do not receive their prescribed medications.  The

- 57 -

extended lockdowns interfere with implementation of prescribed
treatment plans and continuity of care for inmates.

### 11. Inadequate Medical Facilities

Medical facilities at CCJ lack adequate space, privacy,
lighting, and sanitation to provide inmates with medical care
consistent with generally accepted correctional standards.
Approximately 300 inmates receive face-to-face medical care
daily.

Inadequate space is especially significant because it limits
CCJ's ability to provide medical services such as intake
screenings, sick calls, and health assessments as well as care
for inmates with specialty, chronic, and acute needs. The RCDC
intake area is inadequately equipped to manage the daily volume
of inmates during the essential intake screening process. The
area is constantly congested and overcrowded.

Generally accepted professional standards of correctional
medical care require that for a proper clinical evaluation
inmates be examined in a clean and private setting with
sufficient lighting and access to necessary diagnostic tools. We
found mouse droppings in dispensaries and medication rooms
throughout the facility. Moreover, some of these rooms lacked
accessible hand-washing sinks or disinfectant, and contained
unsecured syringes and other sharp implements, which can be
potentially dangerous. Further, the floors and work surfaces of
all of the medical units and intake screening area were filthy.

### 12. Inadequate Dental Care

CCJ fails to provide adequate dental care to its inmates.
Dental care is an important component of overall inmate health
care. Poor oral health has been linked to numerous systemic
diseases. Contrary to generally accepted correctional standards,
dental care at CCJ is not timely and does not include immediate
access for painful or urgent conditions. During our June 2007
on-site visit, we found that there was only one dentist
responsible for over 9,500 inmates.[47] We further learned that the
dentist was unable to perform any restorative care. The
dentist's services were limited to extractions and it usually
takes about two weeks before the dentist was able to perform any
necessary follow-up care. More alarming, we learned that over 25

---

[47]     Three dentists, one dental hygienist, and seven full-
time equivalent dental assistants were cut in February 2007.

- 58 -

percent of the extractions performed at CCJ resulted in chronic infections such as osteitis (inflammation/disease of the bone) or dry sockets.

We also found that the dentist typically was unable to treat inmates with serious or urgent dental needs.  We found many instances where inmates complained of tooth abscesses, but the dentist was unavailable to treat their serious dental needs.  For example, inmate Derek B. was admitted to CCJ on June 17, 2007, with a tooth abscess.  Although Derek requested dental care, the CCJ dentist did not provide treatment for his tooth abscess. Without proper treatment, Derek is at risk of serious deep tissue infection, pneumonia, sepsis, septic shock, and possibly death.

As a result of the dentist's inability to treat serious dental needs, the Cermak emergency room and sick call are inundated with dental emergencies.  Despite having Cermak physicians treat these serious dental emergencies, inmates continue to suffer needlessly because they do not receive appropriate follow-up care.

### 13.   Inadequate Quality Assurance and Performance Measurement

CCJ fails to engage in consistent, effective quality assurance reviews in order to monitor and assess the quality of medical care offered at the facility.  An adequate quality assurance and performance measurement instrument is necessary to examine the effectiveness of health care delivered at CCJ, to discuss medical care results, and to implement corrective action so that the quality of care is improved.  During our on-site visits, we found that CCJ had discontinued many of its performance measurements in February 2007 because CCJ lost accreditation by the National Commission on Correctional Health Care.  As a result, CCJ discontinued its review of chronic disease care, acute and chronic care, completion of treatment for STDs, and access to care.  Performance measurements are a critical component to ensure that polices and procedures are in place and to ensure adequate care.  Without performance measures, the quality of medical care will suffer.

We also found that CCJ failed to conduct self-critical mortality reviews.  Our expert reviewed mortality reviews and autopsies of 13 inmates who died while in custody at CCJ and found that none of the mortality reviews were self-critical.  The absence of self-critical review creates a barrier for proper review that will ensure that proper policies and procedures are in place to correct failures and ensure adequate care, prospectively.

Finally, staff involved in the inmate grievance process are frustrated that once a medical or mental health related grievance is referred to Cermak, a response is not forthcoming. The inmate grievance system should alert medical staff to possible weaknesses in the provision of medical care. We reviewed numerous grievance files that alleged the need for medical services, some of an emergent nature, that showed a referral to Cermak, but contained no actual response to the grievance. For example, inmate Steve S. filed a grievance on March 19, 2007 alleging that he was taken off his psychotropic medication without seeing a doctor, that he had been experiencing nightmares that prevented him from sleeping at night, that he was hearing voices, and that he was contemplating taking his own life and desperately needed help. The CRW acknowledged receipt of the grievance on March 23, 2007, but did not mark the grievance as an emergency and referred the grievance to Cermak with a statement that Steve S. merely alleged he was not getting proper medical attention. On April 2, 2007, Steve S. received a response stating, "Referred to Mental Health Services." The grievance file does not contain any information indicating whether Steve S. ever received mental health treatment.

## C.    INADEQUATE MENTAL HEALTH CARE

CCJ fails to provide inmates with adequate mental health care that complies with constitutional standards. CCJ fails to address the specific needs of inmates with mental illness, including: (1) failure to timely and appropriately evaluate inmates for treatment; (2) inadequate assessment and treatment; (3) inadequate psychotherapeutic medication administration; and (4) inadequate suicide prevention.

Mental health services at CCJ are provided through a combination of County Cermak employees and a contract with the Isaac Ray Center ("IRC") for psychiatric services. Cermak mental health services are directed by a Chief Psychologist who supervises a staff of approximately 50 individuals, including two medical social workers, three activity therapists, one mental health specialist supervisor, and approximately 40 Mental Health Specialists ("MHSs"). County mental health services have recently experienced specific cuts in staffing. The result is an inadequate number of trained staff to provide adequate programming and coverage in the mental health areas.

### 1.    Failure to Timely and Appropriately Evaluate Inmates

CCJ fails to properly identify inmates with mental illness through adequate screening. Adequate screening of incoming

- 60 -

detainees for mental health care needs is instrumental to a facility's ability to identify inmates in need of mental health services, to provide appropriate mental health care, and to reduce potential harm to those whose conditions would otherwise go unrecognized.  Mental health screening should comport with generally accepted correctional standards of care to aid in classification, identification of emergent mental health care needs, provision of continuous care, and management of medication.

Follow-up of known or new mental health problems is a key focus of intake screening.  Mental health screening information should be incorporated into an inmate's medical record.  This ensures the prompt continuation of necessary medication for all inmates with chronic or newly identified mental health conditions.  Persons with potentially serious and/or chronic mental health illness (i.e., active psychosis, suicidal ideation) should be referred from screening for prompt mental health evaluations and examinations by a psychiatrist.

As indicated, CCJ's medical screening and follow-up care procedures deny necessary care to inmates.  The policy governing the CCJ mental health screening process is completely inadequate. Insufficiently trained MHSs perform mental health initial intake screening at CCJ.  This screening is not accomplished under appropriate medical supervision.  The system allows technicians, who are not adequately or appropriately trained in detecting mental illness, to query inmates and detainees regarding their mental health history.

For mental health screening, CCJ staff utilize a form entitled "Department of Mental Health Services Brief Primary Psychological Screening Tool" which is not then incorporated into the medical record.  This is a one page form that is used to collect brief demographic information and answers to 11 general questions.  No mental status exam is completed at that time.  At the end of this brief interview, which lasts for less than five minutes, the MHS makes a decision whether to refer the inmate to general population, refer the inmate for admission to psychiatric services, or to conduct a secondary interview.  The screeners do not ask questions beyond those on the form, and do not appear to understand when additional questions were indicated or what those questions might be, especially relating in the area of assessment of suicide risk.  Thus, mental health symptomatology that is associated with past hospitalizations, current treatment, or suicidal ideation, is unlikely to be uncovered.

- 61 -

Consequently, our expert consultant found that less than five percent of inmates screened are identified as having psychiatric problems. The County's Director of Psychiatric Services acknowledged that the screening process was flawed and one would expect the percentage of inmates identified with psychiatric problems to be as much as ten percent. No psychiatrists are assigned to supervise or support the RCDC intake area where the initial mental health screening is conducted. In addition, we found that even for those inmates who screen positively for serious mental illness, the subsequent referral process to mental health treatment providers is flawed.

