# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

JUL 1 1 2008

Todd H. Stroger
Cook County Board President
118 N. Clark Street
Room 537
Chicago, IL  60602

Thomas Dart
Cook County Sheriff
Richard J. Daley Center
50 W. Washington Street
Room 704
Chicago, IL  60602

          Re:  Cook County Jail
               Chicago, Illinois

Dear President Stroger and Sheriff Dart:

     We write to report the findings of the investigation of
Civil Rights Division and the United States Attorney's Office
into conditions at the Cook County Jail ("CCJ").  On February 16,
2007, we notified the Cook County Board of Commissioners
("County") of our intent to conduct an investigation of CCJ
pursuant to the Civil Rights of Institutionalized Persons Act
("CRIPA"), 42 U.S.C. § 1997.  As we noted, CRIPA gives the
Department of Justice authority to seek a remedy for a pattern or
practice of conduct that violates the constitutional rights of
inmates in adult detention and correctional facilities.

     On June 18-22, 2007, and July 23-27, 2007, we conducted
on-site inspections at CCJ with expert consultants in
corrections, use of force, custodial medical and mental health
care, fire safety, and sanitation.[1]  We interviewed

---

     [1]   Our fire safety and sanitation experts accompanied us
only on the July on-site visit.

- 2 -

administrative staff, security staff, medical and mental health
staff, facilities management staff, training staff, and inmates.
Before, during, and after our visits, we reviewed an extensive
number of documents, including policies and procedures, incident
reports, use of force reports, investigative reports, inmate
grievances, disciplinary reports, unit logs, orientation
materials, medical records, and staff training materials.  In
keeping with our pledge of transparency and to provide technical
assistance where appropriate, we conveyed our preliminary
findings to CCJ officials and legal counsel for the County and
Sheriff's Office at the close of our July 2007 site visit.

        During our July 27, 2007 exit meeting, and by letter dated
August 3, 2007, we notified CCJ officials of life-threatening
deficiencies in sanitation and safety measures at CCJ.  In
particular, we indicated that inadequate emergency key
precautions and grossly unsanitary conditions in certain tiers
resulted in a serious and immediate risk of harm to inmates.  On
August 6, 2007, counsel for the Sheriff's Office promptly
responded by indicating that a number of corrective measures were
being implemented to address our concerns.[2]

        We commend the staff at CCJ for their helpful and
professional conduct throughout the course of the investigation.
We received complete cooperation with our investigation, which is
particularly appreciated given that CCJ is the country's largest
single-site jail.  CCJ provided us with unfettered access to
records and personnel, and responded to our requests, both before
and during our on-site visits, in a transparent and forthcoming
manner.  We also appreciate the County's and the Sheriff's
Office's receptiveness to our consultants' on-site
recommendations.  Accordingly, we have every reason to believe
that the County and the Sheriff's Office are committed to
remedying all known deficiencies at CCJ.

        Consistent with the statutory requirements of CRIPA, we now
write to advise you of the findings of our investigation, the
facts supporting them, and the minimum remedial steps that are
necessary to address the deficiencies we have identified.

---

        [2]    Counsel for the Sheriff's Office provided additional
information regarding corrective measures in a letter and
attachments on October 5, 2007.  We commend the Sheriff's Office
on these reported advances and view them as progress toward
improved conditions at CCJ.  We look forward to the opportunity
to verify the improvements.

- 3 -

42 § U.S.C. 1997b.  As described more fully below, we conclude
that certain conditions at CCJ violate the constitutional rights
of inmates.  In particular, we find that inmates confined at CCJ
are not adequately protected from harm, including physical harm
from excessive use of force by staff and inmate-on-inmate
violence due to inadequate supervision.  In addition, we find
that inmates do not receive adequate medical and mental health
care, including proper suicide prevention.  CCJ inmates also face
serious risks posed by inadequate fire safety precautions.
Finally, we find that environmental and sanitation deficiencies
at CCJ result in unconstitutional living conditions for inmates.

As discussed in this letter, these conditions have resulted
in serious harm to CCJ inmates.  Three inmates committed suicide
at CCJ in the first four months of 2008.  During our
investigation, we identified multiple preventable inmate deaths
and a preventable amputation, due to inadequate medical care.  In
2006, separate incidents of unchecked inmate violence resulted in
two inmate deaths.  In a one-week period during March 2007, CCJ
documented 35 inmate fights, required 27 uses of force, and found
46 weapons within the facility.  The myriad of serious incidents
summarized here, and others discussed herein, indicates that CCJ
is not adequately providing for the safety and well-being of the
inmates.

## I.  BACKGROUND

Located on approximately 96 acres in Chicago, Illinois, CCJ
is the largest single-site county jail in the United States.[3]
CCJ has a daily population of approximately 9,800 adult male and
female inmates, most of whom are awaiting trial in the criminal
court system.  In 2006, CCJ admitted 99,663 inmates.  CCJ is
staffed by approximately 3,800 sworn law enforcement officers and
civilian employees.

CCJ is separated into 11 semi-autonomous divisions,[4] each
with its own superintendent and standard operating procedures.
The majority of the male inmates are housed in three
maximum-security divisions (Divisions I, IX, and X), three
medium-security male divisions (Divisions V, VI, and XI), and one

---

[3]     http://www.cookcountysheriff.org/doc/html/facility.html

[4]     The divisions are designated by number, one through
eleven.  There is no Division VII.  The Receiving Classification
Diagnostic Center essentially functions as a separate division,
with its own superintendent.

- 4 -

medium and minimum-security dormitory division (Division II).
Female inmates of mixed security classifications are housed on
Division III, which also contains male and female medical and
mental health tiers, and Division IV.   Division VIII contains
Cermak Health Services and the Residential Treatment Unit.   The
Receiving, Classification, and Diagnostics Center ("RCDC") is
located in the lower level of Division V and handles reception,
classification, and discharge for all CCJ inmates.   Division I is
the oldest building, dating from 1929, and Division XI is the
newest, opened in 1995.   The divisions range in rated capacity[5]
from 353 inmates in Division III to 1,536 in Division XI.

All corrections and security functions at CCJ are
administered by the Cook County Department of Corrections
("CCDOC") under the Cook County Sheriff.   Health care services at
CCJ are provided by Cermak Health Services of Cook County
("Cermak"), which is part of the Cook County Bureau of Health.
While the health services staff are County employees who are
responsible for the health care of all CCJ inmates, they are not
employed by, or responsible to, the Cook County Sheriff or CCDOC.
Although health care and security issues require a degree of
separation in all correctional facilities, as discussed in more
detail below, the complete division between corrections and
health care operations at CCJ results in serious administrative
problems, including increased frustration, communication
breakdowns, and finger-pointing.   Regardless of the
administrative division, Cook County and the Cook County
Sheriff's Office are responsible for the well-being of CCJ
inmates, including providing adequate care for inmates' serious
medical and mental health care needs.

In 1982, the County entered into a consent decree in Duran
v. Dart, No. 74-C-2949 (N.D. Ill. Apr. 9, 1982) ("Duran Consent
Decree") to resolve a class action lawsuit filed by pre-trial
detainees, pursuant to 42 U.S.C. § 1983, regarding overcrowding
of CCJ.   The Duran Consent Decree, as amended, is still under the
jurisdiction of the United States District Court for the Northern
District of Illinois.   The decree focuses on overcrowding, but
does contain some provisions governing staffing, food service,
personal hygiene, the law library, visitation, physical exercise,
classification, environmental health, and emergencies.   CCJ's
compliance with the Duran Consent Decree is monitored by the John
Howard Association.   CCJ is also governed by multiple other

---

[5]     Actual capacity is often much lower than the rated
capacity due to cells that are inoperable as a result of
maintenance problems.

- 5 -

agreements and orders, such as <u>Harrington v. DeVito</u>, No. 74-C-3290 (N.D. Ill. Oct. 19, 1978) (mental health care) and <u>Jackson v. Sheriff of Cook County</u>, No. 06-CV-493 (N.D. Ill. July 16, 2007) (STD testing). Despite the existence of these court orders, a myriad of unconstitutional practices remain at CCJ. The current court orders applicable to CCJ either do not include specific provisions governing the constitutional concerns raised below regarding protection from harm, inadequate medical and mental health care, fire safety, and sanitation, or have not resulted in lasting or effective corrective measures.

## II.  LEGAL STANDARDS

CRIPA authorizes the Attorney General to seek injunctive relief to enforce the constitutional rights of inmates subject to a pattern or practice of unconstitutional conditions in jails and prisons. 42 U.S.C. § 1997. In defining the scope of jail inmates' Eighth and Fourteenth Amendment rights, the Supreme Court has held that corrections officials must take reasonable steps to guarantee inmates' safety and provide "humane conditions" of confinement. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994); <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979) (holding pre-trial detainees protected by Fourteenth Amendment); <u>Cavalieri v. Shepard</u>, 321 F.3d 616, 620 (7th Cir. 2003). Providing "humane conditions" requires that a corrections system must "take reasonable measures to guarantee the safety of the inmates" and satisfy inmates' basic needs, such as their need for medical care, food, clothing, and shelter. <u>Farmer</u> at 832. The protection of pre-trial detainees' rights under the due process clause of the Fourteenth Amendment is "at least as great as the Eighth Amendment protections available to a convicted prisoner." <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983).

When a jurisdiction takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 851 (1998) (citing <u>DeShaney v. Winnebago County Dept. of Social Servs.</u>, 489 U.S. 189, 199-200 (1989)).

The duties imposed and rights conferred by the Eighth Amendment apply to the unreasonable risk of serious harm, even if such harm has not yet occurred:

> We have great difficulty agreeing that prison
> authorities may not be deliberately indifferent to an
> inmate's current health problems but may ignore a
> condition of confinement that is sure or very likely to

- 6 -

> cause serious illness and needless suffering the next
> week or month or year . . . . That the Eighth Amendment
> protects against future harm to inmates is not a novel
> proposition.  The Amendment, as we have said, requires
> that inmates be furnished with the basic human needs,
> one of which is reasonable safety.