2.   **Inadequate Assessment and Treatment**

CCJ fails to appropriately assess and treat inmates with mental illness, including those inmates on the acute care units and in the RTU. Our investigation revealed two principal problems. The first is the lack of attention to past mental health treatment records including previous psychiatric hospitalizations. Virtually no collateral mental health care information is requested or utilized in the assessment process. The second problem is that medical information already collected is not available for review or utilization in the continued assessment and treatment process. Our review of records indicates that this leads to multiple, often conflicting diagnoses, potential over prescription of antipsychotic and antidepressant medications, and medication dose adjustments without clear rationale. These failures have resulted in mental health deterioration and unnecessary suffering.

We noted that there are significant problems with the mental health treatment records. CCJ fails to maintain complete, accurate, and systematically organized mental health treatment records. CCJ's medical and mental health records system is completely inadequate and mismanaged. We observed numerous incomplete, unfiled, and inaccurate records. This flawed record system greatly increases the risk of error in assessment, treatment, and care. The County Director of Psychiatric Services described the medical record operation within CCJ as "grossly inadequate."

The following examples are illustrative of the assessment and treatment failures at CCJ:

   a.   Seth P. was seen for a psychiatric consult during our July 2007 on-site visit. Seth had been admitted to CCJ three to four weeks prior to the consult and, after initial screening, had been placed in the general

- 62 -

population.  No records were available or requested[48] at
the time of the consult.  The psychiatrist evaluated
Seth and assessed him as exhibiting grandiose thinking
and hyperactivity, prescribed medications, and ordered
Seth to be admitted to CCJ's acute psychiatric unit for
further evaluation.  Immediately following the
psychiatric consult, Seth was sent to an outside
emergency room for evaluation for a possible fracture
of his right hand.  Upon his return to CCJ, the intake
MHS,[49] who was not aware of the recent psychiatric
assessment due to the inadequate record keeping,
determined independently that Seth was to be admitted
to the general population.  The result was that Seth
received no further psychiatric evaluation and did not
receive the prescribed antipsychotic medication ordered
by the psychiatrist.[50]

b.   Melanie O. had a miscarriage at CCJ on May 25, 2007,
     was depressed, and had not received any psychiatric
     follow-up even though she was taking psychotropic
     medications.  During our June 2007 on-site visit, we
     observed Melanie sitting in a hallway, having what
     proved to be an acute allergic reaction.  No medical
     records for Melanie were available at that time.
     Eventually, Melanie's medical record was obtained and
     the record reflected that she had been sent to the
     emergency room two days earlier because of symptoms of
     allergic drug reaction.  Medication was prescribed, but
     Melanie had not received the medication because there
     was no record of the prescription order from the
     hospital.  No medical evaluation had been completed to

---

[48]   The Director of Psychiatric Services indicated that to
request such records would be fruitless.  When we insisted that
the records be requested, none were available nor could they be
located.  Eventually Seth P.'s medical records were located, two
days later, and the record was found to be incomplete.

[49]   Each time an inmate is transferred or leaves the
facility for a consult, he is returned to the intake area for a
housing classification.  In this case, the housing classification
was conducted by the intake MHS.

[50]   The psychiatrist was not aware of the mixup and the
situation was rectified only after we brought the matter to his
attention.  The Director of Psychiatric Services indicated that
this was typical of what happened at CCJ on a daily basis.

- 63 -

determine the cause of her allergic reaction and no
psychiatric assessment of her mental state occurred.

c.    Kyle N., who had been assigned to CCJ's acute
psychiatric unit, had a medical record which contained
misfiled medical record information belonging to
another inmate.

d.    Anthony G. was housed on a Division IX segregation
unit, with limited out-of-cell time, and had not had
any access to psychiatric care in over six months.  He
reported setting fires to get access to medical and
mental health care.  The officers' log verified
Anthony's fire setting.

e.    Drew E. was also housed in Division IX and admitted
that he also set fires to get access after repeatedly
receiving no response to his grievances over lack of
access to medical and mental health care.

As demonstrated, CCJ fails to provide essential, generally
accepted components of an adequate treatment programs in a
correctional mental health system.  The crisis level of care
lacks the capacity for necessary short-term treatment.  There is
not adequate physical space for evaluating and treating inmates
in the emergency or RCDC areas.  At present, psychiatrists do not
go to the general population to see inmates or conduct clinics.
In addition, psychiatrists do not make rounds in any segregation
areas.  Rather, all inmates are brought to the emergency room
area to be seen.  The result is that inmates who for security
reasons or lack of escort correctional staff cannot be brought to
the emergency room area, are not seen.

In addition, CCJ does not have access to an acute care
program that would provide appropriate access for inpatient
hospitalization.  For example, mental health staff have no
involvement in substance abuse assessment or treatment and make
no referrals for substance abuse assessment or treatment.  Also,
a chronic care program for inmates with serious mental illnesses
does not exist.  While CCJ does provide segregated housing units
for inmates with serious mental illnesses, these housing units
lack an adequate treatment program, which is an essential
component of an adequate chronic care program.

3.    **Inadequate Psychotropic Medication Administration**

CCJ fails to timely and appropriately evaluate inmates for
the administration of psychotropic medications and to monitor

- 64 -

their continued administration.  Many CCJ inmates require
psychotropic medications to avoid the unnecessary suffering of
acute and chronic episodes of mental illness.  Generally accepted
correctional mental health care standards require that a
physician see an inmate usually before, but clearly shortly
after, a prescription for psychotropic medication is written in
order to evaluate whether the medication should be maintained and
to evaluate the continued administration for proper dosage and
effectiveness.  Inmates who remain untreated, or who are treated
without being seen by a physician, may suffer from a worsening of
their symptoms, including suicidal and homicidal thoughts, or
from the potentially lethal side effects of medication.  CCJ
consistently fails to follow this practice.

We found significant problems with regard to medication
management, which include the following:  (1) delays ranging from
days to weeks for inmates having their psychotropic medications
started after their admission to CCJ; (2) breaks in receiving
their medications after their prescriptions were initiated at CCJ
related to housing changes and nurse unavailability for
medication administration; (3) inmates not receiving their
prescribed medications due to being locked down for extended
periods of time and unable to receive medications when called;
(4) numerous medication errors appeared to be common;
(5) psychotropic medications being prescribed or reordered
without any clear medical rationale or justification; and
(6) lack of monitoring for side effects, or potential toxicity,
particularly with regard to the psychotropic drugs Lithium,
Depakote, and Clozaril.

As confirmed by our investigation and acknowledged by the
Director of Psychiatry, inmates routinely do not receive
medications as prescribed or have lapses in medication
administration.  Medication errors were common due to nurses
being overwhelmed and failing to observe inmates taking their
medications or to assure that the medication was delivered as
prescribed.

Medication administration problems are compounded by the
fact that psychiatrists do not utilize any formal practice
guidelines or protocols with regard to the psychiatric care being
provided at CCJ.  No routine lab work, weights, measurements, or
screenings are conducted regardless of the medication being
prescribed.  Generally accepted professional standards require
regular blood draws and lab work whenever certain psychotropic
drugs are prescribed to ensure that the patient is receiving
therapeutic levels of the medication.  Metabolic syndrome which
is characterized by the presence of risk factors including

- 65 -

obesity, abnormal lipid profiles (high LDL cholesterol, low LDL cholesterol, and high triglycerides) is not tracked. Screening for the side effects of antipsychotic medication is not routinely done. The result is that CCJ is providing medication management that significantly departs from generally accepted professional standards. Illustrative examples from 2007 include:

a.    Salazar F. did not receive his antipsychotic medication after his transfer to Division IX from CCJ's acute psychiatric unit.

b.    Although Raul G. was housed in the Division V medical unit, he did not receive his prescribed antipsychotic medications for three weeks after intake.

c.    Julius T. was prescribed antipsychotic, antianxiety, and antidepressant medications. The rationale for prescribing these medications could not be determined. In fact, the psychiatric portion of his medical record concerning substance abuse, depression, anxiety, and withdrawal could not be located.

d.    Jones C. was prescribed three varying doses of an antipsychotic medication without clarification as to which dosage was appropriate (40mg, 60 mg, or 80 mg) or clarifying changes in dosage, if that was the case. It appeared that CCJ clinicians were engaging in polypharmacy, the inappropriate practice of prescribing multiple medications within the same class, without justification, for the same illness. He was also being prescribed two additional antipsychotic medications with no justification in the record for the multiple medication orders. It is likely that the lack of available records contributed to the disorganization of the care of this inmate.

e.    Arnold R. was being prescribed an antipsychotic medication and an antidepressant without any documentation in his medical record as to the rationale for the prescription or any follow-up on his psychiatric medications.

f.    Diego F. was receiving two antipsychotic medications and an antidepressant medication. His record contained no rationale for the medications and identified him as having no psychiatric problems.