Helling v. McKinney, 509 U.S. 25, 33 (1993) (internal citations
and quotations omitted); Woodward v. Correctional Medical
Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004)
(citing Farmer, 511 U.S. at 842).

The "Eighth Amendment prohibition against cruel and unusual
punishment has been expanded under the Due Process Clause of the
Fourteenth Amendment to impose upon both federal and state
correctional officers and officials the obligation to take
reasonable steps to protect inmates from violence at the hands of
other inmates."  Goka v. Bobbitt, 862 F.2d 646, 649-50 (7th Cir.
1988); see also Hudson v. Palmer, 468 U.S. 517, 526-27 (1984);
Swofford v. Mandrell, 969 F.2d 547, 549 (7th Cir. 1992); Anderson
v. Gutschenritter, 836 F.2d 346, 349 (7th Cir. 1988); Archie v.
City of Racine, 847 F.2d 1211, 1222-23 (7th Cir. 1988) (en banc).

The Eighth Amendment forbids excessive physical force
against prisoners.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).
This is true even when the use of force does not result in
significant injury.  Id.  A jail or prison official who inflicts
force maliciously and sadistically to cause an inmate harm
violates the Eighth Amendment.  Id.

Inmates also have the right to be free from retaliation for
engaging in constitutionally protected conduct, such as
complaining about conditions of confinement.  Walker v. Thompson,
288 F.3d 1005 (7th Cir. 2002); DeWalt v. Carter, 224 F.3d 607,
618 (7th Cir. 2000) ("An act taken in retaliation for the
exercise of a constitutionally protected right violates the
Constitution").

While low staffing levels do not, by themselves, constitute
due process violations, they provide support for a conclusion
that the inmates are treated "recklessly or with deliberate
indifference" to their safety.  Swofford, 969 F.2d at 549.
Similarly, although overcrowding is not a per se constitutional
violation, overcrowding resulting in bunking multiple inmates in
a single cell without adequate safety, space, sanitation,
bedding, or opportunities for activities outside the cells can
amount to unconstitutional conditions of confinement.  French v.
Owens, 777 F.2d 1250, 1252-53 (7th Cir. 1985) (holding that

- 7 -

overcrowding was unconstitutional where it led to unsafe and
unsanitary conditions); Wellman v. Faulkner, 715 F.2d 269 (7th
Cir. 1983) (holding that prison was unconstitutionally
overcrowded); see also Nami v. Fauver, 82 F.3d 63, 67 (3d Cir.
1996) (holding that double-bunking coupled with extended in-cell
periods despite safety hazards could constitute a constitutional
violation).

A jailer's deliberate indifference to an inmate's serious
medical needs violates the Eighth Amendment. Estelle v. Gamble,
429 U.S. 97, 102 (1976); Maggert v. Hanks, 131 F.3d 670, 671 (7th
Cir. 1997). "Deliberate indifference" involves both an objective
and a subjective component. The objective component is met if
the deprivation is "sufficiently serious." Farmer, 511 U.S. at
834. Prison officials may not refuse, unreasonably delay, or
intentionally interfere with medical treatment for incarcerated
individuals. Hudson v. McHugh, 148 F.3d 859 (7th Cir. 1998)
("[T]his is the prototypical case of deliberate indifference, an
inmate with a potentially serious problem repeatedly requesting
medical aid, receiving none, and then suffering a serious
injury."); Zentmyer v. Kendall County, 220 F.3d 805 (7th Cir.
2000). "Deliberate indifference can be evidenced by 'repeated
examples of negligent acts which disclose a pattern of conduct by
the prison medical staff' or it can be demonstrated by 'proving
there are such systemic and gross deficiencies in staffing,
facilities, equipment, or procedures that the inmate population
is effectively denied access to adequate medical care.'"
Wellman, 715 F.2d at 271 (citing Ramos v. Lamm, 639 F.2d 559, 575
(10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981)). Jail
officials also may not provide an easier but less efficacious
course of treatment nor may they offer only cursory medical care
when the need for more serious treatment is obvious. See Estelle,
Estelle, 429 U.S. at 104-05. Failure to provide medication can
violate the duty to provide adequate medical care to address
serious medical needs. See, e.g., Zentmyer, 200 F.3d at 811.

The County's obligation to provide adequate medical care
includes a duty to provide adequate mental health care. Farmer,
511 U.S. at 832; Sanville v. McCaughtry, 266 F.3d 724, 734 (7th
Cir. 2001) (noting that a mentally ill inmate's condition was
"objectively, sufficiently serious" such that incarcerating him
under conditions that posed a substantial risk that he would
commit suicide subjected him to cruel and unusual punishment).
In addressing the constitutionally minimal standards for mental
health care in a jail or prison, the Seventh Circuit notes:
"When a claim is based upon the failure to prevent harm, in order
to satisfy the first element the plaintiff must show that the
inmate was 'incarcerated under conditions posing a substantial

- 8 -

risk of serious harm.'"  Id. (citing Farmer, 511 U.S. at 832);
see also Estate of Novack v. County of Wood, 226 F.3d 525, 529
(7th Cir. 2000); Estate of Cole v. Fromm, 94 F.3d 254, 261 (7th
Cir. 1996).  Where a jail's "actual practice" towards treatment
of mentally ill inmates in general is clearly inadequate, the
facility may be held to be "on notice" at the time of an inmate's
incarceration that there is a substantial risk of deprivation of
necessary care.  Woodward, 368 F.3d at 927 (practice of
inadequate employee training, incomplete intake screening, and
inadequate suicide watch constituted deliberate indifference).

The risk of suicide is an "objectively serious harm" from
which inmates have a right to protection, under the deliberate
indifference standard.  Matos v. O'Sullivan, 335 F.3d 553, 557
(7th Cir. 2003).  Inadequate suicide prevention may constitute
deliberate indifference.  Hall v. Ryan, 957 F.2d 402, 406 (7th
Cir. 1992) (noting that prisoners have a constitutional right "to
be protected from self-destructive tendencies," including
suicide); Woodward, 368 F.3d at 929 (fact that no previous
suicides occurred in jail did not negate possibility of a
practice of deliberate indifference toward suicidal detainees);
Cavalieri, 321 F.3d at 620 (holding that the right to be free
from deliberate indifference to suicide was clearly established).

Inmates are constitutionally entitled to environmental
conditions that do not pose serious risks to health and safety,
including deficient sanitation, inadequate fire safety,
inadequate ventilation, and pest infestation.  Vinning-El v.
Long, 482 F.3d 923, 924-25 (7th Cir. 2007) (holding that
deliberate indifference could be established by inference from
conditions, including floor covered with water, broken toilet,
blood and feces smeared along wall, no mattress to sleep on);
Gillis v. Litscher, 468 F.3d 488, 568 (7th Cir. 2006) ("[A] state
must provide . . . reasonably adequate ventilation, sanitation,
bedding, hygienic materials, and utilities (i.e., hot and cold
water, light, heat, plumbing)."); Board v. Farnham, 394 F.3d 469
(7th Cir. 2005) (requiring adequate ventilation); Isby v. Clark,
100 F.3d 502, 506 (7th Cir. 1996) ("Sanitation, we assume,
includes things like odors and general cleanliness around the
cell.") (emphasis in original); French, 777 F.2d at 1257 (holding
that fire safety is a "legitimate" concern under the Eighth
Amendment); Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th  Cir.
1995) (requiring adequate pest control).

In addition, detainees have a right to be free of bodily
restraints, such as shackles or a restraint chair, unless the
facility demonstrates a legitimate penological or medical reason
for the restraint.  Murphy v. Walker, 51 F.3d 714, 718 (7th Cir.

- 9 -

1995).  Where restraints are used, the inmate should be properly
monitored and the length of restraint-time should be limited to
ensure the inmate's safety.  <u>French</u>, 777 F.2d at 1253-54.
Restraints imposed by correctional officers that are medically
unjustifiable and have no adequate security rationale infringe on
an inmate's due process rights.  <u>Wells v. Franzen</u>, 777 F.2d 1258,
1263 (7th Cir. 1985) (restraint of a suicidal inmate).

### III.  FINDINGS

We find that CCJ fails to adequately protect inmates from
harm and serious risk of harm from staff and other inmates; fails
to provide inmates with adequate medical and mental health care;
fails to provide adequate suicide prevention; fails to provide
adequate fire safety precautions; and fails to provide safe and
sanitary environmental conditions.

### A.  INADEQUATE PROTECTION FROM HARM

Corrections officials must take reasonable steps to
guarantee inmates' safety and provide "humane conditions" of
confinement.  <u>Farmer</u>, 511 U.S. at 832.  Providing humane
conditions requires that a corrections system must satisfy
inmates' basic needs, such as their need for safety.
Additionally, jail officials have a duty to take reasonable steps
to protect inmates from physical abuse.

To ensure reasonably safe conditions, officials must take
measures to prevent the use of unnecessary and inappropriate
force by staff.  Officials must also take reasonable steps to
protect inmates from violence at the hands of other inmates.  In
addition, officials must provide adequate systems to investigate
incidents of harm, including staff misconduct and alleged
physical abuse of inmates.  Finally, a jail has an obligation to
protect vulnerable inmates from harm, such as those who are at
risk of suicide or at risk from other inmates.  For the reasons
set forth below, CCJ fails to meet constitutional standards in
all of these regards.

### 1.  <u>Inappropriate and Excessive Use of Force</u>

Although the violence present in a correctional setting
necessarily permits the appropriate use of force, the
Constitution forbids excessive physical force against inmates.  A
determination of whether force is used appropriately requires an
evaluation of the need for the use of force, the relationship
between that need and the amount of force used, the seriousness
of the threat reasonably believed to exist, and efforts made to
temper the severity of a forceful response.  <u>Hudson v. McMillian</u>,

- 10 -

503 U.S. 1, 7 (1992).  Generally accepted correctional practices provide that appropriate uses of force in a given circumstance should include a continuum of interventions, and that the amount of force used should not be disproportionate to the threat posed by the inmate.  Absent exigent circumstances, lesser forms of intervention, such as issuing disciplinary infractions or passive escorts, should be used or considered prior to more serious and forceful interventions.