- 66 -

### 4.    <u>Inadequate Suicide Prevention</u>

Suicide prevention practices at CCJ are grossly inadequate. Constitutional requirements mandate the development of suicide prevention standards.  These standards require (1) an appropriate policy and procedure; (2) education and training for all staff members; (3) appropriate screening to assess suicide risk; (4) appropriate housing for those identified as at risk; (5) appropriate supervision, observation, and monitoring of those inmates so identified; (6) appropriate referrals to mental health providers and facilities; (7) appropriate communication between correctional health care and correctional personnel; (8) appropriate intervention addressing procedures of how to handle a suicide in progress; and (9) appropriate notification, reporting, and review if a suicide does occur.

CCJ's current practice of suicide prevention does not comport with generally accepted professional standards of correctional mental health care.  CCJ's written policy on suicide prevention fails to ensure appropriate management of suicidal inmates and lacks major components of an adequate suicide prevention program.  For example, CCJ's policy states that "if a patient is determined to be an imminent risk of harm to self, they will be placed in restraints following protocol."  This practice of manually restraining suicidal individuals is contrary to generally accepted professional standards and, as affirmed in conversations with CCJ staff, being utilized solely due to lack of staff for continuous observation of the suicidal inmate.  The result of this inappropriate policy is the unnecessary and excessive use of restraints.

An illustrative example is inmate Dallas W. who was placed in four-point leather restraints (all limbs) after expressing thoughts of committing suicide, despite the fact that he exhibited no aggressive or suicidal behavior.  The review of restraint logs from July 2006 to June 2007 showed that in over 50 percent of the episodes, inmates were shackled with full leather restraints because of suicidal ideation and the fact that continuous observation was unavailable.  This is grossly inappropriate.

In addition, the appropriate observation of suicidal inmate patients is hindered by physical limitations of the rooms in which they are being placed.  Observation rooms have blind spots and windows that are set too high for routine viewing.  Moreover, many of the rooms contain numerous environmental risk factors including exposed plumbing and electrical hazards.

Contrary to generally accepted correctional practices, CCJ correctional officers and other staff have no access to cut-down tools for quick response in the event of a suicide attempt by hanging.  In each of the three CCJ suicides completed in 2008, there was a delay between discovery of the inmate hanging and removal of the noose.  For example, on January 1, 2008, the first correctional officer to discover inmate Grant N. hanging from his bunk attempted to lift Grant to remove the sheet from his neck, but was unable to do so.  Approximately six additional minutes elapsed before paramedics were able to cut Grant down, using a key to sever the noose.

As a result of the administrative division between corrections and health care at CCJ, communication between mental health staff and correctional staff is informal and often strained.  Significant communication problems between custody and mental health staff result in a fragmented, uncoordinated system. This problem is exacerbated because suicide prevention is not under the direction and supervision of mental health staff. Inmates placed on suicide watch are being observed by correctional officers who have a myriad of other responsibilities in addition to the observation task and have limited or no familiarity with the on-going assessment of suicidal individuals. The current suicide prevention program fails to contain different levels of supervision of the inmate based on the presenting risk factors for suicide.  Staff are not appropriately trained in suicide prevention.  Annual training for correctional officers regarding suicide prevention is not required.  Correctional officers assigned to the mental health units do not receive any additional specialized training on working with individuals with mental illness.  Finally, contrary to generally accepted practice, there is no adequate clinical administrative review by mental health staff following a suicide or a suicide attempt to identify what could have been done to prevent the act.  Our review of the records of two recent inmate suicides[51] illustrates the significant problems:

a.    On July 27, 2006, inmate Manuel M. hanged himself to death in a maximum security wing of CCJ.  A correctional officer reportedly found Manuel hanging from a bed sheet at 3:20 a.m.  He had been in CCJ

---

[51]    In addition to the suicides discussed above, on March 14, 2008, an inmate was found hanging in his Division I cell.  He was hospitalized in critical condition and died when he was taken off life support on March 18, 2008.  On April 14, 2008, another CCJ inmate hanged himself with a bed sheet in a Division I cell, and was pronounced dead at the hospital.

- 68 -

approximately one week on a charge of failing to register as a sex offender. His records reveal that at intake he provided a history of suicide attempts in the past, but denied current suicidal ideation. No secondary mental health evaluation was conducted. Manuel received no additional mental health assessment prior to his death in the facility.

b. On July 25, 2006, inmate Andrew K. committed suicide by hanging himself in his cell, two days after arriving at CCJ. Andrew was discovered by another inmate. His record reveals that at the time of intake, Andrew denied suicidal ideation and no secondary mental health evaluation was conducted. Andrew's documented past history included three prior psychiatric hospitalizations, including a suicide attempt by overdose. Nevertheless, Andrew received no additional mental health assessment prior to his death. No recommendations or findings were made in the mortality review, except for the comment "May consider a two person accommodation to watch over each other."

5. **Inadequate Staffing, Training, and Supervision**

CCJ's fragmented system of providing mental health care has contributed to many of the problems above. In addition, many of the shortcomings in mental health care are exacerbated by the lack of adequate staffing, support, training, and supervision.[52] CCJ maintains an insufficient number of appropriately trained mental health and custody staff to provide adequate mental health services.[53] Moreover, delays in access to mental health care are exacerbated by an insufficient number of staff trained to identify, respond, and provide the necessary mental health treatment. Generally accepted correctional standards of care

---

[52]   Concerns were raised by the Chief Executive Officer of the IRC regarding the decreased budget for mental health services and the resulting mental health staff cuts, particularly the decrease in the number of MHSs and the replacement of existing MHSs with less qualified individuals. The severe budget cutbacks, as reflected in decreased staffing, resulted in a "breakdown in translation and execution of mental health care."

[53]   We observed very limited programming on the units. An interview with the Chief Psychologist verified that within the last six months due to budget cuts and the resulting staff reduction, programming on the units had been severely reduced.

- 69 -

require that facilities maintain adequate staffing to provide
inmates with necessary mental health care.

Shortages in key staff areas (MHS, correctional staff,
nursing, medical records, and social workers) interfere with
adequate access to mental services.[54]  As indicated, there is an
inadequate number of MHSs to provide screening and supportive
mental health care.  This problem is compounded by the fact that
recently hired MHSs lack the necessary training and experience.
As indicated, correctional staff are inadequately trained to work
with mental health inmates.  In addition, officers are being
rotated too frequently to develop familiarity with the
population.[55]  There are an insufficient number of nurses to
provide mental health services for the designated mental health
units and to run a medication administration program that
comports with generally accepted professional standards.[56]  In
addition, there are insufficient numbers of social workers to
provide for discharge planning, continuity of care, and

_____

[54]     These staffing shortages were noted by the Court
Monitor for Mental Health responsible for monitoring compliance
with the CCJ consent decree in Harrington v. DeVito, No.
74-C-3290 (N.D. Ill. Oct. 19, 1978).  In his 1998 and 2002
reports, the Court Monitor for Mental Health found that a
shortage of adequately trained nurses, activity therapists,
mental health specialists, psychiatrists and psychologists
resulted in inmates "facing significant access barriers to care
and adequate therapeutic programming resources."  He further
found that the lack of adequate numbers of medical record
technicians resulted in incomplete records, included filing not
being completed in a timely fashion or misfiling, and lack of
availability of records during clinical assessments.  Our
independent evaluation identified that inadequate staffing
currently results in unconstitutional mental health care
deficiencies.  These same staffing deficiencies were identified
by the Harrington lawsuit and referenced in the 1998 and 2002
Court Monitor for Mental Health's reports.

[55]     The Court Monitor for Mental Health also noted the lack
of compliance with the Harrington Consent Decree with regard to
security staffing.  He found that the failure to utilize
appropriately trained correctional officers on a regular basis in
mental health areas was noted to have significantly impacted the
treatment offered to inmates with serious mental illness.