We found that inmates at CCJ are regularly subjected to inappropriate and excessive uses of physical force.  CCJ officers too often respond to inmates' verbal insults or failure to follow instructions by physically striking inmates, most often with the active assistance of other officers, even when the inmate presents no threat to anyone's safety or the security of the facility.  Moreover, even in cases in which the initial use of force is reasonable, officers sometimes continue to engage in physical force after the inmate has been brought under control or is effectively restrained.

A top security administrator frankly acknowledged to us the existence of "a culture of abusing inmates" when he came to CCJ in October 2006.  While senior management has taken steps to reduce the use of force, such as requiring Use of Force Reports and by subjecting these documents to greater scrutiny, the excessive and inappropriate use of force has not been brought under control.  We believe that, despite management's efforts, a culture still exists at CCJ in which the excessive and inappropriate use of physical force is too often tolerated.

Our investigation included an intensive examination of documents provided by CCJ concerning the incidents listed below and a host of others occurring between January 2006 and July 2007.  We also conducted a great many staff and inmate interviews.  In some cases, our findings of inappropriate or excessive uses of force are in accord with CCJ's own conclusions.

    a.    Use of Force in Response to Verbal Altercations

The use of force, while sometimes necessary in a corrections setting, must be appropriate to the given circumstances and proportionate to the threat posed.  A verbal taunt from an inmate to an officer is a rule violation and may appropriately result in disciplinary action, but it should not require a physical response.  As the examples below demonstrate, verbal altercations with inmates too often provoke physical responses from CCJ officers:

- 11 -

1.  In July 2007, following his hour of exercise, Alberto
    P.[6] refused to return to his cell and a female officer
    locked the cell doors while Alberto remained outside.
    He called the officer a "b----." When Alberto came out
    with his property to be moved to disciplinary
    segregation for insulting the officer, he was beaten by
    a number of officers. One officer later told Alberto
    that he had tried to stop the beating, but he just
    "didn't have enough juice" (apparently explaining his
    inability to control the other officers). CCJ records
    confirm that Alberto was transferred to segregation and
    taken to Cermak for his injuries.

2.  In June 2007, Dennis L. returned to his cellblock after
    a psychological evaluation. An officer refused to give
    Dennis a dinner tray. Dennis got into a verbal
    altercation with the officer and threw a cup of liquid
    at him. A number of officers attacked Dennis in his
    cell. Emergency Room records indicate that Dennis
    suffered blunt trauma to his head and body, three teeth
    knocked loose, and a laceration to his lower lip from
    this incident.

3.  In April 2007, Billy D. wanted to exit his cell and was
    accused of pushing his way out. He had a "heated"
    verbal altercation with the officer. One officer
    struck Billy in the face and other officers joined in.
    Medical records show that Billy required internal and
    external stitches to close a one-inch laceration that
    punctured his lip.

4.  In September 2006, an officer was handing out extra
    lunches to inmates. Malcolm W. asked for one, but was
    refused. Malcolm and the officer exchanged verbal
    insults. A mental health staff member and another
    inmate witnessed the officer slap Malcolm's face and
    drag him from the dorm. CCJ's Internal Affairs
    Division ("IAD") sustained allegations of abuse, and
    recommended that the officer be suspended for 29 days.
    The officer was "dedeputized" and prohibited from
    carrying a firearm or effecting arrests.

---

[6]    To protect privacy, we have used pseudonyms to identify
inmates and officers listed in this letter. Upon request, we
will provide the County with a schedule that cross-references the
pseudonyms with the proper names, where appropriate.

- 12 -

5.    In March 2006, Danny P., who according to CCJ records
      was a slight man of 5'1" and 110 pounds, was on his way
      to the law library.  He got into a shouting match with
      the female officer escorting him, which resulted in him
      being taken back to his housing unit.  Near the secure
      staff station, the officer lunged at Danny and began to
      slap him.  Two other officers grabbed his arms and
      pushed him into a dayroom.  As he was being handcuffed,
      several other officers continued to punch and kick him.
      He was hit in the mouth after being handcuffed.  CCJ
      records show that a sergeant found Danny standing
      outside the security office handcuffed and bleeding
      about the face.  The female officer was disciplined for
      failing to report the incident in a timely manner and
      also for failing to obtain medical treatment for Danny.
      Danny filed a lawsuit against CCJ regarding this
      incident, and the parties agreed to settle the case in
      March 2008.

   **b.    Use of Force for Failure to Follow Instructions**

It is inappropriate and excessive to use force for rule
violations which do not present a threat to safety or security.
At CCJ, inmates' failure to follow orders too often lead to
physical abuse, even where no security risk is present:

1.    In June 2007, there was a fight on Thomas K.'s unit, in
      which he did not participate.  A group of officers came
      to the unit, strip-searched the inmates, and sent them
      back to their cells.  As Thomas started to go up the
      stairs to his top tier cell, his hands were on his neck
      holding his shirt, instead of on top of his head, as he
      had been directed.  An officer grabbed Thomas by the
      neck, which choked him, and Thomas reacted by grabbing
      the officer's arm.  The officer immediately swung and
      hit Thomas in the eye with a walkie-talkie, causing a
      wound that required five stitches to close.  Cermak
      medical records confirm Thomas's injuries and that he
      was hit with an "unknown object."  The officer
      continued hitting Thomas after the first blow, although
      Thomas offered no resistance.  We observed Thomas's
      injuries during our on-site visit.

2.    In February 2007, Matthew S. was ordered to leave the
      barber shop for standing up before his turn.  When he
      tried to explain why he stood up, an officer grabbed
      him by the collar and told him to leave the barber
      shop.  Matthew argued with the officer.  Outside the

- 13 -

barber shop, officers shoved his head into the concrete after he had been handcuffed. CCJ records confirmed that Matthew needed stitches to his face and a tetanus shot following this incident, but he refused treatment.

3.    In April 2006, Terrence M. was being processed in his division when an officer noticed that Terrence had an unauthorized shirt. The officer asked for the shirt, but Terrence refused to give it to him. After Terrence was restrained, the officers punched and kicked him. As a result of the beating, Terrence suffered a broken jaw that required surgery at an outside hospital. CCJ found abuse by one officer, and the officer was terminated.

4.    In April 2006, Darnell J. refused to go to recreation when he was told he could not first use the bathroom. Several officers shoved Darnell into the hallway where they beat and kicked him. A sergeant watched and then joined in the beating. Two other inmates in the hallway were also beaten. Darnell was hospitalized for neck injuries. CCJ found abuse by the sergeant and seven officers and also that the sergeant and several officers had filed false reports. IAD recommended termination for the sergeant and three officers.

5.    In March 2006, John S. was being strip-searched prior to going to recreation. He was tapping on the wall. An officer ordered him to stop and hit him on top of the head. John continued to tap. After John was searched, the officer said: "You're f------ guilty" and slammed him on top of a cart and against the wall. John was pulled into the hallway where other officers started to beat him. He was hit in the face, dragged by his hair, choked, and beaten. Photographs of John in the CCJ files show injuries to his face and body. IAD found that the officers used excessive force and recommended that two officers be terminated.

6.    In March 2006, Jacob D. objected to a tier change and insisted on speaking with an officer. Three officers extracted him from his cell. He was handcuffed behind his back and, while they were taking him to the segregation unit, the officers pushed his head into the wall. He was hit in the face, thrown down stairs, kicked, and punched repeatedly. Photographs of Jacob from the following day show that his face was badly bruised and his eye was swollen shut. IAD found that

- 14 -

three officers used excessive force and recommended
that they be suspended for 29 days.

7.   In January 2006, Byron S. was cleaning the dayroom with
     other inmate workers when a group of officers accused
     Byron and another inmate of planting contraband in the
     visiting area, and took both inmates into the hallway.
     Byron was beaten by multiple officers.  After he was
     handcuffed and lying on the floor, Byron received a
     blow that broke his jaw.  Medical records confirm that
     his jaw was fractured.  Byron's jaw was wired shut at
     an outside hospital, which required him to eat with a
     straw.  Three months later, Byron required additional
     surgery and his jaw was wired shut for a second time.
     Byron filed a lawsuit against CCJ regarding this
     incident, and the parties agreed to settle the case in
     September 2007.

8.   In January 2006, Michael A. was resisting going to
     disciplinary segregation because he believed he had
     already served his time for the infraction in question.
     He asked to talk to a sergeant, who said that nothing
     could be done.  When he continued to resist, stating
     that he wanted to talk to a captain, a correctional
     officer said: "No," and struck him in the face.  Other
     officers were called and joined in beating him.  He was
     sent by ambulance to an outside hospital.  Medical
     records show he suffered a fractured nose and two black
     eyes.

     **c.   Use of Force as Punishment or Retribution**

     We found that inappropriate and excessive use of force also
occurs when officers are angry and upset about inmate violence
against staff.  Physical force is also sometimes inappropriately
used at CCJ even after an active dispute between an inmate and
officer has ended, apparently to punish the inmate.  Retaliatory
force even occurs when officers are dealing with mentally ill
inmates with limited impulse control, although the inmates do not
present a threat to themselves or others.[7]  The use of force is

---

[7]   According to a division superintendent, a number of
officers assigned to the tiers for inmates with mental illness
have not received training on working with the mentally ill.  The
excessive use of force with mentally ill inmates is likely
attributable to lack of, or ineffective, officer training.

- 15 -

never appropriate as retribution for previous bad acts and is
inappropriate when an inmate is not a present threat:

1.  In July 2007, Robert T., who suffers from mental
    illness, exposed himself to a female officer.  In
    response, he was taken to a clothing room where a group
    of officers handcuffed him and then proceeded to hit
    and kick him after he was restrained.  CCJ records
    confirm that Robert was sent to an outside hospital
    with severe head trauma.

2.  In June 2007, Russell G.'s cellmate opened the cell
    door and Russell got out of his cell.  In response, an
    officer locked all the inmates in their cells.  After
    Russell was back in his cell, officers sent his
    cellmate downstairs and entered Russell's cell.  The
    officers handcuffed Russell, then stomped on his back
    and hit him.  His eye became swollen and his teeth were
    chipped.  Before taking him to the dispensary, the
    officers threatened to beat Russell again and charge
    him with battery unless he told medical staff that he
    had hurt himself falling off his bunk.  Russell was
    sent from the dispensary to Cermak Hospital for medical
    treatment.