[56]     This was acknowledged by the Acting Director of Nursing
who indicated it is difficult to maintain adequate psychiatric
nurse coverage on the psychiatric units.

- 70 -

reintegration into the community.  Finally, there are an
inadequate number of trained health record technicians to operate
an effective health record system.

## D.    INADEQUATE FIRE SAFETY

The level of fire safety at CCJ is poor.  Inadequate fire
safety at any correctional institute presents a grave risk of
harm from smoke, fire, and the serious security concerns that
arise during an emergency.  These serious risks are present
throughout CCJ.  There are no smoke detectors in most inmate
housing areas, which means staff have no way to receive warning
of fire or smoke other than from the inmates who may have set the
fire.  Keys are not marked for rapid identification in an
emergency.  Staff was often not prepared to quickly unlock the
doors for rapid evacuation, not knowledgeable of how the fire
alarm system works, and poorly prepared for an emergency.  Weekly
Divisional Reports, from February 26, 2007 through June 17, 2007,
show an average of 1.8 fires per week at CCJ.  During our site
visits, we saw evidence in numerous cells that inmates are
setting fires beneath their beds in order to utilize the metal
bunk as a hot plate to heat food.  Multiple inmates reported that
they resort to lighting fires in their cells in order to get
correctional officers' attention.  Considerable improvement in
built-in protection and staff preparedness is necessary to meet
generally accepted standards for fire safety in a correctional
setting.[57]

One CCJ correctional officer is assigned to make monthly
fire safety "inspections" for the entire facility.  These are
cursory inspections to confirm that items on a standard checklist
are done.  The designated officer has not had training in fire
safety and apparently just fills out the inspection check list
with little in-depth evaluation of safety issues.  Reportedly,
there is a fire safety officer for each division, but these
officers' only responsibility regarding fire safety is the
monthly inspection of fire extinguishers.  Fire safety
inspections should be done by persons trained in fire safety.
They should have knowledge in basic housekeeping, emergency
preparedness, basic applicable codes, fire extinguishers, and
sprinklers.

---

[57]    In addition to generally accepted correctional
standards, the Illinois Office of the State Fire Marshal requires
that all jails must comply with the National Fire Protection
Association's Life Safety Code ("LSC") (200).

- 71 -

Key control is a major problem. On several occasions during our on-site visits, when officers were asked to unlock doors, there was confusion as to which key unlocked a specific door or if the correct key was on the ring the officer carried. In many cases, several keys were tried without success, and then a key on the same ring was found that would unlock the door. The keys were not identified by touch and the visual markings were difficult to read in low light situations. In a correctional setting, generally accepted correctional standards require that all emergency keys be identified by sight and touch.[58] On October 5, 2007, the Sheriff's Office reported that CCJ had made improvements in key control, but we have not yet verified this information.

Divisional emergency procedures and fire plans are different between divisions with no standard format or standard procedures. For example, the Division IV instructions require that emergency keys to be color-coded red, but other divisions do not. Some instructions include floor plans, while others do not. While it is understandable that both the physical plants and levels of security differ by division and require some variation, the general format and information should be similar. This will help employees to more easily familiarize themselves with the procedures as they move positions.

Fire drills are not being done on a regular basis on each shift. Many officers reported that they had not participated in any recent fire drills and had not had training on fire safety since the academy. According to generally accepted correctional standards, monthly fire drills are required in institutional occupancies.[59] Monthly drills should rotate so that they are conducted quarterly on each shift. Drills should be conducted at differing times and under differing conditions, such as using different egress routes to confirm that officers have the necessary keys and know how to use them. Records of each drill should be maintained for at least one year.

CCJ does not have sufficient smoke detection and sprinkler systems. Smoke detection should be installed in all housing units in accordance with generally accepted correctional

---

[58]    See also LSC § 23.7.5.

[59]    The Municipal Code of Chicago, Fire Prevention Code ("FPC"), also requires monthly fire drills. FPC, Article XVI, § 1 (15-4-920) (Jan. 1999).

- 72 -

standards.[60] Basement storage areas should have sprinkler protection or be enclosed in fire resistive construction.[61] Stairs should be enclosed so that smoke will not travel throughout the buildings. Most of the CCJ Divisions do not comply with these generally accepted correctional standards. For example, Division I, which was built in 1929, has no sprinklers and no smoke detection. A manual fire alarm system is installed. The cells are open-barred in the front and back and the doors to the stairs are open bars from the basement to the fourth floor, which could allow smoke to spread quickly throughout the building in the event of a fire. Only Division XI, Dorm 4 of Division II, and Cermak are fully protected with automatic sprinklers. Some of the buildings have partial sprinkler protection in selected areas of the basements, while others do not. Several fire/smoke barrier doors were not working properly. Many of the stairwell and fire doors throughout CCJ were wedged open, which would allow smoke and heat to travel quickly throughout the building. In addition, in many divisions no one is consistently checking emergency doors and locks to ensure that they are operational. We found that the locking mechanisms on multiple emergency exits in housing units had been sabotaged by inmates inserting debris into the lock, unbeknownst to staff, which prevented the doors from opening from inside the housing unit. This is a major safety hazard.

In many divisions, we found extra mattresses stored inappropriately in rooms without adequate fire protection. For example, in Dormitory Two of Division II, we found several mattresses stored in the multi-purpose room on the first floor, which is not designed or protected as a storage room. A fire in these mattresses could quickly spread smoke throughout the building and unnecessarily expose inmates to danger. Mattresses should only be stored in designated areas that are protected against fire risks. The potential risk from CCJ's flammable mattresses is clear. On January 4, 2007, two officers were injured after an inmate in Division IX set his mattress on fire. One officer suffered smoke inhalation and was admitted to the hospital. Another officer was cut on his arm during an evacuation of the housing unit.

Finally, as discussed above, the RCDC becomes very crowded in the late afternoons and evenings. There are two doors out of this area. Assuming each door has a clear width of 34 inches,

---

[60]    See also LSC § 23.3.4.4.

[61]    See also FPC § 9 (15-16-030)(b); LSC § 23.3.2.

generally accepted correctional practices indicate that each door is a sufficient exit for a crowd of 135 to 170 persons.[62]   That means the RCDC can safely provide emergency exits for 270-340 people.   The number of RCDC occupants, including newly admitted inmates, inmates returning from court, correctional officers, and medical and mental health care staff, often swells well beyond 400 persons, clearly exceeding the available egress capacity.

## E.   INADEQUATE SANITATION AND ENVIRONMENTAL CONDITIONS

CCJ has severe environmental health and safety problems at every level of operation.[63]   Most CCJ staff appeared well meaning with regard to environmental conditions, even when, in some instances, the staff person had never received adequate training to sufficiently understand the task at hand.   However, inadequate staffing, inadequate training, insufficient oversight, and a lack of uniformity of policies and procedures across divisional lines are detrimental to staff who want to perform at a professional level.

### 1.   Facility Maintenance

In a facility the size and age of CCJ, it is normal and expected that maintenance and repair work would be an on-going challenge.   In a correctional setting where inmates and staff are dependent on maintenance staff for their water, heat, lighting, and ventilation, it is also expected that these issues would be addressed in a timely manner in order to reduce risks of illness and injury to inmates and staff alike.   That is not the case at CCJ.   Work orders generated by correctional staff are transmitted to the Cook County Facilities Management Department.   During our site visits, we observed hundreds of maintenance and repair needs, many of which had not been addressed for months.   Upon review of work orders generated between February and July 2007, we found 2715 were uncompleted, including many that were more than four months old.   With the exception of Division XI, staff uniformly complained about the lack of timely responses to work order requests.   The failure to timely process work orders exacerbates the overcrowding issues at CCJ.   In Division V alone, more than 100 cells (approximately ten percent of the division's

---

[62]   See, e.g., LSC § 7.3; FPC § 10 (13-160-210).

[63]   Although the John Howard Association found "reasonably successful" sanitation efforts in 2007 (Court Monitoring Report at 64), conditions at CCJ were far below compliance with constitutional requirements during our on-site visits.

- 74 -

capacity) were closed because of maintenance issues during our
July 2007 visit.