3.  In August 2006, an inmate stabbed an officer.  Because
    Martin S. had argued with the officer earlier in the
    day, officers erroneously believed he had committed the
    stabbing.[8]  As a result, officers responded to an "all
    available" call and began to beat Martin in the
    mistaken belief that he was the inmate who had
    assaulted the officer.  Besides being punched and
    stomped, he was also hit with a radio and kicked in the
    groin.

4.  Inmate Andrew B. was also housed in the unit where the
    August 2006 attack on the officer occurred.  Andrew had
    nothing to do with the attack.  A large number of
    officers came onto the unit and proceeded to beat the
    inmates indiscriminately.  Andrew was ordered to lie
    down and, while he promptly obeyed, he was stomped and
    kicked by the officers.

---

[8]     CCJ records confirm that another inmate was charged
with the crime.

- 16 -

5.    In April 2006, Damien H. pushed out of his cell.  An
      officer escorted him back to his cell.  At the door of
      his cell, Damien turned and hit the officer, for which
      he was charged with aggravated battery.  All available
      officers were called and, while restraining Damien,
      several officers punched, kicked, and stomped him.  IAD
      found that three officers had used excessive force and
      recommended 29-day suspensions for all of them.

6.    In January 2006, an officer wanted Jerry M. to return
      to his cell, which Jerry resisted, and the officer
      rolled the door over Jerry's foot.  Jerry called the
      officer a "b----."  The officer then beat Jerry with
      handcuffs wrapped around his hand like brass knuckles.
      A CCJ internal investigation of this incident found
      that excessive force had been used and recommended that
      the officer be terminated.  The Sheriff's Merit Board,
      which hears CCJ termination cases, ruled against CCJ
      and reinstated the officer to duty.

      d.    Use of Force at Intake

     The pattern of inappropriate and excessive use of force is
distributed throughout the CCJ divisions, and not confined to the
areas where the use of force is most likely to occur in a
correctional setting:  the maximum security units and intake
area.  However, an especially high number of abuse of force
allegations do emerge from CCJ's RCDC intake unit.

     There is unanimity of opinion among those familiar with CCJ,
including administrators and staff, the County, the Sheriff's
Office, and the court monitors, that conditions in RCDC are
unacceptable and must be changed.  As discussed in more detail
below, the RCDC is chronically overcrowded, cramped, chaotic, and
insufficiently staffed.  The impact of these conditions on the
use of force is considerable.  In the RCDC, inmates who request
attention for various needs run the risk of becoming victims of
physical abuse.  Inmates are especially vulnerable to abuse when
they are taken in large groups to be strip searched in an
isolated area out of the view of non-security intake staff.  Many
inmates report that those who are old, mentally ill, or do not
understand English, are struck by officers for undressing or
dressing too slowly.  Finally, inmates may also be targeted for
physical abuse because of the charges for which they were
arrested.

1.    In September 2006, Pedro S. was arrested on a sex
      charge brought by his niece.  While in the intake area,

- 17 -

three officers who had read his charge began taunting
him, yelling threats in Spanish, and asking if he knew
what was about to happen to him.  The officers struck
him many times and called him a "f------ Mexican."  The
other inmates were ordered to turn and face the wall
"or else."  Because the officers threatened to kill
Pedro if he said anything about the incident, he did
not seek medical attention.  Pedro was released four
days later and immediately saw a doctor and reported
the incident to the Chicago Police Department.  The
Police Department contacted CCJ.  Medical records
confirm that Pedro's injuries included a broken rib and
damage to his jaw and knee.

2.   In July 2006, Lonnie L., 59-years-old, was leaving the
medical area of intake and heading to the bullpen.
When he turned around to get more medication, an
officer told him not to return to the medical area.
Lonnie did not obey the order.  The officer came into
the medical area and hit Lonnie on the mouth.  When
Lonnie fell to the ground, the officer kicked him and
again struck him in the mouth, knocking out a tooth.
The officer dragged Lonnie by the pants out of the
medical area.  During Lonnie's intake strip search, the
same officer hit him in the back with a cane.  Three
inmates testified that they witnessed the incident.
Medical records indicated injury to Lonnie's ribs and
lung.  CCJ found abuse and recommended that the officer
be terminated.

3.   While being processed into CCJ in May 2006, Antonio R.
was wandering around the intake area asking for his
methadone.  An officer told him to return to his
holding pen.  Antonio apparently did not obey quickly
enough, as the original officer and others proceeded to
beat him, first in the main open area and then in an
adjoining tunnel.  They hit Antonio with a radio,
knocked out his dentures and smashed them under a boot.
As a result of this incident, Antonio suffered multiple
fractures and a collapsed lung.  After being returned
from one outside hospital, he was sent to another in
acute respiratory distress.  He was transferred to a
Level 1 trauma center, where he needed to be placed on
a ventilator.  Medical records confirm Antonio's severe
injuries.

4.   In February 2006, while being processed into the CCJ
for driving on a suspended license, James W. would not

- 18 -

(and could not) remove jewelry embedded in a piercing
because it was permanently soldered.  The officer
conducting the strip search attempted to strike James,
who blocked the blow.  The officer then called over
other officers, who hit James in the face multiple
times.  One officer hit him repeatedly with a handcuff
wrapped around his hand.  James later stated that the
officers had used his head as a "bongo drum."  Medical
records confirm that James was diagnosed with a
perforated ear drum and blood in his right ear at
Cermak Hospital the next day.  Additional records show
that the incident resulted in diminished hearing in one
of James's ears.  James filed a lawsuit against CCJ
concerning this incident and the parties agreed to
settle the case in March 2008.

     **e.    Inadequate Oversight of Use of Force**

    Effective measures to prevent excessive and inappropriate
uses of force start with the adequate reporting of information to
permit the identification of potential problem cases and
effective internal investigations.  We find that CCJ fails to
elicit adequate information about use of force incidents, making
management review ineffective.  We also find that, in most cases,
internal affairs investigations of use of force are undertaken
only when a lawsuit is filed, rather than when a serious incident
occurs.

       **i.    Management Review**

    In order for CCJ to provide adequate oversight of officers'
use of force, management must have adequate information to review
incidents and reach a conclusion as to the propriety of a use of
force.  While all officers involved in a use of force incident
fill out a Use of Force Report, in most cases these reports
provide very little information because they are written in
generalities.  For example, numerous Use of Force reports fail to
describe, in factual terms, the type and amount of force that
officers used.  Many Use of Force Reports merely describe the
force used with phrases such as, "used the least amount of force
necessary to gain control of the inmate" or "faced inmate to the
floor."  Although most shift commanders review Use of Force and
Incident Reports to ensure that reports are completed, some
commanders reported that they do not review the reports for
substantive content.  Although copies of Incident Reports are
forwarded to CCJ's Executive Director, Assistant Executive
Directors, Superintendents, and the official file, it is unclear

- 19 -

if the administration routinely conducts any additional review of these reports.

Moreover, while in most cases there are both Incident Reports and Use of Force Reports, the reports generally do not indicate the nature or extent of an inmate's injuries, arguably the most telling indication that there *may* have been an inappropriate use of force. The reports usually conclude with an inmate being taken for "medical attention," but with no indication of why medical attention was required. The reports also fail to capture the time the inmate received medical attention, which makes it difficult to assess whether medical attention was promptly provided. In the May 2006 case of Jacob D., there is no indication of any injury in the CCJ reports, but when Jacob was transferred the next day to the Illinois Department of Corrections ("IDOC"), his facial bruising and swelling was so severe that the IDOC contacted CCJ immediately to report the physical condition of the incoming prisoner. In the case of John S., there is also no indication of injury in the CCJ reports about a March 2006 incident. The reports simply state that John was taken for medical attention and released from the dispensary, with no mention of any injuries. In fact, as photos taken later show, John suffered two black eyes and a swollen lip, among other injuries. In both of these cases, CCJ eventually found excessive use of force by the officers, but the reports themselves were devoid of helpful information.[9]

Because the information contained in Use of Force and Incident Reports is insufficient for management to determine whether the incident raises suspicions concerning use of force, review by management, when it occurs, usually does not result in identifying cases for investigation. There can be no effective oversight if necessary information is not put forth when the incident happens. For example, a report indicating that an inmate sustained a black eye after an inmate-officer altercation should raise concern, but management will never know about the black eye under the current system.

In addition to the lack of information contained in CCJ reports, we discovered that the Incident Reports did not contain a tracking number or source of issuance until a July 2007 initiative by the Executive Director. This initiative is consistent with generally accepted correctional practice. Previously, it was extremely cumbersome to track any one incident

---

[9]     In both of these cases, investigations were initiated as a result of external complaints.

- 20 -

(for use of force and other serious incidents) and, in all
likelihood, impossible to ascertain if all incidents were being
reported and processed.  Incident tracking numbers are now to be
issued by External Operations staff.  Serious incidents and uses
of force should also be tracked by each division with a uniform
logging system for recording serious incidents at all levels of
CCJ.

    Finally, CCJ has no tracking or early warning system to
identify those officers who are the most frequent users of
physical force and those whose actions have elicited the most
complaints of excessive force, grievances, or injuries.  An
appropriate early warning system is an accountability tool that
allows for early intervention by alerting a facility to a need
for retraining, problematic policies, supervision lapses, or
possible bad actors.  In 2004, CCJ hired an external consulting
firm to review its policies and procedures regarding the use of
force after a special grand jury concluded that a 1999 incident,
in which correctional officers beat and terrorized 49 inmates at
CCJ, constituted "gross, if not criminal, misconduct."  The
consulting report recommended that CCJ institute an early warning
system "as soon as possible."  The 2004 recommendation was never
implemented.