Part of the backlog regarding work orders is a result of the
division between CCJ's correctional staff and the County
Facilities Management Department.  Correctional staff are not
permitted to undertake any facility repair work.  Even a burned
out lightbulb in an inmate's cell requires a Facilities
Management work order and an electrician to change the bulb.
This results in inmates having no lighting in their cells for
multiple days in a row, which is especially dangerous when the
inmates are locked inside their cells for extended periods.

Electrical hazards were prominent throughout the housing
areas and neither correctional officers nor maintenance staff
seemed to be concerned about them.  During our July 2007 on-site
visit, 34 uncompleted work orders for exposed wiring in Division
XI dated as far back as February 23, 2007.  We frequently
observed broken switch plate and receptacle covers with exposed
live wires throughout the housing units, including shower and
toilet areas where floors were wet, creating a severe shock
hazard.  In Division VIII, a receptacle in a recreation room was
pulled completely away from the wall, with no cover plate.  The
outlet tested live, which is a major safety hazard to inmates and
staff.

Plumbing deficiencies were also abundant.  It was common to
find that multiple sinks, toilets, and showers were inoperable in
a single tier.  It was rare to find hot water availability in a
cell, and we observed many inmates locked in cells for as long as
26 hours with no access to drinking water.  We saw multiple in-
cell plumbing leaks that resulted in constant cell flooding.
Many of these conditions had existed for more than a month.

Serious ventilation issues were observed in some areas.  In
Division VI, Unit 2-C, 21 out of 22 cells had no ventilation
because metal plates had been installed behind the grate on the
supply ducts, prohibiting the movement of air into the cells.[64]
Although the unit was designed to house 44 inmates, it was
overpopulated at the time of our visit and housed more than 60
inmates, with many inmates housed three to a cell and locked in
for 26-hour periods every other day.  These cells are not big
enough to meet generally accepted correctional standards for

---

[64]    This condition violated Illinois County Jail Standards
701.120(a)(4).

- 75 -

three inmates.[65]  Air quality measurements indicated excessive temperature and relative humidity within the tier.  The combination of high temperature and humidity, overcrowding, and lack of air movement creates an unhealthy environment that increases the risk of disease transmission.  This particular tier also had exposed wiring in the dayroom; all three of the sinks in the toilet area were out of order; two of the three showers were inoperable; a water leak under the tile on both sides of the bathroom door created a falling hazard; and six burned out lights in the dayroom resulted in unacceptably low light levels.

Finally, as discussed above, conditions in the RCDC intake area are grossly inadequate for the purpose it serves and the number of inmates who are processed through the area each day.  Consistent with generally accepted correctional standards, the limited toilets available should serve a dormitory of a maximum of 36 inmates, not the several hundred inmates processed through the RCDC each day.  Given the lack of timely responses to plumbing problems at CCJ, it is easy to imagine the filthy environmental conditions that exist in the RCDC when the toilets become clogged.

Maintenance and sanitation are categorically inadequate throughout the facility, exposing inmates and staff to unhealthy and unsafe environments as a result.

## 2.   **Pest Control**

The three major pest problems observed during our site visits involved mice, cockroaches and drain flies.  Although mice and cockroaches are nocturnal by nature and are not generally seen in daylight hours, we did observe a few of these during our visits and found evidence of their presence.  Staff and inmates alike commented on the presence of mice in the facility and many

---

[65]     None of the cells at CCJ are sized to accommodate more than two inmates per cell.  In fact, the American Correctional Association waived their sizing standards for portions of the facility to allow accreditation because many of the cells do not meet current standards for housing two inmates.  A third inmate in these cells has to place his mattress on the floor of the cell, further reducing the unencumbered space in the cell and making it difficult for the inmates to move around in the cell.  The third inmate on the floor is forced to sleep with his face at floor level where he inhales dust particles and airborne allergens that settle to the floor; increasing the risk to the inmate of contracting respiratory infections.

inmates had towels or other types of barriers across the bottom
of their celldoors to keep the mice out of their cells at night.
Drain flies are small flies that are found in shower and toilet
areas where they lay their eggs in gelatinous organic matter that
builds up under the rim of toilets and in floor drains.   These
flies were noted in several of the divisions including the Cermak
medical area where fly traps were being used to capture adult
flies.   Outbreaks of adult flies have been associated with
bronchial asthma in susceptible individuals.   Their presence is
also a sign of inadequate housekeeping and sanitation.

Except for the food service and Cermak hospital areas, pest
control is managed by CCJ staff.   CCJ has only one person
assigned to conduct pest control for the entire 96-acre facility.
While this person is a licensed and certified pest control
operator ("PCO"), one person cannot perform adequate pest control
for a facility of this size and nature.   Staff indicated that the
PCO works on an on-call basis to resolve acute problems.   Pest
control at CCJ is totally a reactive effort.   The size of the
facility does not allow the PCO to do much follow up or
preventive work.   We found numerous mousetraps that had heavy
layers of dust on them, indicating that little follow up work was
done to check the traps and to replace bait as needed.

### 3.   **Sanitation Oversight**

We were informed that CCJ has a single registered sanitarian
on staff.   However, upon interviewing the facility's sanitarian,
we learned that she was not registered by any state or national
professional organization and had no formal education as a
sanitarian.   She has been in her current position for six years,
but has never had an opportunity for any in-service training
outside of the department.   She also had not had any
opportunities for training on the few pieces of sanitation
equipment provided to her.   This lack of training severely limits
her ability for professional growth to learn about current
environmental health practice as well as emerging environmental
issues in correctional facilities such as MRSA.   The CCJ
sanitarian is not being supported through training and education.

CCJ's sanitarian functions as an inspector who also provides
some training to staff on chemical usage.   Her inspections duties
cover areas such as housekeeping, lighting, plumbing, chemicals,
pest control, fire extinguishers, hot water temperatures, and the
like.   Housekeeping inspections are done by visiting one tier per
division per month.   Given the facility's size, it could be six
months to a year before she is able to make a return visit to a
particular tier.   She checks hot water temperatures by asking the

inmates because she has no tools to measure the temperature. She
checks fire drill logs and the inspection tags on the fire
extinguishers to make sure documentation is completed, but she
has no involvement in the actual fire drills themselves. She
checks lighting by looking for burned out fixtures because she
has had no training on how to use a light meter. She inspects
the kitchen but has no equipment to test or measure anything with
to insure that safe food conditions exist in the kitchen. Her
last ServSafe® and Illinois Department of Public Health Food
Service Certification training occurred in 2001 and expired in
2006. Despite all of the inspection work she does, she has no
authority to effect changes in housekeeping practices, food
service operations, housing conditions, pest problems, or fire
safety issues. In effect, she is an inspector of documentation
more than a verifier of actual conditions at CCJ.

Organizational oversight appears to be weak throughout the
divisions. We constantly observed conditions that should not
have existed if staff were being held accountable for conditions
in the housing areas. Staff must be aware of and take action
when policies are violated by inmates and unsafe conditions are
seen. Staff frequently seemed to turn their back on issues such
as obvious safety hazards caused by inmates tampering with
electrical outlets, hanging clothes lines from damaged light
fixtures in cells or in shower areas, the accumulation of large
amounts of commissary items and/or food items in their cells,
etc. Apparently no one is held accountable for the poor levels
of housekeeping that we observed throughout the jail.

Oversight must also extend to the inmates themselves. They
must be held accountable for their actions when they do not
adequately clean their cells and dayrooms, when they damage CCJ
property, and when they openly violate CCJ policies. Failure to
enforce inmate accountability greatly increases the maintenance
load on staff and creates a higher risk for staff and inmate
injuries.

4.  **Housekeeping**

The level of cleanliness at CCJ is very poor. In the
housing and medical areas we observed accumulations of dirt,
trash, mold, and mildew that had been allowed to exist for long
periods of time. Cells frequently had heavy layers of dirt and
dust under the bunks and around the toilet areas. Shower areas
frequently had dirt, mold, and mildew on walls and ceilings.
Toilet areas were extremely unsanitary.

- 78 -

Mattresses are not cleaned and sanitized between uses.
Hundreds of mattresses were seen in use that were worn to the
point that they were incapable of being cleaned and many covers
were missing entirely.  Torn and damaged mattresses allow the
transfer of harmful pathogens, such as MRSA, from person to
person and also serve as convenient hiding places for shanks and
other contraband.