### ii. Investigations

    To ensure reasonably safe conditions for inmates,
correctional facilities must develop and maintain adequate
systems to investigate staff misconduct, including alleged
physical abuse by staff.  Beyond management review, the avenue
for oversight at CCJ is the Internal Affairs Division ("IAD").
Generally accepted correctional practices require clear and
comprehensive policies and practices governing the investigation
of staff use of force and misconduct.  Adequate policies and
practices include, at a minimum, screening of all Use of Force
and Incident Reports, specific criteria for initiating
investigations based upon the report screening, specific criteria
for initiating investigations based upon allegations from any
source, timelines for the completion of internal investigations,
and an organized structure and format for recording and
maintaining information in the investigatory file.  The
investigation must also be and appear to be unbiased.  CCJ's
investigatory practice fails on multiple levels.

    To be effective, investigations must be undertaken promptly.
A jail, by its nature, has a tremendously high turnover of
inmates.  An inmate whose incident is being investigated may well
have left CCJ if the investigation does not occur soon after the

- 21 -

incident, and the same is true for inmate witnesses.  Because CCJ
does not initiate many use of force investigations, most use of
force investigations are not opened until long after an incident
has taken place.  Instead, investigations are undertaken because
the inmate has filed a lawsuit, which can be up to two years
after an incident occurs.  For example, the investigation of
Michael A.'s January 2006 beating did not begin until 16 months
after the incident, despite the fact that Michael was treated at
an outside hospital, suffered a fractured nose, and had,
according to the medical records, "raccoon eyes."  The
investigation of the incident in which Byron S. suffered a broken
jaw did not start until Byron filed suit seven months later, even
though Byron's visible injuries required him to eat through a
straw with his jaw wired shut.  Because of the delay, inmate
witnesses to the occurrence will likely have left CCJ by the time
an investigation begins.  IAD's only attempt to reach an inmate
witness who has left CCJ is a form letter to a last known
address, which rarely elicits any response.  We found that many
investigations are simply undertaken far too late to be
effective.

     Perhaps even more troubling is the fact that investigations
are reactive and suffer from the appearance of bias.  The vast
majority of IAD files we reviewed stated that the investigation
of use of force was opened at the request of CCJ's attorney in
response to an inmate lawsuit CCJ is defending in court.  It is
almost impossible for IAD to appear fair and unbiased when the
investigation is undertaken only because CCJ is defending an
inmate lawsuit.  All uses of force should be appropriately
reviewed through the chain of command.  Whenever Incident
Reports, Use of Force Reports or other information raise the
possibility that excessive force was used, such incidents should
be thoroughly investigated by IAD.  In particular, incidents
involving suspicious inmate injuries, such as black eyes or blunt
head trauma, and incidents requiring medical care at an outside
hospital should be investigated by IAD.  An appropriate
evaluation of incidents for investigation will require more
detailed Use of Force and Incident Reports and a more thorough
management review than CCJ's current practice.

     IAD also reported a backlog in resolving use of force cases
and incidents involving inmate-on-inmate assaults because it is
difficult to obtain medical releases from Cermak, CCJ's on-site
health care provider, in a timely manner.[10]  Obtaining medical

_____

     [10]   IAD is under the Sheriff's Office while Cermak is part
of the Cook County Bureau of Health.

- 22 -

records from Cermak can take anywhere from six to 12 months,
which prevents IAD from bringing prompt closure to an
investigation.  This type of delay is totally unacceptable, and
is devastating for any investigation.

We also found that there are attempts by officers or other
staff to conceal the inappropriate or excessive use of force.
CCJ officials found that the officer involved in the January 2006
beating of Jerry M. had attempted to persuade a sergeant on the
tier to change his story as to what had happened.  In another
case, Russell G. reported that the officer who caused his
injuries in June 2007 threatened him with worse treatment unless
he told the medical staff that he had hurt himself by falling out
of his bunk.  We found two accounts of senior division staff
attempting to dissuade inmates from complaining about the use of
force, in one case by the offer of a favor and in the other by
the threat of criminal charges.  CCJ's administration and IAD
must take action to ensure that inmates are not intimidated into
concealing excessive use of force and that information received
is accurate and credible.

Finally, we also found flawed investigatory techniques at
CCJ.  For example, investigators often do not give sufficient
attention to the inmate injuries that are known.  When
investigators question officers accused of using excessive force,
the officers are generally not even questioned as to how an
inmate's particular injury might have occurred.  For example, IAD
opened an investigation of the March 2006 case of Antonio R.
after a doctor at an outside hospital reported that Antonio was
in serious condition with "blunt trauma all over his body."
Although the investigator was aware of Antonio's injuries at the
time he questioned both of the officers involved, he never asked
the officers about the nature of Antonio's injuries or how they
occurred.  While there may sometimes be tactical reasons to avoid
discussing inmate injuries when an officer is first questioned,
the investigation is incomplete if the officers are never asked
to address the inmate's resulting injuries.

We found other examples of investigatory techniques that are
unlikely to result in complete or credible information.  For
example, on March 9, 2006, an investigator interviewed inmate
Gabriel M. about a use of force incident involving another inmate
in his tier.  The investigator then attempted to interview
Gabriel's cellmate about the same incident but, since the
cellmate could not speak English, the investigator utilized
Gabriel as the Spanish interpreter to provide his cellmate's
statement.  Relying on one inmate to translate for another inmate
in an investigation involving both of them is a poor

- 23 -

investigatory technique that calls into question the credibility
of the information gathered by CCJ investigators.[11]

### iii. Videocameras and Overhead Cameras

When properly utilized, cameras in a correctional setting
can augment inmate safety and security and provide essential
information for investigations.  Certainly video surveillance
should never be used to substitute for direct officer supervision
of inmates, but it often is helpful to supplement supervision and
for incident reconstruction.  CCJ has limited and antiquated live
feed overhead cameras in some divisions, but the cameras do not
have the critical capability to record and replay, and most do
not capture activities outside of the housing unit dayrooms.
Moreover, while there are two small monitors in the RCDC intake
area, we discovered that the officers in the Security Office were
unaware that the monitors could view various parts of the intake
area.  The cameras, installed to monitor activity in a part of
CCJ that had experienced among the highest number of allegations
of excessive and inappropriate uses of force, were not being
used.

Procedures at CCJ require that a handheld videocamera be
brought to the scene of any use of force and that the use of
force be recorded.  While this policy is helpful for review of
cell extractions and other planned uses of force, it is not
surprising that the use of handheld videocameras has not been an
effective means of oversight for unplanned uses of force.  None
of the numerous videotapes we reviewed captured an unplanned use
of force in progress.  Improvements and additions to CCJ's video
surveillance system, including the ability to record for
retrieval following an incident, would be a much more effective
oversight mechanism.

### 2.   Deficient Inmate Safety and Supervision

CCJ does not provide adequate inmate supervision, which
exposes inmates and staff to unsafe conditions.  Lack of adequate

---

[11]   Title VI of the Civil Rights Acts requires that
recipients of federal funds take reasonable steps to provide
meaningful access to limited English proficient communities.
Given Cook County's growing Hispanic population, CCJ should
ensure that some investigators and correctional officers are
familiar with rudimentary Spanish.  In addition, CCJ staff would
benefit from receiving diversity training.  See Title VI of the
Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

- 24 -

security staff, insufficient direct supervision in the majority
of the housing units, a dilapidated physical plant, inadequate
policies and procedures, and an overcrowded environment combine
to result in an unsecure facility that is dangerous for everyone
on the premises.  On April 9, 2007, the John Howard Association
found that the rates of injuries to CCJ inmates and staff have
increased significantly in the past decade, despite a substantial
decrease in inmate population.[12]  In 2006, inmate injuries
occurred at the highest rate since the John Howard Association
began gathering data, and staff injuries reached the third
highest rate since 1991.[13]  Our review of CCJ documents revealed
that between January 1, 2007 and June 19, 2007, IAD opened
approximately 254 cases involving inmate assault and/or battery
and five cases of sexual assault.  In 2006, IAD opened
approximately 357 cases involving inmate assault, battery, or
sexual assault.

Insufficient inmate supervision has been a serious problem
at CCJ for decades.  Inmate supervision is seriously compromised
by chronic overcrowding and under-staffing.  The federal district
court monitoring the Duran Consent Decree has repeatedly cited
CCJ for failing to provide adequate security staff to ensure safe
and secure conditions at the facility.[14]  In September 2006,
then-Sheriff Michael Sheahan admitted that the Jail is "severely
understaffed."[15]  The John Howard Association's April 9, 2007
report found that CCJ would require an additional 189 new
correctional officers and suitable replacements for the 130 to

---

[12]    Court Monitoring Report, Duran v. Dart, No. 74-C-2949,
at 115-16 (N.D. Ill. Apr. 9, 2007) ("2007 Court Monitoring
Report").  Monthly averages for staff injuries have risen from
6.6 in 1996 to 28.3 staff injuries per month in 2006.

[13]    Id. at 116.  Monthly averages for inmate injuries
increased from 14.7 injuries per 1000 inmates in 1996 to 27.8
injuries per 1000 inmates1 in 2006.

[14]    Leonard N. Fleming, "Federal Judge Warns County to Fix
Overcrowding at the Jail," Chicago Sun Times, Dec. 1, 2007;
Jonathan Lipman, "Judge Blasts Staffing at Jail," Daily
Southtown, Dec. 29, 2005.

[15]    Joint Status Report, Duran v. Dart, No. 74-C-2949, at 8
(N.D. Ill. Sept. 29, 2006).

- 25 -

152 correctional officers on inactive status[16] to comply with the
Duran Consent Decree and "good correctional practices."[17]  CCJ's
Post Analysis Reports and Divisional Staffing Reports for April
through June 2007 revealed that at least 172 correctional officer
positions at CCJ were vacant or inactive.  Although the External
Operations Unit, which is responsible for the security of the CCJ
perimeters, the Emergency Response Team, the Canine Unit, and the
transportation of 800 to 1500 inmates to and from court daily,
has an authorized security staffing complement of 420 positions,
on May 1, 2007, the actual External Operations manpower
availability comprised 352 positions.  Our expert consultant
found that the level of correctional staff available to supervise
housing units at CCJ is woefully inadequate.