5.    **Food Service**

The food service program at CCJ is contracted to the Aramark
Corporation, which operates two kitchens, one located in the
basement of Division XI and a larger, central kitchen.  The
kitchens operate under a Health Analysis Critical Control Point
process that is approved by the Chicago Department of Health.
The food service supervisors currently have ServSafe© and
Illinois Department of Public Health Food Service Manager
Certifications.  They receive outside inspections once or twice a
year from the Cook County Department of Public Health and are
inspected on a weekly and monthly basis by jail personnel.

The Division XI kitchen prepares approximately 4500 meals
per day and operates three shifts per day seven days per week.
While sanitation was problematic during our June 2007 visit, the
Division XI Superintendent took immediate action and conditions
were vastly improved during our July 2007 visit.  However, as
both of the dishwashing machines in this kitchen had been out of
order since March 2007, so all pots, pans, and preparatory
utensils are washed by hand without adequate sanitization
procedures.

The central kitchen prepares approximately 30,000 meals per
day and works 200 inmates per day in four crews.  Although the
County selects the inmates who work in the food service area,
Aramark is responsible for their training and supervision.
Inmate workers reported that they receive no training prior to
working in the kitchen.  Aramark staff confirmed that no formal
training takes place.  The correctional officers who work in the
kitchen are responsible only for security.

In March 2007, CCJ found that inmate workers were not
utilizing gloves or hairnets, numerous sinks had clogged drains,
and excessive garbage was piled on the floor.  During our on-site
visits, the dishwashing machines had a very heavy scale buildup
from hard water deposits that tend to clog spray nozzles and
limit the effectiveness and proper washing of food contact
surfaces.  The floor in the dishwashing area is in poor repair,
causing standing water, and is not easily cleanable as required

- 79 -

by food codes.  The Cook County Department of Public Health cited
CCJ on March 13, 2007 for this violation.

The delivery of food to the housing areas is accomplished
with non-insulated carts that are loaded from the plating line
and held until they are picked up by the staff who are
responsible for the delivery.  The kitchen supervisor estimated
that some carts are held two to three hours between plating and
delivery.  Because these carts are not insulated or heated, food
is allowed to cool to a point at which bacterial growth can
occur.  Additionally, food was observed being plated at
unacceptable temperatures.  Food codes require that hot food be
held and served at 140 degrees, but we observed food being plated
for delivery at 26 to 44 degrees below the required temperatures.
The low plating temperatures and significant delays in food
delivery greatly increase the risk of food borne disease.

## IV.   REMEDIAL MEASURES

In order to rectify the identified deficiencies and protect
the constitutional rights of inmates confined at CCJ, this
facility should implement, at a minimum, the following remedial
measures:

## A.   Protection from Harm

1.   Use of Force

a.   Develop and maintain comprehensive and
contemporary policies and procedures regarding
permissible use of force.

(1)   Prohibit the use of force as a response to
verbal insults or inmate threats.

(2)   Prohibit the use of force as a response to
inmates' failure to follow instructions where
there is no immediate threat to the safety of
the institution, inmates, or staff, unless
CCJ has attempted a hierarchy of nonphysical
alternatives which are documented.

(3)   Prohibit the use of force as punishment.

b.   Establish effective oversight of the use of force.

- 80 -

(1)   Develop and implement a policy to ensure that staff adequately and promptly reports all uses of force.

(2)   Ensure that management review of incident reports, use of force reports, and inmate grievances alleging excessive or inappropriate uses of force includes a timely review of medical records of inmate injuries as reported by medical professionals.

(3)   Ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

(4)   Develop and maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct.

(5)   Develop and implement policies and procedures for the effective and accurate maintenance, inventory and assignment of chemical and other security equipment.

(6)   Develop and implement a process to track all incidents of use of force that at a minimum includes the following information:  the inmate(s) name, housing assignment, date and type of incident, injuries (if applicable), if medical care is provided,  primary and secondary staff directly involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

c.   Develop an effective and comprehensive training program in the appropriate use of force.

(1)   Ensure that staff receive adequate competency-based training in CCJ's use of force policies and procedures.

- 81 -

    (2)   Ensure that staff receive adequate competency-based training in use of force and defensive tactics.

    (3)   Ensure that IAD management and staff receive adequate competency-based training in conducting investigations of use of force allegations.

2.    Safety and Supervision

    a.   Ensure that correctional officer staffing and supervision levels are appropriate to adequately supervise inmates.  Discontinue the practice of cross-watching.

    b.   Ensure that inmate work areas are adequately supervised whenever inmates are present.

    c.   Ensure frequent, irregularly timed, and documented security rounds by correctional officers inside each housing unit.

    d.   Develop and implement policies and procedures requiring all tools, utensils, equipment, flammable materials, etc. are inventoried and locked down at all times.

    e.   Ensure that staff adequately and promptly report incidents.

    f.   Develop a process to track all serious incidents that captures all relevant information, including: location, any injuries, if medical care is provided, primary and secondary staff involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

    g.   Establish a procedure to ensure that inmates do not possess or have access to contraband.  Conduct regular inspections of cells and common areas of the housing units for contraband.

    h.   Ensure that inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures.

- 82 -

    i.    Increase use of overhead recording security
        cameras throughout the common areas of the
        facility.

    j.    Conduct regular inspections of cells and common
        areas of the housing units to identify and prevent
        rule violations by inmates.

    k.    Review, and revise as applicable, all security
        policies and Standard Operating Procedures
        ("SOPs") on an annual basis.

    l.    Review, and revise as applicable, all security
        post orders regularly.

    m.    Revise policies, SOPs, and post orders for all
        armed posts to include instruction on use of
        deadly force and when and under what circumstances
        the weapon should be used.

    n.    To the extent possible, taking in account the
        different security levels and different physical
        layouts in the various divisions, standardize
        security policies, procedures, staffing reports,
        and post analysis reports across the divisions.

    o.    Provide formal training on division-specific post
        orders each time a correctional officer is
        transferred from one division to another.

    p.    Implement specialized training for officers
        assigned to special management units, which
        include the Special Incarceration Units,
        disciplinary segregation, and protective custody
        units.  Officers assigned to these units should
        possess a higher level of experience and be
        regularly assigned to these units for stability
        purposes.

3.    Disciplinary Process

    a.    Ensure that inmates are afforded due process for
        any disciplinary actions against them, including
        promptly receiving a disciplinary ticket and a
        fair hearing.

- 83 -

  b. Ensure that disciplinary hearings are conducted in a private setting.

4. Classification

  a. Develop and implement policies and procedures for an objective classification system that separates inmates in housing units by classification levels.

  b. Update facility communication practices to provide officers involved in the classification process with current information as to cell availability on each division.

  c. Update the classification system to include information on each inmate's history with the Special Incarceration Unit "level system" at CCJ.

  d. Provide competency-based training and access to all supervisors on the full capabilities of the CCJ classification and inmate tracking system (or any replacement system).

5. Inmate Grievance Procedure

  a. Develop and implement policies and procedures to ensure inmates have access to an adequate grievance process that ensures that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates, inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

  b. Ensure that grievance forms are available on all units and are available in Spanish.

  c. Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

6. Access to Information

  a. Ensure that newly admitted inmates receive information they need to comply with facility rules and regulations, be protected from harm,

- 84 -

report misconduct, access medical and mental health care, and seek redress of grievances.

b.    Ensure that inmates who are not literate are afforded the opportunity to have information on facility rules and services explained to them orally.

c.    Ensure that information on facility rules and services is available in Spanish.

B.    **Medical Care**

1.    Intake Screening

a.    Ensure that adequate intake screening and health assessments are provided.  Develop and implement an appropriate medical intake screening instrument that identifies observable and non-observable medical needs, including infectious diseases, and ensure timely access to a physician when presenting symptoms require such care.

b.    Ensure that acute and chronic health needs of inmates are identified in order to provide adequate medical care.

c.    Ensure that medical screening information is reviewed in a timely manner by trained medical care providers.

d.    Provide adequate screening and health assessments for inmates in accordance with generally accepted correctional standards of care and ensure adequate evaluation for mental illness and suicide risk.

e.    Ensure that tuberculosis ("TB") screening is conducted in a timely manner.

2.    Acute care

a.    Provide timely medical appointments and follow-up medical treatment.  Ensure that inmates receive treatment that adequately address their serious medical needs.  Ensure that inmates receive acute care in a timely and appropriate manner.