        The lack of adequate staff is magnified by the fact that CCJ
is chronically overcrowded.  In fact, every day from June 2006
through April 2007, numerous inmates were required to sleep on
the floor of two-person cells that housed three inmates.[18]
Divisional reports for the period of February 26, 2007 through
June 17, 2007 reflect that an average of 485 inmates were forced
to sleep on the floor each night.  During our site visit on July
23, 2007, Division VI held 1268 inmates in space with a rated
capacity of 992 inmates.[19]  Dormitory Four in Division II is
operating at twice its design capacity.[20]  However, we did not
observe any increase in security staffing levels or enhanced
supervision practices within the overcrowded divisions.

        Overcrowding has an impact on security at CCJ.  For example,
the week of March 19, 2007, CCJ had more inmates sleeping on the
floor (591) than any other week in the four-month period of March
through June 2007.  During that week, CCJ also had the most
fights (35), the most uses of force (27), and found the third
most "shanks" (homemade knives) (34) and second most weapons

_____

        [16]    Correctional officers on "inactive status" include
persons on disability, suspension, leave of absence, military
leave, or leave for a duty injury.

        [17]    2007 Court Monitoring Report at 84.

        [18]    Id. at 12.

        [19]    The actual capacity of Division VI was much lower than
992 on July 23, 2007, due to numerous cell closures because of
maintenance problems, which further exacerbated the overcrowding.

        [20]    2007 Court Monitoring Report at 15.

- 26 -

(12), of any other week during the same period.[21]  On November
30, 2007, Judge Virginia Kendall for the United States District
Court for the Northern District of Illinois apparently chastised
the County and Sheriff's Office for failing to ease overcrowding
at CCJ, stating:  "This is no longer a budget problem.  It is a
constitutional violation."[22]  Despite the fact that CCJ has been
subject to the Duran Consent Decree for 25 years, the County and
the Sheriff's Office have been unable to solve the problems of
overcrowding and inadequate supervision at CCJ.

CCJ has taken some unusual steps to try to deal with the
problems of overcrowding and inadequate staffing.  The practice
of cross watching, discussed below, is an unacceptable and
dangerous approach.  A recently instituted policy of extended
lockdowns is similarly unacceptable.  In the spring of 2007, CCJ
implemented extended lockdown periods for all general population
inmates.  Under this system, only half of the inmates in each
housing tier were allowed out of their cells during each shift.
Generally, this meant that half of the inmates were allowed out
of their cells for a period in the morning, half of the inmates
were allowed out of their cells for a period in the afternoon and
evening, and all of the inmates were locked in their cells during
the night.  Because the groups of inmates rotated on a shift by
shift basis, the result was that every other day each group of
inmates spent a continuous 26-hour period locked inside the
cells.  This practice was applied indiscriminately to all general
population inmates, except those housed on the medical units.  As
discussed in further detail below, in addition to constituting an
unjust restriction on pre-trial detainees, the extended lockdown
practice interfered with medical and mental health care,
programs, and the grievance system.  Moreover, deficient
maintenance in many cells (no lighting, plumbing failures, etc.)
resulted in inhumane conditions for an extended lockdown.
Therefore, as a result of CCJ's inadequate supervision, inmates
are subjected to unjustified, prolonged periods of in-cell
confinement.  Following our July 2007 visit, the Sheriff's Office
informed us that CCJ had revised the lockdown policy to decrease
the length of the in-cell periods.  This would be an improvement

---

[21]    Weekly averages for March through June 2007 were:  23.5
fights, 17 uses of force, 23.5 shanks, and 6.6 weapons.

[22]    Staff Writer, "Judge Orders Cook County to Fix Jail
Overcrowding," PR Newswire Europe, Nov. 30. 2007; Leonard N.
Fleming, "Federal Judge Warns County to Fix Overcrowding at the
Jail," Chicago Sun Times, Dec. 1, 2007; Notification of Docket
Entry, Duran v. Dart, No. 74-C-2949 (N.D. Ill. Nov. 30, 2007).

- 27 -

and a welcome change, and we look forward to assessing the new lockdown system.[23]

As discussed below, the result of CCJ's inadequate inmate supervision is that inmates and staff are exposed to unsafe conditions, an increased risk of violence and an abundance of dangerous and illegal contraband.

        a.    **Assaults on Inmates and Staff**

The severity and frequency of inmate-on-inmate assaults demonstrate that CCJ is not providing for the safety and well-being of the inmates.  In a period of less than two months in the spring of 2006, inmates reportedly engaged in at least seven separate knife fights that resulted in serious injuries to at least 33 inmates and seven correctional officers, including one inmate death.[24]

Weekly Divisional Reports from February 26, 2007 through June 17, 2007 show an average of 23.5 inmate fights and 3 incidents of "battery to staff with injury" per week at CCJ. Many of these incidents occurred in CCJ's maximum security divisions, where inmates should be supervised at the highest level, and extra precautions should be taken to minimize access to, and creation of, shanks and other weapons.  Clearly CCJ cannot be expected to prevent all altercations between inmates. Nevertheless, the Constitution requires correctional officers and Cook County officials to take "reasonable steps to protect

---

[23]    CCJ's latest attempt to deal with overcrowding involves a "hot bunking" pilot program whereby inmates volunteer to take turns using the same bed in eight-hour shifts.  See Sheriff's Supplemental Report, <u>Duran v. Dart</u>, No. 74-C-2949, at 2 (N.D. Ill. Jan. 15, 2008).  Although each inmate is reportedly using his or her own bedding, the hot bunking procedure could result in serious sanitation and infection control problems, as well as possible inmate-to-inmate intimidation regarding potential volunteers.

[24]    <u>See e.g.</u>, William Lee, "Two Cook County Jail Inmates Were Stabbed During a Fracas in a Maximum-security Division Monday Night," <u>Daily Southtown</u>, May 2, 2006; Lori Rackl, "2 Inmates in Hospital After Jail Brawl," <u>Chicago-Sun Times</u>, Apr. 24, 2006; William Lee, "Seven Inmates at Division 11 are Injured by Homemade Knives in a Gang-Related Fight," <u>Daily Southtown</u>, Apr. 24, 2006; Staff Writer, "Knife Fights in Cook County Jail Injure 17," <u>Chicago Tribune</u>, Mar. 13, 2006.

- 28 -

inmates from violence at the hands of other inmates." <u>Goka v.</u>
<u>Bobbitt</u>, 862 F.2d 646, 649-50 (7th Cir. 1988).  The level of
inmate-on-inmate and inmate-on-staff violence that is occurring
within CCJ is so unacceptably high that it is clear that inmates
are not adequately supervised, in accordance with generally
accepted correctional standards.  Notably, just as the Court and
CCJ staff have recognized the shortage of staff supervision,
inmates are also aware that they could engage in violence with
little to no supervision.  Much of the violence at CCJ involves
group attacks, which reflect some degree of planning and
coordination by the inmates, without the staff's knowledge or
intervention.

     As the following examples demonstrate, CCJ is not meeting
its constitutional obligations to provide for the safety and
well-being of its inmates:

   1.    On December 29, 2007, multiple inmates suffered stab
         wounds during a fight in a Division IX dayroom.  Six
         inmates required treatment from outside hospitals and
         two inmates were admitted to the hospital with multiple
         stab wounds and other serious injuries.  Officers were
         required to use Oleoresin Capsicum spray ("OC spray")
         to break up the fight.  CCJ recovered four shanks, some
         of which measured six inches in length, and another
         weapon in the tier.  Despite the severity of this
         incident, IAD did not open an investigation file.

   2.    On June 26, 2007, an officer delivering breakfast trays
         found inmate Louis J. unconscious on the floor of his
         cell in Division IX.  Louis J. was admitted to the
         hospital for trauma and died on July 8, 2007, as a
         result of his injuries.  Hospital records showed a
         hematoma with fractures and wounds to the face and
         head.  Although the Incident Report related to this
         incident states that Louis J. may have suffered a
         seizure, Louis J.'s cellmate was promptly transferred
         to CCJ's highest level of disciplinary segregation, the
         Level IV Special Incarceration Unit in Division IX.
         However, CCJ could not produce a disciplinary citation,
         hearing record, or investigation documentation on the
         incident.[25]  Louis J.'s cellmate was still in the

_____

    [25]   We requested all documentation related to this incident
on multiple occasions.  We never received any disciplinary or
investigation records.  CCJ did not complete a mortality review
for Louis J., allegedly because he was no longer in custody at
the time of his death.

- 29 -

Special Incarceration Unit a month after the incident, during our July 2007 site visit.

3.   On June 26, 2007, officers noticed that several inmates from Tier 4B were running as they returned from the Division X gymnasium.  Officers found several inmates with stab wounds and other injuries in the corner of the gymnasium.  One inmate was hospitalized with a stab wound to the neck and another inmate had a broken jaw. The fight was apparently the result of different gang affiliations mixed within the tier.  Upon investigating, officers recovered three shanks.  CCJ placed the entire 48-inmate tier on extended lockdown from June 26 through July 8, 2007, wherein each inmate was allowed out of his cell for only one hour per day, and only one inmate was allowed out at a time.  No other obvious precautions were taken to address the gang problem on the tier.  When the lockdown ended on July 8, another fight broke out involving some of the same inmates and the same gangs as the June 26 incident.  One inmate was stabbed and officers recovered another shank.

4.   On June 20, 2007, inmates Auben J. and Sam D. suffered injuries to their heads and faces following a fight in the outdoor area of Tier A-H in Division IX.  Because no officers witnessed or responded to stop the fight, it was eventually broken up by another inmate, Roger R. Officers only learned of the fight after observing Auben J. bleeding from the head when he returned from exercise.  Because Roger R. admitted that he helped separate the fighting inmates and injured Auben J. in doing so, he was transferred to disciplinary segregation along with Auben J. and Sam D.

5.   On May 10, 2007, seven inmates were treated for stab wounds after a gang-related fight involving approximately 25 inmates in the Division IX, Tier 3C, dayroom.  Inmates Mark V., Alex W., and Arthur A. had to be transferred to outside hospitals for medical treatment.  CCJ staff found a shank in the dayroom.