- 85 -

b.   Provide adequate acute care for inmates with
serious and life-threatening conditions.

c.   Ensure that staff are adequately trained and
prepared to handle emergent situations in
accordance generally accepted professional
standards.

3.   Chronic care

a.   Ensure that inmates receive thorough assessments
for, and monitoring of, their chronic illness.
Develop clinical practice guidelines for inmates
with chronic and communicable diseases. Ensure
that standard diagnostic tools are employed to
administer the appropriate preventative care in a
timely manner.

b.   Adopt and implement appropriate clinical
guidelines for chronic diseases such as HIV,
hypertension, diabetes, asthma, and elevated blood
lipids, and policies and procedures on, inter
alia, timeliness of access to medical care,
continuity of medication, infection control,
medicine dispensing, intoxication/detoxification,
record-keeping, disease prevention, and special
needs.

c.   Ensure that medical staff are adequately trained
to identify inmates in need of immediate or
chronic care, and provide timely treatment or
referrals for such inmates.

d.   Ensure that inmates with chronic conditions are
routinely seen by a physician to evaluate the
status of their health and the effectiveness of
the medication administered for their chronic
conditions.

e.   Ensure adequate follow-up treatment and medication
administration concerning all inmates with chronic
conditions.

- 86 -

4.  Treatment and Management of Communicable Disease

    a.  Provide adequate treatment and management of
        communicable diseases, including TB and
        Methicillin-resistant Staphylococcus aureus
        ("MRSA").

    b.  Ensure that inmates with communicable diseases are
        appropriately screened, isolated, and treated.

    c.  Ensure that inmate and staff do not interfere with
        HVAC and negative pressure systems.

    d.  Develop and implement an adequate TB control plan
        in accordance with generally accepted correctional
        standards of care.  Such should provide guidelines
        for identification, treatment, and containment to
        prevent transmission of TB to staff or inmates.

    e.  Develop and implement policies that adequately
        manage contagious skin infections.  Develop a skin
        infection control plan to set expectations and
        provide a work plan for the prevention of
        transmission of skin infections, including
        drug-resistant infections to staff and other
        inmates.

    f.  Conduct a sufficient initial health assessment,
        including screening for TB and STDs, of all
        inmates in a timely fashion.

    g.  Develop and implement adequate guidelines to
        ensure that inmates receive appropriate wound
        care.

5.  Access to Health Care

    a.  Ensure inmates have adequate access to health
        care.

    b.  Ensure that the medical request process for
        inmates is adequate and provides inmates with
        adequate access to medical care.  This process
        should include logging, tracking, and timely
        responses by medical staff.

    c.  Develop and implement an effective system for
        triaging medical requests.  Ensure that sick call

- 87 -

requests are appropriately triaged based up the
seriousness of the medical issue.

6.   Follow-Up Care

   a.   Provide adequate care and maintain appropriate
        records for inmates following hospitalization.
        Ensure that inmates who receive specialty or
        hospital care are evaluated upon their return to
        the facility and that, at a minimum, discharge
        instructions are noted and appropriately provided.

7.   Record Keeping

   a.   Ensure that medical records are adequate to assist
        in providing and managing the medical care needs
        of inmates at CCJ.

   b.   Ensure that medical records are complete,
        accurate, readily accessible, and systematically
        organized.  All clinical encounters and reviews of
        inmates should be documented in the inmates'
        records.

8.   Medication Administration

   a.   Ensure that treatment and administration of
        medication to inmates is implemented in accordance
        with generally accepted professional standards of
        care.

   b.   Ensure that administration of medication is
        accurate and adequately documented.  Develop
        policies and procedures for the accurate
        administration of medication and maintenance of
        medication records.  Provide a systematic review
        of the use of medication to ensure that each
        inmate's prescribed regimen continues to be
        appropriate and effective for his condition.

   c.   Ensure that medicine distribution is hygienic and
        appropriate for the needs of inmates.

9.   Medical Facilities

   a.   Ensure that sufficient space is available to
        provide inmates with adequate medical care
        services including:  intake screening, sick call,

- 88 -

physical assessment, and acute, chronic, emergency, and speciality medical care (such as geriatric and pregnant inmates).

b.  Ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms.  Ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

10.  Specialty Care

a.  Ensure that specialty consultations are timely and that any resulting reports are forwarded to CCJ staff. Specialist recommendations should be implemented in a timely manner or, where deemed inappropriate, a CCJ physician should properly document why such recommendations were implemented.  Provide adequate long-term care planning for inmates with chronic illnesses.

b.  Ensure that inmates are provided adequate access to specialty care in accordance with generally accepted professional standards of care.

c.  Ensure that pregnant inmates are provided adequate care in accordance with generally accepted professional standards of care.

11.  Staffing, Training, and Supervision

a.  Provide adequate staffing, training, and supervision of medical and correctional staff necessary to ensure adequate medical care is provided.

b.  Ensure that medical staffing is adequate for inmates' serious medical needs and that physicians adequately monitor their patients.

c.  Provide adequate physician oversight and supervision of medical staff.

d.  Ensure that there is an adequate number of correctional officers to escort inmates to medical units.

- 89 -

12.  Dental Care

   a.   Ensure that inmates receive adequate dental care
        in accordance with generally accepted professional
        standards of care.  Such care should be provided
        in a timely manner.

13.  Quality Assurance Review

   a.   Ensure that CCJ's quality assurance system is
        adequate to identify and correct serious
        deficiencies with the medical system.

   b.   Ensure that CCJ's quality assurance system is
        capable of assisting in managing and treating
        inmate medical needs.  At a minimum, such a system
        should be reliable and capable of tracking medical
        related incidents.

B.  **Mental Health Care:**

1.  Timely and Appropriately Evaluate Inmates

   a.   Ensure CCJ properly identifies inmates with mental
        illness through adequate screening.

   b.   Ensure that inmates with potentially serious
        chronic mental health illness are referred for
        prompt mental health evaluations and examinations
        by a psychiatrist.

   c.   Provide adequate mental health assessment and
        treatment in accordance with generally accepted
        professional standards of mental health care.

   d.   Ensure that adequate crisis services are available
        to address the psychiatric emergencies of inmates.

   e.   Provide staffing adequate for inmates' serious
        mental health needs.  Provide adequate on-site
        psychiatry coverage.  Ensure that psychiatrists
        see inmates in a timely manner.  Ensure that
        psychotropic medication prescriptions are reviewed
        by a psychiatrist on a regular, timely basis.

   f.   Provide adequate screening to properly identify
        inmates with mental illness.  Ensure that CCJ's
        intake evaluation process includes a mental health

- 90 -

screening that is incorporated into an inmate's medical record.

g.    Develop and implement an appropriate intake screening instrument that identifies mental health needs, and ensure timely access to a mental health professional when presenting symptoms require such care.

2.    Assessment and Treatment

a.    Ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses and problems.  Provide therapy services where necessary for inmates with serious mental health needs.  Provide adequate opportunities for inmates and staff to have confidential communications related to mental health treatment, while maintaining appropriate security precautions.

b.    Ensure that mental health evaluations done as part of the disciplinary process include recommendations based on the inmate's mental health status.

c.    Provide adequate on-site psychiatry coverage for inmates' serious mental health needs.  Ensure that psychiatrists see inmates in a timely manner and that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis.

d.    Ensure that medications are provided to inmates in a timely manner and that they are properly monitored.

e.    Provide staffing adequate for inmates with serious mental health needs.  Ensure that services, such as distribution of medications, are performed by nurses or other properly trained staff.

f.    Provide policies and procedures that appropriately assess inmates with mental illness.

g.    Provide adequate medical documentation and general procedures as part of the mental health

- 91 -

assessments that accounts for inmates' psychiatric histories.

h.   Develop and implement an appropriate intake screening instrument that identifies mental health needs, and ensure timely access to the mental health professional when presenting symptoms require such care.

3.   Psychotherapeutic Medication Administration

a.   Ensure timely responses to orders for medication and laboratory tests, and prompt documentation thereof in inmates' charts.

b.   Ensure that adequate psychotherapeutic medication administration is provided in accordance with generally accepted professional mental health care standards.

c.   Ensure that changes to inmates' psychotropic medications are clinically justified.   Screen inmates on psychotropic medications for movement disorders and provide treatment where appropriate.

d.   Ensure that inmates receive adequate screening and evaluation for the administration of psychotropic medications in a timely manner.