6.   On December 5, 2006, 31-year-old Marcus K. was found dead in his cell.  His cellmate was charged with first-degree murder for allegedly strangling Marcus K. after the two were heard arguing.  The two men were locked in their cell at the time, and other inmates in

- 30 -

the common area alerted a correctional officer that an
inmate needed help during the altercation.

7.   On April 22, 2006, inmate Izzy J. suffered a fatal stab
     wound to the head during a gang-related fight involving
     approximately 20 inmates in Division XI.  Six other
     inmates were hospitalized after the brawl; five of the
     inmates were stabbed with shanks.

8.   On April 2, 2006, inmates Tyson D. and Freddy R. were
     seriously injured during a gang-related fight involving
     at least six other inmates in Division XI.  Both Tyson
     D. and Freddy R. were admitted to the hospital with
     multiple stab wounds to the back.

In addition to the inmate-on-inmate violence, CCJ's security
failings put staff in danger as well:

1.   On March 22, 2007, maximum security inmate Reed W.
     stabbed a correctional officer, a nurse, a hospital
     patient, and a bus driver during an unsuccessful escape
     attempt at Stroger Hospital, where he had been taken
     for a doctor's appointment.  CCJ officials reported
     that Reed W. may have smuggled a shank out of CCJ
     Division IX in his rectum.

2.   On August 16, 2006, correctional officer Ben W. was
     hospitalized for five days and required 30 stitches
     after being attacked by inmate Daniel M. in Division V.
     The inmate was able to run from the scene before any
     other officers could come to Officer W.'s aid.

3.   On April 15, 2006, six officers received medical
     treatment, and at least four inmates were hospitalized
     for stab wounds, after a multiple-inmate fight broke
     out in a Division XI dayroom.  Officers recovered
     several wooden sticks and at least one metal shank
     following the fight.

     **b.   Inadequate Security Staffing**

As a result of insufficient security staffing, CCJ is not
providing adequate supervision of the inmate housing areas.  As
discussed above, a major concern surrounding inmate supervision
is the practice of "cross watching."  Cross watching refers to
the practice of having one correctional officer simultaneously

- 31 -

supervise two tiers of cells as opposed to one.[26]  The correctional officer monitors the second tier on camera while stationed in the first tier's control center.  By policy, the officer supervising a housing unit is supposed to conduct security rounds inside the unit every 30 minutes, which allows him to check on inmates in their cells and in the shower and bathroom areas.  These areas are not visible on the security monitors or from the officer's standard post inside unit's control center.  However, if or when the officer conducts a security check inside the first housing unit, the second housing unit is unsupervised.  If the officer leaves the control center of the first housing unit to conduct a check of the second housing unit, the inmates in the first housing unit can see that there is no officer supervising their actions.[27]  Although we recognize that CCJ has made efforts to increase staffing levels in housing units and decrease cross watching, we observed numerous instances of cross watching during our June and July 2007 visits to CCJ.  The practice is highly utilized during lunch periods, but we also observed cross watching throughout the day.

As noted earlier, because inmates are aware when there is not an officer in the housing unit, there is a higher risk for illicit inmate behavior, including inmate assaults, production of weapons, and gang and drug activity.  For example:

1.    On May 15, 2007, an officer was cross watching two tiers in Division IX, a maximum security division. Inmate Carson T. was assaulted by five or six inmates in the tier dayroom.  He received multiple wounds to his shoulders, back, face, and was admitted to the hospital.  The cross watching officer did not notice anything amiss until he saw inmate Carson T. pacing by the tier door.  CCJ documents noted that Carson T. had "injuries resulting from being attacked with a homemade knife" and that a "small piece of metal was sticking out [his] back."  During the subsequent investigation, security staff found two shanks in the tier.  No officer observed the dayroom assault.

---

[26]    Cross watching is prohibited by the <u>Duran</u> Consent Decree and the John Howard Association has cited CCJ for the practice, but it continues to occur.  <u>See</u> 2007 Court Monitoring Report at 86.

[27]    The number of inmates per housing unit varies across divisions, but it is not unusual for one cross watching officer to be responsible for more than 90 inmates in two units.

- 32 -

2.    On May 10, 2007, also in Division IX, an officer was
      cross watching two tiers when a disturbance involving
      25 inmates occurred.    Seven inmates received injuries
      including multiple lacerations and puncture wounds.

3.    On December 24, 2006, the assigned officer was cross
      watching two tiers in Division VI when inmate George W.
      assaulted inmate Otis F., causing a head injury.

4.    On July 25, 2006, inmate Andrew K. committed suicide in
      Division I while the assigned officer was cross
      watching two tiers.    The Medical Examiner reported that
      inmates discovered Andrew hanging by the cell bars,
      alerted officers, untied his noose, and initiated chest
      compressions before staff intervened.    Although staff
      reported that sight checks occurred in the tiers on a
      frequent basis, it is not clear if the officer actually
      saw Andrew in his cell at the times reported.
      Inexplicably, the CCJ investigation of the incident did
      not include the results of interviews of the other
      inmates who were present in the tier at the time of
      Andrew's death.

5.    On March 19, 2006, inmate John M. was attacked by two
      other inmates in Tier D-B of Division XI, which at the
      time was a maximum security division.    Because the
      officer assigned to Tier D-B was at lunch, and the two
      closest officers were cross watching Tiers D-B and D-C
      and Tiers D-A and D-D, the officers had to wait for
      back-up to arrive before anyone could enter Tier D-B to
      break up the fight.    John M. suffered two puncture
      wounds to his neck and one puncture wound under his
      arm.    After the fight, officers recovered two steel
      shanks, a broken cane, and three razors from the tier.

      c.    **Contraband and Vandalism**

      Another indicator of inadequate supervision is the amount of
dangerous contraband that is being recovered from the housing
units and the ease by which inmates can fabricate homemade
weapons.    Due to the dilapidated condition of scores of cells,
shower areas, and various dayroom features, inmates have ample
material for fabricating weapons, including floor tiles, metal
from light fixtures, metal from the ventilation system, glass
from cell light bulbs, electrical wiring, and plumbing fixtures.
It is virtually impossible for any correctional facility to
completely deter inmates from obtaining materials for weapons due
to the condition of the physical plant, but the problem at CCJ is

- 33 -

further exacerbated by the lack of direct supervision in most of the divisions.

Even though the CCJ administration has recently made efforts to curtail the creation of shanks and other weapons through the establishment of a "Weapons Committee," a severe contraband problem still exists. For example, IAD's Contraband Log reveals that, between January 1, 2007 and June 19, 2007, security staff found approximately 484 weapons and shanks. Many of these weapons and shanks were found in inmate cells and dayrooms after a stabbing incident. The Weekly Divisional Reports from February 26, 2007 through June 17, 2007 show an average of 23.5 shanks and 6.6 weapons found each week at CCJ. In just one week, April 2-8, 2007, CCJ staff recovered 55 shanks and 12 weapons. In 2006, IAD opened approximately 590 cases involving shanks, 77 involving weapons, and 115 cases involving other contraband. The number of weapons and shanks is extremely high, even considering CCJ's large inmate population.

During our site visits, we noticed scores of opportunities for inmates to fabricate shanks and other weapons. We found broken and jagged floor tiles laying exposed in dayrooms without raising the notice of staff. In some instances, inmates are using the absence of ventilation grates in their cells to rig a "dumbwaiter" system that allows them to transmit drinking water between the housing unit's upper and lower tiers from within their locked cells. However, the inmates can also use these passageways to pass contraband. Shower and bathroom walls in the Residential Treatment Unit ("RTU") that had been damaged by inmate vandalism provided ample opportunity for weapons production and concealment of contraband. We observed numerous vandalized cell lighting fixtures and missing and vandalized cell vents, which are commonly used to create shanks. Inmates' access to the lighting fixtures can lead to additional dangers. For example, on June 14, 2007, an inmate attempted suicide by cutting himself with a broken light bulb.

In addition to the troubling, unchecked proliferation of weapons at CCJ, it is clear that there is a serious narcotics problem. Between January 1, 2007 and June 19, 2007, IAD opened approximately 110 cases related to narcotics/drugs. In 2006, IAD opened approximately 160 cases involving narcotics/drugs.

The lack of adequate supervision at CCJ is further highlighted by the frequent and flagrant rule violations that are evident in almost every tier throughout the facility, including special management units that should have a higher degree of supervision. For example:

- 34 -

1.   Scores of cells have been vandalized and are rife with
     gang and general graffiti.

2.   Scores of cells contain homemade clothes lines.  The
     hanging linens prevent adequate visibility into the
     cell.  Also, the clothes lines can be used by inmates
     as potential weapons or suicide implements.

3.   Small in-cell fires are common.  Many inmates use the
     cell lighting fixtures as an ignition source for
     warming food and starting fires.  Numerous inmates
     covered the cell light bulb with a milk carton that
     serves as a lamp shade and an ignition source.  In
     scores of cells, the bottom bunk has evidence of having
     been heated.  Inmates and staff reported that inmates
     use the bottom bunks as hot plates for warming food by
     setting a fire underneath them.

4.   Scores of cells contain dozens of empty milk cartons
     and other stored debris that can be used by inmates for
     improper purposes and provide a potential fuel load in
     case of a fire.

5.   Numerous shower areas have been vandalized, resulting
     in exposed ceilings and materials that can and are used
     to fabricate weapons.

6.   Numerous inmates use extra blankets as carpets or room
     dividers for their cell, while other inmates claim a
     shortage of blankets.

7.   Scores of cells, shower areas, bathrooms, and dayrooms
     have exposed electrical wiring.

8.   Scores of vents, window sills, stairwells, and screens
     throughout the tiers are plugged and covered with
     debris.

9.   As discussed below, many in-use cells are so unsanitary
     or have such severe maintenance problems that it is
     clear that adequate security checks are not occurring.

It is common for inmates to try to engage in vandalism or
rule infractions, and CCJ could not be expected to prevent all
such inmate activities.  However, it is not generally accepted
correctional practice to allow these violations to occur so
flagrantly and with such prevalence throughout the facility.