4.   Other Mental Health Issues

a.   Ensure that administrative segregation and observation status are not used to punish inmates for symptoms of mental illness and behaviors that are, because of mental illness, beyond their control.

b.   Ensure that CCJ mental health records are centralized, complete, and accurate.

c.   Ensure that CCJ quality assurance system is adequate to identify and correct serious deficiencies with the mental health system.

d.   Ensure that a psychiatrist or physician conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.   Seclusion or restraint

- 92 -

orders should include sufficient criteria for release.

e. Ensure that all staff who directly interact with inmates (including Correctional Officers) receive competency-based training on basic mental health information (e.g., diagnosis, specific problematic behaviors, psychiatric medication, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; and the appropriate use of force for inmates who suffer from mental illness.

D. **Suicide Prevention Measures**

1. Provide adequate treatment for inmates with self-injurious behavior.

2. Develop policies and procedures to ensure appropriate management of suicidal inmates and the establishment of a suicide prevention program.

3. Ensure that all staff are educated and adequately trained on suicide recognition and intervention, including pre-service and annual in-service suicide prevention training.

4. Provide a curriculum for pre-service and annual in-service competency-based suicide prevention training that includes an array of topics so that staff are adequately trained to identify and manage suicide.

5. Ensure that, prior to assuming their duties and on a regular basis thereafter, all staff who work directly with inmates have demonstrated competence in identifying and managing suicide.

6. Ensure that CCJ suicide prevention policies include an operational description of the requirements for both pre-service and annual in-service training.

7. Ensure that any staff who are exempt from suicide prevention training have limited inmate contact.

8. Screen all inmates upon intake, including questioning to assess current and past suicide risk.

- 93 -

9.    Document inmate suicide attempts at CCJ in the inmate's correctional record in the classification system, in order to ensure that intake staff will be aware of past suicide attempts if an inmate with a history of suicide attempts is admitted to CCJ again in the future.

10.    Ensure that intake staff are sufficiently experienced and qualified to identify inmates that pose a risk for suicide, and conduct appropriate follow-up evaluations by mental health professionals of new inmates within 14 days of intake.

11.    Ensure that inmates on suicide precautions receive adequate mental status examinations by a mental health clinician.

12.    Ensure that suicidal inmates are housed in an area that is safe for them with appropriate supervision and observation by staff.

13.    Ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.

14.    Provide different levels of supervision of an inmate based on the presenting risk factors for suicide.

15.    Ensure that detainees placed on suicide watch are assessed adequately, monitored appropriately to ensure their health and safety, and released from suicide watch as their clinical condition indicates according to professional standards of care.

16.    Ensure that cut-down tools are readily available to staff in all housing units.  Train staff in use of cut-down tools.

17.    Ensure a component of administrative review is implemented following a suicide or a suicide attempt to identify what could have been done to prevent the suicide.

**E.    Fire and Life Safety**

1.    Ensure that all facilities have adequate fire and life safety equipment which is properly maintained and inspected.

- 94 -

2.   Implement competency based testing for staff regarding fire/emergency procedures.

3.   Develop and implement adequate policies and procedures regarding fire prevention including emergency planning and drills.

4.   Ensure that emergency keys are appropriately marked, available, and consistently stored in a quickly accessible location.

5.   Ensure that fire alarms are installed and maintained in all housing areas.

6.   Inventory and store all flammable, toxic, and caustic materials in a well ventilated, but locked, compartment.

7.   Ensure that emergency drills are conducted on a regular basis.

F.   **Sanitation and Environmental Conditions**

1.   Sanitation and Maintenance of Facilities

   a.   Develop and implement policies and procedures to ensure adequate cleaning and maintenance of the facilities with meaningful inspection processes and documentation. Such policies should include oversight and supervision, as well as establish daily cleaning requirements for toilets, showers, and housing units.

   b.   Ensure prompt and proper maintenance of shower, toilet, and sink units.

   c.   Ensure proper ventilation and airflow in all cells and housing units.

   d.   Ensure adequate lighting in all housing units and prompt replacement and repair of malfunctioning lighting fixtures.

   e.   Ensure adequate pest control, including sufficient staffing for routine and follow-up pest control services.

- 95 -

    f.    Ensure that all inmates have access to needed hygiene supplies.

    g.    Develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials.

    h.    Use cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

    i.    Secure all sharp medical tools.

    j.    Destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. Inspect and replace as often as needed all frayed and cracked mattresses.

    k.    Develop a plan to reduce and prevent triple-bunking of inmates in cells designed for two inmates.

    l.    When triple-bunking of inmates is unavoidable, provide a stackable bunk, moveable platform, or cot for each triple-bunked cell, so that inmates are not required to sleep with the mattress directly on the cell floor.

3.    Environmental Control

    a.    Ensure adequate control and observation of CCJ cells, particularly with regard to razors, fire loading materials, commissary items, and cleaning supplies.

    b.    Repair electrical shock hazards; develop and implement a system for maintenance and repair of electrical outlets, devices, and exposed electrical wires.

- 96 -

4.   Sanitary Laundry Procedures

   a.   Ensure that laundry delivery procedures protect
        inmates from exposure to contagious disease,
        bodily fluids, and pathogens by preventing clean
        laundry from coming into contact with dirty
        laundry or contaminated surfaces.

   b.   To limit the spread of MRSA and other infectious
        disease, require inmates to provide all clothing
        and linens for CCJ laundering and prevent inmates
        from washing and drying laundry outside the formal
        procedures.

   c.   To limit the spread of MRSA and other infectious
        disease, ensure that clothing and linens returned
        from off-site laundry facility are clean,
        sanitized, and completely dry.

   d.   Provide all inmates with properly cleaned and
        adequate bedding and clothing.

5.   Food Service

   a.   Provide training for kitchen workers in the areas
        of food safety and food handling to reduce the
        risk of food contamination and food-borne
        illnesses.

   b.   Ensure that dishes and utensils, food preparation
        and storage areas, and vehicles and containers
        used to transport food are properly cleaned and
        sanitized.

   c.   Ensure that foods are served and maintained at
        proper temperatures.

                    * * * * * * *

     Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website.   While
we will provide a copy of this letter to any individual or entity
upon request, as a matter of courtesy, we will not post this
letter on the Civil Rights Division's website until ten calendar
days from the date of this letter.

     We hope to continue working with the County in an amicable
and cooperative fashion to resolve our outstanding concerns

- 97 -

regarding CCJ.  Assuming there is a continuing spirit of
cooperation from the County, we also would be willing to send our
consultants' evaluations under separate cover.  These reports are
not public documents.  Although the consultants' evaluations and
work do not necessarily reflect the official conclusions of the
Department of Justice, their observations, analysis, and
recommendations provide further elaboration on the issues
discussed in this letter and offer practical technical assistance
in addressing them.

    We are obligated to advise you that, in the event that we
are unable to reach a resolution regarding our concerns, the
Attorney General may initiate a lawsuit pursuant to CRIPA to
correct deficiencies of the kind identified in this letter 49
days after appropriate officials have been notified of them.
42 U.S.C. § 1997b(a)(1).

    We would prefer, however, to resolve this matter by working
cooperatively with you and are confident that we will be able to
do so in this case.  The lawyers assigned to this investigation
will be contacting the facility's attorney to discuss this matter
in further detail.  If you have any questions regarding this
letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights
Division's Special Litigation Section, at (202) 514-0195, or
Joan Laser, of the United States Attorney's Office, at (312)
353-1857.

                              Sincerely,

                              Grace Chung Becker
                              Acting Assistant Attorney General

                              Patrick J. Fitzgerald
                              United States Attorney
                              Northern District of Illinois

cc:   Salvador Godinez
      Executive Director
      Cook County Department of Corrections

- 98 -

Patrick T. Driscoll, Jr.
Chief, Civil Actions Bureau
Office of the Cook County State's Attorney

Donald J. Pechous
Assistant State's Attorney
Office of the Cook County State's Attorney

Peter M. Kramer, Esq.
General Counsel
Cook County Sheriff's Office

Daniel F. Gallagher, Esq.
Querrey & Harrow
Counsel for the Sheriff's Office

Paul A. O'Grady, Esq.
Querrey & Harrow
Counsel for the Sheriff's Office