- 35 -

The sheer frequency of these issues demonstrates that inadequate
supervision is common at CCJ.

### d.   Inadequate Visibility

Inmate supervision is further hampered by CCJ's physical
layout, which does not allow for direct supervision in most
divisions.  With the exception of the Division II and RTU
dormitory units, correctional officers are not stationed inside
the housing units.  In most divisions, the housing units are
supervised by an officer from a tier control center or security
entrance post that only allows for observation of the dayroom and
some common areas of the housing unit.  This is the case even in
the special management units, such as disciplinary segregation
and protective custody, which is a grossly atypical corrections
practice.  The officer cannot see into the individual cells while
in the control center and is therefore required to conduct
frequent physical checks of inmates in their cells.  However,
security check documentation at CCJ is spotty.  For example,
during our on-site visits we discovered pre-recorded security
checks on housing unit logs and also security checks that were
suspiciously logged at precise intervals throughout a shift
without any deviation.  In addition, numerous inmates throughout
the facility reported that officers commonly only enter the
housing unit during shift change or meal times, but not on
regular rounds throughout the day.  This is not surprising, as a
single officer may be cross watching two housing units
simultaneously from one control center.

Even if security rounds within the housing units are
occurring as scheduled, lack of visibility into cells is a major
safety concern.  Scores of cells are dark due to inoperable
lighting fixtures, missing light bulbs, or inmate vandalism of
lighting fixtures.  We also observed the results of rampant
vandalism of the lighting system in the RTU dormitory units,
despite the fact that an officer is purportedly posted inside
each RTU dormitory at all times.  In fact, one RTU dormitory had
no working lights and another had only two or three working
lights, out of 24 light fixtures.  Lack of operable lights makes
the entire unit dangerous both for inmates and officers.  This
problem is compounded by the fact that correctional officers
cannot replace broken or burned out light bulbs, but must issue a
work order and wait for Facilities Management to handle the
request.  In addition, we observed many cells and shower areas
with "privacy curtains" and with the celldoor windows obscured by
cardboard, paper, towels, and other materials.  It is very
difficult, if not impossible, for officers to provide adequate
safety and security checks of inmates when they cannot see into

- 36 -

the cells and shower areas.  Compounding the lack of adequate
inmate supervision within the housing units is the fact that
cells are not equipped with intercoms or emergency call buttons,
which are useful safety and security features designed to allow
for a locked inmate to alert an officer in an emergency
situation.  Intercoms or emergency call buttons are especially
important for special management units, where the inmates spend
approximately 23 hours of the day locked inside their cells,
often alone.

Of particular concern for inmate and officer safety is the
lack of visibility in the Special Incarceration Unit of Division
IX.  As these cells house CCJ's highest risk offenders and
inmates with demonstrated behavior problems, the celldoor windows
have been modified to prevent inmates from throwing liquids or
objects at officers.  However, instead of installing a protective
covering that would allow for observation, such as safety glass,
CCJ welded a metal plate with small holes in it on to the cell
windows in the Division IX Level 4 tier.  As a result, it is
virtually impossible to see into the cell, especially at night.

In addition to inadequate interior security visibility,
during a night time tour of CCJ, we observed approximately 22
external post and building lights that were not functioning in
the area between Division I and Division V.  This is unacceptable
and a significant security risk.

   e.   Inadequate Security Policies and Procedures

At CCJ, each separate division has Standard Operating
Procedures ("SOPs") that cover all the necessary components for a
security program, such as key control, cell locking procedures,
incident reporting, and search procedures.  During our review, we
found that while some CCJ policies and procedures were up to
date, many were not.  Generally accepted correctional practices
require that post orders should be reviewed on a quarterly basis.
CCJ policy requires that post orders be reviewed annually.  We
reviewed the post orders available at various security posts
throughout CCJ and found many post orders that had not been
reviewed in multiple years.  For example, in Division XI, we
inspected a manned gun tower.  The post order for the tower was
dated January 1996 and was last revised on January 15, 2003.  In
addition to being outdated, the post order did not contain
essential information for an armed post, including instruction on
when and under what circumstances the weapon should be used.
CCJ is also lacking in proper policies regarding inventory of
security equipment, including the newly introduced OC spray,
which could allow for unaccounted misuse by correctional

- 37 -

officers.  When post orders are not updated regularly and do not
address vital information, facility practices will develop in an
ad hoc nature and will not account for current needs.  Outdated
policies, procedures, and post orders are inconsistent with
generally accepted correctional standards and contribute to a
failure of the overall security system.

Although CCJ policies must adapt to some extent to account
for the different security levels and different physical layouts
in the various divisions, there is widespread policy variation
from division to division on issues ranging from the handling of
grievances to incident reporting.  This can be confusing for
correctional officers, who rotate posts every 90 days and may be
transferred from one division to another without adequate
training on division-specific SOPs.  Policy discrepancies abound
division to division, which result in widely different security
practices.  There is no standardized format in use throughout CCJ
for division Roster Staffing Reports and Post Analysis Reports.
Even CCJ's top level administration is unclear how security
procedures are implemented throughout the facility.  For example,
a high level security official told us that each and every inmate
should be patted down when he or she returns from the recreation
yard.  However, Division I supervisors reported that inmates are
only subjected to pat downs at random upon their return from the
yard.

An additional area of policy concern is with regard to
special management units, which include the Special Incarceration
Units, disciplinary segregation, and protective custody units.
Generally accepted correctional practices require that officers
who are assigned to these types of units possess a higher level
of detention experience, receive focused training in special
management operations, and are regularly assigned to these units
for stability purposes.  Correctional officers in CCJ's special
management units rotate on a regular basis and do not receive
specialized training for working with high risk inmates.  This
practice should be changed at the policy level.

   f.  Disciplinary Process

CCJ operates the inmate discipline component with a policy
and procedure that appears to be adequate and provides sufficient
due process to inmates.  However, we did note some concerns with
regard to the disciplinary process.  First, hearings are not
consistently conducted in a private, confidential manner and
secure setting in accordance with generally accepted correctional
standards.  During our observation of the disciplinary hearings
in Division II, 12 inmates were brought into a large room and

- 38 -

seated together for their individual disciplinary hearings, including inmates whose disciplinary charges involved incidents of violence against each other.  The proceedings were conducted within hearing of the other inmates.  This process certainly presents safety and security issues because there may still be animosity between inmates who were involved in an altercation. For example, on July 26, 2007, two inmates began fighting during a disciplinary hearing in the Division VI library, and required medical care.  Also, the victim may be reluctant to be truthful during the hearing for fear of retaliation by the aggressor.  In addition, we noted that the statements made by the inmates during the hearing are written down by the disciplinary board in a very abbreviated fashion that may not adequately represent the inmates' statements.

3.    **Deficient Classification Procedures**

All inmates admitted or discharged from CCJ are processed in the RCDC.  The RCDC is located in the basement of Division V, and was originally designed as a storage area.  Instead of storage, it holds several hundred inmates as they are strip searched, processed through booking, fingerprinted, photographed, screened for medical and mental health problems, and assigned to a bullpen until they can be transferred to their appropriate divisions. Almost every evening, the RCDC bullpens hold hundreds of inmates, for several hours at a time, who are crowded shoulder-to-shoulder behind chain link fences so tightly that there is insufficient space for them to sit or lie down.  There is one female bathroom and only one male bathroom, with two toilets, and no hand washing facilities, for hundreds of male inmates to share.[28]  While the RCDC overflows with hundreds of inmates, a surprisingly small number of correctional officers attempt to perform a multitude of duties, including the supervision of inmates.  In addition to the natural stress resulting from admission to jail, inmates upon booking, who may have been held for multiple days in various police departments before arriving at CCJ, can be medically and mentally unstable.  Newly admitted inmates are very unpredictable.  The overcrowded, disorganized, and understaffed RCDC is a major security and safety risk to staff and inmates.

---

[28]    On January 14, 2008, the Sheriff's Office sent us photographs of recent renovations to the RCDC bathroom, including six new sinks and five new urinals.  This is a vast improvement, but the single bathroom and limited toilets is still problematic, given the immense number of inmates in the RCDC each evening.

- 39 -

The John Howard Association found the RCDC "grossly inadequate in size, design, and virtually every other respect."[29] We concur.  The Sheriff's Office and the County concede that the RCDC physical plant is inadequate and we understand that funds have been allocated for construction of a new RCDC and RTU, but the new facility will not be completed until late 2009, at the earliest.[30]

Classification problems do not end with the physical plant of the RCDC.  The Sheriff's Office admits that the present classification system is "extremely obsolete."[31]  The system was purchased in 1991 and last updated in 1993.  It is an antiquated inmate tracking system that is incapable of tracking basic information, such as the number of empty beds in each CCJ division at any time.  The RCDC Superintendent is required to make telephone calls on a constant basis to the other divisions in order to ascertain the bed availability.  Although the RCDC Superintendent has access to e-mail, the superintendents of the other divisions do not.

The classification system contains provisions for initial custody assessment and for custody re-assessments.  However, although CCJ uses a Special Incarceration Unit "level system" to manage high risk inmates and security threat groups, that information is not contained within the classification policies and procedures manual.

Perhaps more troubling than the obsolete nature of the CCJ classification system is the fact that many supervisors do not understand how to properly utilize the system.  Midway through our second site visit to CCJ, we learned that information on each inmate's classification status and history is readily available from terminals in every division.  However, many CCJ supervisors and even division superintendents had previously reported to us that they could not access such information on the system.  The superintendent who revealed the broader tracking capabilities to us acknowledged that many CCJ supervisors are not proficient with the CCJ system.

---

[29]    2007 Court Monitoring Report at 67.

[30]    President Todd H. Stroger and the Cook County Board of Commissioners' Status Report, <u>Duran v. Dart</u>, No. 74-C-2949, at 8 (N.D. Ill. June 11, 2007).

[31]    Sheriff's 2007 Status Report and Response to John Howard Association Court Monitoring Report, <u>Duran v. Dart</u>, No. 74-C-2949, at 22 (N.D. Ill. June 11, 2007).